UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | 13 CV 06366 |
| v. | ) ) ) | Judge Norgle |
| WILLIAM A. DAVIS, III; *et al.*, | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' PETITION TO PROVE UP
DAMAGES AND FOR ENTRY OF FINAL JUDGMENT**

Plaintiffs, the CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION

FUND, *ET AL.* (collectively "Trust Funds"), by their attorney Kevin P. McJessy, hereby move

this Court pursuant to Federal Rules of Civil Procedure 54, 55 and 58 to enter a final judgment

against Defendants WILLIAM A. DAVIS, III, TINA HARBIN, JAMES HARBIN and DAWIN

FUENTES (collectively "Defendants") jointly and severally. In support of their motion, Trust

Funds state as follows:

**Complaint**

1.      The Trust Funds filed a complaint against Defendants under ERISA to collect

unpaid fringe benefit contributions. The Trust Funds allege that Defendants are personally liable

for unpaid fringe benefit contributions arising out of their operation of Imperium, LLC, which

was a company bound by a collective bargaining agreement with the Chicago Regional Council

of Carpenters ("Union"), because Defendants engaged in a scheme to defraud the Trust Funds of

contributions owed for hours worked by Imperium, LLC's employees. As a result, Defendants

lost any limited liability protections afforded by the Illinois Limited Liability Company Act and

are themselves bound by the collective bargaining agreement and ERISA for the unpaid fringe benefit contributions.

## Defendants' Personal Liability

2.      In cases involving benefits protected by ERISA, there is a federal interest supporting disregard of the corporate form to impose liability. Accordingly, limited liability protections may be pierced more easily in ERISA cases than in pure contract cases in order to promote the federal policies underlying the statute. *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 460, 461 (7th Cir. 1991); *The Trustees of the Chicago Painters and Decorators Pension, Health and Welfare, Deferred Savings, Apprenticeship, Scholarship and Joint Cooperation Trust Funds v. Destiny Decorators, Inc.,* 07 C 4236, 2009 U.S. Dist. LEXIS 91191 *29-30 (N.D. Ill. Sept. 30, 2009) (Lefkow, J.).

3.      Limited liability protections are lost (1) if there is evidence of a misrepresentation, failure to keep adequate corporate records or failure to operate business at arms's length, and (2) if adherence to the limited liability protections would promote fraud or injustice. *Chi. Dist. Council of Carpenters Pension Fund v. Sunshine Carpet Servs., Inc., 866 F. Supp. 1113, 1118 (N.D. Ill. 1994); The Trustees of the Chicago Painters and Decorators Pension, Health and Welfare, Deferred Savings, Apprenticeship, Scholarship and Joint Cooperation Trust Funds v. Destiny Decorators, Inc.,* 07 C 4236, 2009 U.S. Dist. LEXIS 91191 *30-31 (N.D. Ill. Sept. 30, 2009) (Lefkow, J.).

4.      Where owners of a company engage in conduct intended to conceal payments to workers in order to hide the hours worked by employees in a manner specifically intended to allow the company to avoid its ERISA fringe benefit contribution obligations, the owners of the business lose the limited liability protections they might otherwise enjoy under the law. *The*

*Trustees of the Chicago Painters and Decorators Pension, Health and Welfare, Deferred Savings, Apprenticeship, Scholarship and Joint Cooperation Trust Funds v. Destiny Decorators, Inc.,* 07 C 4236, 2009 U.S. Dist. LEXIS 91191 *33-34 (N.D. Ill. Sept. 30, 2009) (Lefkow, J.).

5.      In this instance, Defendants paid their workers in cash for hours worked and then failed to maintain any record of those hours with the specific intent to avoid reporting and paying fringe benefit contributions for those hours to the Trust Funds. When the Trust Funds' auditors subsequently discovered the substantial amount of cash withdrawals from the company's accounts, Defendants fabricated a promissory note from "JLL, LLC," a non-existent company, and represented that the cash withdrawals had been used to pay the promissory note. Defendants had successfully used this scheme in a prior audit by the Trust Funds to avoid paying fringe benefit contributions protected by ERISA. *See* Deposition of T. Harbin, pp. 30-31, 35, 80-84, Exh. D; Deposition of J. Harbin, pp. 35-37, Exh. E; Deposition of W. Davis, pp. 137, 150-153, Exh. F; Decl. of J. Libby ¶¶7-11, Exh. B.

6.      As a result, Defendants misrepresented the hours worked by their employees, misrepresented the purpose of the cash withdrawals from their company accounts and fabricated documents to conceal the purpose of the cash withdrawals and payments, failed to maintain corporate records of the purpose of the cash withdrawals and payments and the hours worked by their employees and failed to operate the business at arm's length. Consequently, adherence to the limited liability protections afforded by law would promote Defendants' fraudulent conduct by effectively insulating them from responsibility for their acts and promote injustice in that it would allow Defendants to avoid their obligation to make payments to secure their employees' federally protected fringe benefits.

## Default Order

7.     On February 11, 2015, after Defendants twice failed to comply with this Court's scheduling orders, this Court entered an order of default against the Defendants. That order provides in part:

> IT IS HEREBY ORDERED THAT for the reasons stated in open court and as set forth in Plaintiffs' Motion for Sanctions for Defendants' Repeated Failure to Comply with this Court's Scheduling Order and pursuant to Federal Rules of Civil Procedure 16 and 37(b)(2)(A) a judgment by default is hereby entered against William A. Davis III, Tina L. Harbin, Dwain A. Fuentes and James Harbin, jointly and severally; Plaintiffs are ordered to file a petition for the prove up of damages including attorneys' fees and costs within 21 days of this order; and, the trial date set for March 11, 2015 is stricken.

A copy of this Order is attached hereto as Exhibit A.

## Damages

8.     Based on the records produced by Defendants and the adjusted Audit Report, the Trust Funds now move this Court to enter a final judgment. The amount owed by Defendants is $130,389.09, which is comprised of the following:

A.     **The Trust Funds are owed $65,524.70 in unpaid contributions.** The Audit Report revealed unpaid contributions of $75,524.70. *See* Decl. of J. Libby, ¶5, Exh. B. The Trust Funds collected $10,000.00 from a bond posted to secure payment of Imperium, LLC's fringe benefit contributions. *See* Decl. of J. Libby, ¶13, Exh. B.

B.     **The Trust Funds are owed $1,494.00 for auditor's fees incurred by the Trust Funds to complete the audit of Defendants' books and records.** *See* Decl. of J. Libby, ¶4, Exh. B. *See also Trustees of the Chicago Plastering Institute Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 902 (7th Cir. Ill. 2009) ("ERISA itself grants the district court authority to award the plaintiffs their reasonable attorney's fees and costs . . . This court, among others, has construed the latter provision to include an award of audit costs."); *Moriarty ex rel. Local Union No. 727, I.B.T. Pension Trust v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005).

C.     **The Trust Funds are owed $9,707.49 in interest under ERISA on the amount that is due.** *See* 29 U.S.C. § 1132(g)(2)(B); 29 U.S.C. § 1132(g)(2)(C); Decl. of J. Libby, ¶6, Exh. B.

D. **The Trust Funds are owed $15,104.93 in liquidated damages.** *See* Decl. of J. Libby, ¶6, Exh. B; 29 U.S.C. § 1132(g)(2)(B).

E. **The Trust Funds are owed $38,557.97 in reasonable attorneys' fees and costs the Trust Funds incurred in this action.** *See* Decl. of J. Libby, ¶12, Exh. B; Decl. of McJessy, ¶4, Exh. C; 29 U.S.C. § 1132(g)(1) and (g)(2)(D). *See also Trustees of the Chicago Plastering Institute Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 902, 903 (7th Cir. Ill. 2009); *Chicago Regional Council of Carpenters Pension Fund v. RCI Enterprises, Inc.*, 2011 U.S. Dist LEXIS *6-7 (N.D. Ill., July 20, 2011) (Feinerman, J.); *Board of Trustees of the Rockford Pipe Trades Indus. Pension Fund v. Fiorenza Enters.*, 2011 U.S. Dist. LEXIS 28209, 21-22 (N.D. Ill. Mar. 18, 2011.

9. The Trust Funds are also entitled to recover attorneys' fees incurred to enforce or collect the amounts due. *See Free v. Briody*, 793 F.2d 807, 808-09 (7th Cir. 1986) (holding that union-affiliated fringe benefit funds are entitled to collect attorneys' fees for work incurred to collect on a judgment rendered under ERISA).

10. A proposed draft order is attached as Exhibit G.

WHEREFORE, Plaintiffs the Chicago Regional Council of Carpenters Pension Fund *et al.* hereby move this Court to enter final judgment in their favor and against Defendants jointly and severally in the amount of $130,389.09 as follows:

A. $65,524.70 in unpaid contributions pursuant to the audit;

B. $1,494.00 for auditor's fees incurred by the Trust Funds to complete the audit of Defendants' books and records;

C. $9,707.49 in interest under ERISA on the amount that is due;

D. $15,104.93 in liquidated damages;

E. $38,557.97 in reasonable attorneys' fees and costs the Trust Funds incurred in this action;

F. reasonable attorney' fees and costs incurred by the Trust Funds in enforcing this order; and

G. such other relief as this Court deems appropriate.

CHICAGO REGIONAL COUNCIL OF
CARPENTERS PENSION FUND *et al*.

By:   s/ Kevin P. McJessy
        One of their attorneys

Kevin P. McJessy
MCJESSY, CHING & THOMPSON, LLC
3759 North Ravenswood, Suite 231
Chicago, Illinois 60613
(773) 880-1260
(773) 880-1265 (facsimile)
mcjessy@MCandT.com

## CERTIFICATE OF SERVICE

I, Kevin P. McJessy, an attorney, certify that I caused the foregoing **Plaintiffs' Petition To Prove Up Damages And For Entry Of Final Judgment** to be served upon

James E. Taylor                James Harbin
8055 S. Stony Island Ave.     Tina Harbin
Chicago, Illinois 60617       6615 S. Yale Ave.
                              Chicago, IL 60621

by electronic delivery via the Court's CM/ECF system on this 4th day of March 2015.

_s/ Kevin P. McJessy_____
Kevin P. McJessy

13 CV 06366

Exhibit  A

*PM*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF | ) | |
| CARPENTERS PENSION FUND *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | 13 CV 06366 |
| | ) | |
| v. | ) | |
| | ) | Judge Charles R. Norgle |
| WILLIAM A. DAVIS, III; TINA L. HARBIN; | ) | |
| DWAIN A. FUENTES; and, JAMES HARBIN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

WHEREAS, this Court entered an order on May 7, 2014 (i) ordering the Chicago Regional Council of Carpenters Pension Fund *et al.* ("Plaintiffs") to submit their Proposed Findings of Fact and Conclusions of Law on or before November 7, 2014, (ii) ordering all defendants, William A. Davis III, Tina L. Harbin, Dwain A. Fuentes and James Harbin (collectively "Defendants"), to file their responses on or before November 21, 2014, and (iii) ordering that this matter proceed to trial on December 9, 2014;

WHEREAS, Plaintiffs filed Plaintiffs' Proposed Findings of Fact and Conclusions of Law on November 7, 2014;

WHEREAS, all Defendants failed to file a response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law;

WHEREAS, on December 8, 2014 this Court continued the December 9, 2014 trial date in this matter to March 11, 2015 and granted all Defendants 21 days to file their responses to Plaintiffs' Proposed Findings of Fact and Conclusions of Law;

WHEREAS, all Defendants failed to file responses to Plaintiffs' Proposed Findings of Fact and Conclusions of Law in accordance with this Court's December 8, 2014 order;

IT IS HEREBY ORDERED THAT for the reasons stated in open court and as set forth in Plaintiffs' Motion for Sanctions for Defendants' Repeated Failure to Comply with this Court's Scheduling Order and pursuant to Federal Rules of Civil Procedure 16 and 37(b)(2)(A), a judgment by default is hereby entered against defendants William A. Davis III, Tina L. Harbin, Dwain A. Fuentes and James Harbin; Plaintiffs are ordered to file a petition for the prove up of damages including attorneys' fees and costs within 21 days of this order; and, the trial date set for March 11, 2015 is stricken.

_2-11-15_
Date

_Charles Norgle_
Judge Charles Norgle

13 CV 06366

Exhibit  B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND *et al.*, | ) ) ) | |
| | ) | 13 CV 06366 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Norgle |
| WILLIAM A. DAVIS, III; *et al.*, | ) ) ) | |
| Defendants. | ) | |

## **DECLARATION OF JOHN LIBBY**

I, John Libby, hereby declare under penalty of perjury pursuant to the laws of the United States, that the statements set forth herein are true and correct to the best of my knowledge, information and belief.

1.     I am the Manager, Audits & Collections for the Chicago Regional Council of Carpenters Pension Fund, the Chicago Regional Council of Carpenters Welfare Fund, the Chicago and Northeast Illinois Regional Council of Carpenter Apprentice and Trainee Program, and the Labor/Management Union Carpentry Cooperation Promotion Fund (collectively "the Trust Funds").

2.     As part of my duties, I am responsible for managing the collection of contributions for medical, pension and other benefits due from numerous employers pursuant to collective bargaining agreements between the employers and the Chicago and Northeast Illinois Regional Council of Carpenters ("Union").

3.     Imperium, LLC, an Illinois limited liability company ("Imperium"), is an employer bound by the collective bargaining agreement with the Union.  Pursuant to the collective bargaining agreement, Imperium is also bound by the declarations of trust establishing

the Trust Funds (collectively "Trust Agreements"). Pursuant to the collective bargaining agreement and the Trust Agreements, Imperium is required to pay fringe benefit contributions to the Trust Funds for work performed by Imperium's employees and non-union subcontractors performing work falling within the jurisdiction of the Union.

4.       Pursuant to the collective bargaining agreement and Trust Agreements, Imperium is required to submit to a periodic review of its books and records in order to verify the accuracy of the contributions reported and paid to the Trust Funds. In October 2011, the Trust Funds directed Legacy Professionals, LLP ("Legacy") to conduct a review of Imperium's fringe benefit contributions to the Trust Funds. To date, the Trust Funds have paid Legacy $1,494.00 as auditors' fees for Legacy to conduct its review of Imperium's books and records and to prepare the audit report.

5.       Imperium produced records to Legacy. Legacy prepared a report of Imperium's fringe benefit contributions to the Trust Funds based on Legacy's review of the records produced by Imperium. Legacy delivered a copy of its report to the Trust Funds. The Trust Funds maintain a copy of Legacy's audit report in their files as part of their ordinary course of business. A copy of the audit report prepared by Legacy after its review of records produced by Imperium is attached as Exhibit B-1. According to the audit report and based on the records produced by Imperium to Legacy, Imperium owes $75,524.70 in unpaid fringe benefit contributions to the Trust Funds.

6.       Summaries of the updated calculations of accrued interest and liquidated damages as of March 4, 2015 are attached hereto as Exhibit B-2. Imperium owes $9,707.49 in unpaid interest calculated pursuant to 26 U.S.C. §6621 and $15,104.93 in unpaid liquidated damages calculated in accordance with the Trust Agreements.

7.    The Trust Funds subsequently learned that the owners of Imperium paid its workers in cash in order to avoid paying the fringe benefit contributions to the Trust Funds for the hours worked by Imperium's carpenter employees.

8.    I attended the deposition of Tina Harbin taken in the bankruptcy proceeding *In re Imperium, LLC,* 13-07952 and I attended the depositions of Tina Harbin, James Harbin, William Davis, III and Dawin Fuentes in this lawsuit.  During those depositions, the Trust Funds learned that Imperium took cash from its bank accounts and used that cash to pay its carpenter employees for hours worked.  Because the workers were paid in cash, the hours did not appear in Imperium's payroll records.  Imperium did not pay fringe benefit contributions for the hours worked by the carpenter employees for which the employees were paid by cash.  In this way, Imperium tried to conceal hours worked by its carpenters and to avoid paying the fringe benefit contributions to the Trust Funds for those hours.

9.    Imperium initially tendered to the Trust Funds a fictitious promissory note. Imperium falsely informed the Trust Funds that the cash taken from its bank account had been used to pay the promissory note.

10.    Then, during the course of the depositions, it was disclosed that the owners of Imperium agreed to fabricate the promissory note in order to explain why Imperium had taken large amounts of cash out of its bank account.  Imperium gave the promissory note to the Trust Funds to explain the purpose of the cash withdrawals from Imperium's bank accounts.  The cash was not used to pay the promissory note but instead was used to pay Imperium's workers.

11.    It was also disclosed during the depositions that the owners of Imperium had used this scheme in the past and had successfully avoided paying fringe benefit contributions

identified in a prior audit by Legacy. In that instance, the Trust Funds had accepted Imperium's representations regarding the purpose of the cash payments to pay a promissory note as true.

12.    The Trust Funds have had to employ the services of attorney McJessy Ching & Thompson, LLC to collect the amounts owned by Imperium and its owners. As a result, the Trust Funds incurred attorneys' fees and costs.

13.    The Trust Funds have collected $10,000 from a bond posted by Imperium to guaranty payment of fringe benefit contributions.

14.    I have reviewed the Trust Funds' records for the audit of Imperium's fringe benefit contributions and I attended the depositions as described herein. Therefore, I have personal knowledge of the matters stated in this affidavit and could testify competently to them.

FURTHER AFFIANT SAYETH NOT.

_____   _3/3/15_
John Libby                   Date

13 CV 06366

# Exhibit B-1

# Discrepancy Summary By Month

| | | |
|---|---|---|
| Account Number: | 24950 | Audit Period: July 1, 2010 through September 30, 2011 |
| Employer: | Imperium, LLC | Contact: Tina Harbin |
| Address: | 6615 S Yale Ave | Title: Partner |
| | Chicago, IL 60621 | |
| Phone: | (773) 874-5661 | Page: 1 of 14 |

| Reporting Period | Discrepancy Total Hours | Discrepancy Benefit Hours | Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|
| July 2010 | | 638.00 | 22.32 | $14,240.16 |
| August 2010 | | 276.25 | 22.32 | $6,165.90 |
| September 2010 | | 52.50 | 22.32 | $1,171.80 |
| October 2010 | | 24.50 | 22.32 | $546.84 |
| November 2010 | | 157.25 | 22.32 | $3,509.82 |
| January 2011 | | 164.25 | 22.32 | $3,666.06 |
| March 2011 | | 110.50 | 22.32 | $2,466.36 |
| June 2011 | 936.00 | 936.00 | 24.32 | $22,763.52 |
| July 2011 | 837.00 | 837.00 | 24.32 | $20,355.84 |
| August 2011 | (8.00) | (8.00) | 24.32 | ($194.56) |
| September 2011 | | 34.25 | 24.32 | $832.96 |

| Total Hours | 1,765.00 | Benefit Hours | 3,222.50 | Discrepancy Amount | $75,524.70 |
|---|---|---|---|---|---|
| | | | | Liquidated Damages | $11,477.93 |
| | | | | Total Amount Due | $87,002.63 |

# Discrepancy Summary By Error Type

| | | | |
|---|---|---|---|
| Account Number: | 24950 | Audit Period: | July 1, 2010 through September 30, 2011 |
| Employer: | Imperium, LLC | Contact: | Tina Harbin |
| Address: | 6615 S Yale Ave | Title: | Partner |
| | Chicago, IL 60621 | | |
| Phone: | (773) 874-5661 | Page: | 2 of 14 |

| Code | Description | Dollar Amount |
|---|---|---|
| | **SIGNATORY EMPLOYER: PAYROLL** | |
| P1 | Clerical Error | ($194.56) |
| P1T | Clerical Error | $2,140.16 |
| P3T | Omission | $7,198.72 |
| P11T | No Record Identified as Carpenter Not Reported | $33,780.48 |
| | **SIGNATORY EMPLOYER: CASH DISBURSEMENTS** | |
| CD41A | Non-signatory Subcontractor 100% Labor Factor | $13,979.44 |
| CD41B | Non-signatory Subcontractor 100% Labor Factor | $18,620.46 |

| | |
|---|---|
| Sub-Total Discrepancies From All Listed Codes | $75,524.70 |
| Liquidated Damages | $11,477.93 |
| Total Amount Due | $87,002.63 |

# Liquidated Damages Schedule

| Reporting Period | Contributions Due | Compounding Periods | Calculating Percentage | Total Liquidated Damages Owed |
|---|---|---|---|---|
| July 2010 | $14,240.16 | 19.00 | 20.00% | $2,848.03 |
| August 2010 | $6,165.90 | 18.00 | 20.00% | $1,233.18 |
| September 2010 | $1,171.80 | 17.00 | 20.00% | $234.36 |
| October 2010 | $546.84 | 16.00 | 20.00% | $109.37 |
| November 2010 | $3,509.82 | 15.00 | 20.00% | $701.96 |
| January 2011 | $3,666.06 | 13.00 | 20.00% | $733.21 |
| March 2011 | $2,466.36 | 11.00 | 17.79% | $438.77 |
| June 2011 | $22,763.52 | 8.00 | 12.65% | $2,879.59 |
| July 2011 | $20,355.84 | 7.00 | 10.98% | $2,235.07 |
| August 2011 | ($194.56) | | | |
| September 2011 | $832.96 | 5.00 | 7.73% | $64.39 |

| | | | |
|---|---|---|---|
| | | Total Damages this Schedule | $11,477.93 |
| Total Discrepancies | $75,524.70 | 20% of Discrepancies | $15,104.94 |
| | | Assessed Damages | $11,477.93 |

# Monthly Detail Report

| | | | | |
|---|---|---|---|---|
| Account Number: | 24950 | Audit Period: | July 1, 2010 through September 30, 2011 | |
| Employer: | Imperium, LLC | Month: | **July 2010** | |
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | Page # : | 4 of 14 | |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee . Name | Error Code | Total Hours Reported | Benefit Hours Reported | * * * * * Actual Hours Per Week * * * * * | | | | | | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 02-Jul | W/E 09-Jul | W/E 16-Jul | W/E 23-Jul | W/E 30-Jul | Total Hours | | | |
| 1 | Unidentified Subcontractor | CD41B | 0.00 | 0.00 | 0.00 | 117.75 | 162.00 | 171.75 | 186.50 | 638.00 | | 0.00 | 638.00 |
| | | | | Total | 0.00 | 117.75 | 162.00 | 171.75 | 186.50 | 638.00 | | 0.00 | 638.00 |

Total Items Listed in this Period:      1.00

# Monthly Detail Report

| Account Number: | 24950 | | | | | | | | Audit Period: | | July 1, 2010 through September 30, 2011 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employer: | Imperium, LLC | | | | | | | | Month: | | **August 2010** | | | |
| Address: | 6615 S Yale Ave | | | | | | | | | | | | | |
| | Chicago, IL 60621 | | | | | | | | Page # : | | 5 of 14 | | | |
| Phone: | (773) 874-5661 | | | | | | | | | | | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | * * * * * Actual Hours Per Week * * * * * | | | | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 06-Aug | W/E 13-Aug | W/E 20-Aug | W/E 27-Aug | | | | | |
| 1 | Unidentified Subcontractor | CD41B | 0.00 | 0.00 | 196.25 | 0.00 | 0.00 | 0.00 | | 196.25 | | 0.00 | 196.25 |
| 1 | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 0.00 | 80.00 | 0.00 | 0.00 | | 80.00 | | 0.00 | 80.00 |
| | | | | Total | 196.25 | 80.00 | 0.00 | 0.00 | 0.00 | 276.25 | | 0.00 | 276.25 |

Total Items Listed in this Period:     2.00

# Monthly Detail Report

| Account Number: | 24950 | | Audit Period: | July 1, 2010 through September 30, 2011 |
|---|---|---|---|---|

| Employer: | Imperium, LLC | | Month: | September 2010 |
|---|---|---|---|---|
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | | Page # : | 6 of 14 |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | W/E 03-Sep | W/E 10-Sep | W/E 17-Sep | W/E 24-Sep | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | \* \* \* \* \* Actual Hours Per Week \* \* \* \* \* \* | | | | | | | | |
| 1. | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52.50 | | 52.50 | | 0.00 | 52.50 |
| | | | | Total | 0.00 | 0.00 | 0.00 | 52.50 | 0.00 | 52.50 | | 0.00 | 52.50 |

Total Items Listed in this Period: 1.00

# Monthly Detail Report

| Account Number: | 24950 | | Audit Period: | July 1, 2010 through September 30, 2011 |
|---|---|---|---|---|
| Employer: | Imperium, LLC | | Month: | **October 2010** |
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | | Page # : | 7 of 14 |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | Actual Hours Per Week | | | | | | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 01-Oct | W/E 08-Oct | W/E 15-Oct | W/E 22-Oct | W/E 29-Oct | Total Hours | | | |
| 1 | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 0.00 | 24.50 | 0.00 | 0.00 | 0.00 | 24.50 | | 0.00 | 24.50 |
| | | | | Total | 0.00 | 24.50 | 0.00 | 0.00 | 0.00 | 24.50 | | 0.00 | 24.50 |

Total Items Listed in this Period:      1.00

# Monthly Detail Report

| | | | | |
|---|---|---|---|---|
| Account Number: | 24950 | | Audit Period: | July 1, 2010 through September 30, 2011 |
| | | | | |
| Employer: | Imperium, LLC | | Month: | **November 2010** |
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | | Page # : | 8 of 14 |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | * * * * * Actual Hours Per Week * * * * * | | | | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 05-Nov | W/E 12-Nov | W/E 19-Nov | W/E 26-Nov | | | | | |
| 1 | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 122.75 | 8.50 | 26.00 | 0.00 | | 157.25 | | 0.00 | 157.25 |
| | | | | Total | 122.75 | 8.50 | 26.00 | 0.00 | 0.00 | 157.25 | | 0.00 | 157.25 |

Total Items Listed in this Period: 1.00

# Monthly Detail Report

| | |
|---|---|
| Account Number: 24950 | Audit Period: July 1, 2010 through September 30, 2011 |
| Employer: Imperium, LLC | Month: **January 2011** |
| Address: 6615 S Yale Ave | |
| Chicago, IL 60621 | Page # : 9 of 14 |
| Phone: (773) 874-5661 | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | W/E 07-Jan | W/E 14-Jan | W/E 21-Jan | W/E 28-Jan | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | \* \* \* \* \* Actual Hours Per Week \* \* \* \* \* | | | | | | | | |
| 1 | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 0.00 | 164.25 | 0.00 | 0.00 | | 164.25 | | 0.00 | 164.25 |
| | | | | | | | | | | | | | |
| | | | | Total | 0.00 | 164.25 | 0.00 | 0.00 | 0.00 | 164.25 | | 0.00 | 164.25 |

Total Items Listed in this Period: 1.00

# Monthly Detail Report

| Account Number: | 24950 | | Audit Period: | July 1, 2010 through September 30, 2011 |
|---|---|---|---|---|
| Employer: | Imperium, LLC | | Month: | **March 2011** |
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | | Page # : | 10 of 14 |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | Actual Hours Per Week | | | | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 04-Mar | W/E 11-Mar | W/E 18-Mar | W/E 25-Mar | | | | | |
| 1 | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 0.00 | 110.50 | 0.00 | 0.00 | | 110.50 | | 0.00 | 110.50 |
| | | | | Total | 0.00 | 110.50 | 0.00 | 0.00 | 0.00 | 110.50 | | 0.00 | 110.50 |

Total Items Listed in this Period:     1.00

# Monthly Detail Report

| | | | |
|---|---|---|---|
| Account Number: | 24950 | Audit Period: | July 1, 2010 through September 30, 2011 |
| Employer: | Imperium, LLC | Month: | **June 2011** |
| Address: | 6615 S Yale Ave | | |
| | Chicago, IL 60621 | Page # : | 11 of 14 |
| Phone: | (773) 874-5661 | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | * * * * * Actual Hours Per Week * * * * * | | | | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 03-Jun | W/E 10-Jun | W/E 17-Jun | W/E 24-Jun | | | | | |
| 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. | Aguilar, Ramon | P11T | 0.00 | 0.00 | 0.00 | 24.00 | 40.00 | 48.00 | | 112.00 | | 112.00 | 112.00 |
| ▬▬▬▬▬ | CONTRERAS JUAN C | P1T | 80.00 | 80.00 | 40.00 | 32.00 | 24.00 | 48.00 | | 144.00 | | 64.00 | 64.00 |
| 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 | Contreras, Jaime | P11T | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 | 40.00 | | 72.00 | | 72.00 | 72.00 |
| ▬▬▬▬▬ | HARBIN CAMERON C | P3T | 0.00 | 0.00 | 8.00 | 32.00 | 0.00 | 32.00 | | 72.00 | | 72.00 | 72.00 |
| 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 | Hernandez, Genaro | P11T | 0.00 | 0.00 | 16.00 | 32.00 | 40.00 | 48.00 | | 136.00 | | 136.00 | 136.00 |
| 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 | Lopez, Juan | P11T | 0.00 | 0.00 | 0.00 | 24.00 | 40.00 | 48.00 | | 112.00 | | 112.00 | 112.00 |
| 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 | Mata, Hector | P11T | 0.00 | 0.00 | 0.00 | 24.00 | 40.00 | 48.00 | | 112.00 | | 112.00 | 112.00 |
| 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 | Mata, Martin | P11T | 0.00 | 0.00 | 40.00 | 24.00 | 40.00 | 48.00 | | 152.00 | | 152.00 | 152.00 |
| 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 | Pinto, Jenaro | P11T | 0.00 | 0.00 | 16.00 | 32.00 | 0.00 | 32.00 | | 80.00 | | 80.00 | 80.00 |
| ▬▬▬▬▬ | SANCHEZ MIGUEL | P1T | 120.00 | 120.00 | 40.00 | 32.00 | 24.00 | 48.00 | | 144.00 | | 24.00 | 24.00 |
| | | | | | | | | | | | | | |
| | | Total | 160.00 | 256.00 | 280.00 | 440.00 | 0.00 | 1,136.00 | | 936.00 | 936.00 | | |

Total Items Listed in this Period:     10.00

# Monthly Detail Report

| Account Number: | 24950 | | Audit Period: | July 1, 2010 through September 30, 2011 |
|---|---|---|---|---|

| Employer: | Imperium, LLC | | Month: | July 2011 |
|---|---|---|---|---|
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | | Page # : | 12 of 14 |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | * * * * * Actual Hours Per Week * * * * * | | | | | | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | W/E 01-Jul | W/E 08-Jul | W/E 15-Jul | W/E 22-Jul | W/E 29-Jul | Total Hours | | | |
| 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 | Aguilar, Ramon | P11T | 0.00 | 0.00 | 40.00 | 40.00 | 24.00 | 0.00 | 0.00 | 104.00 | | 104.00 | 104.00 |
| | CONTRERAS JUAN C | P3T | 0.00 | 0.00 | 40.00 | 40.00 | 32.00 | 0.00 | 0.00 | 112.00 | | 112.00 | 112.00 |
| 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 | Contreras, Jaime | P11T | 0.00 | 0.00 | 40.00 | 21.00 | 0.00 | 0.00 | 0.00 | 61.00 | | 61.00 | 61.00 |
| 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 | Hernandez, Genaro | P11T | 0.00 | 0.00 | 40.00 | 40.00 | 32.00 | 0.00 | 0.00 | 112.00 | | 112.00 | 112.00 |
| 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 | Lopez, Juan | P11T | 0.00 | 0.00 | 40.00 | 40.00 | 32.00 | 0.00 | 0.00 | 112.00 | | 112.00 | 112.00 |
| 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 | Mata, Hector | P11T | 0.00 | 0.00 | 40.00 | 40.00 | 32.00 | 0.00 | 0.00 | 112.00 | | 112.00 | 112.00 |
| 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 | Mata, Martin | P11T | 0.00 | 0.00 | 40.00 | 40.00 | 32.00 | 0.00 | 0.00 | 112.00 | | 112.00 | 112.00 |
| | SANCHEZ MIGUEL | P3T | 0.00 | 0.00 | 40.00 | 40.00 | 32.00 | 0.00 | 0.00 | 112.00 | | 112.00 | 112.00 |
| | | | | Total | 320.00 | 301.00 | 216.00 | 0.00 | 0.00 | 837.00 | | 837.00 | 837.00 |

Total Items Listed in this Period:     8.00

# Monthly Detail Report

| Account Number: | 24950 | Audit Period: | July 1, 2010 through September 30, 2011 |
|---|---|---|---|
| Employer:<br>Address: | Imperium, LLC<br>6615 S Yale Ave<br>Chicago, IL 60621 | Month: | August 2011 |
| | | Page # : | 13 of 14 |
| Phone: | (773) 874-5661 | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | Actual Hours Per Week | | | | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Month | | | | | | | | |
| ▓▓▓▓▓▓ | AGUILAR JR CARLO | P1 | 160.00 | 160.00 | 152.00 | | | | | 152.00 | | (8.00) | (8.00) |
| | | | Total | 152.00 | 152.00 | 0.00 | 0.00 | 0.00 | 0.00 | 152.00 | | (8.00) | (8.00) |

Total Items Listed in this Period: 1.00

# Monthly Detail Report

| Account Number: | 24950 | | Audit Period: | July 1, 2010 through September 30, 2011 |
|---|---|---|---|---|
| Employer: | Imperium, LLC | | Month: | **September 2011** |
| Address: | 6615 S Yale Ave | | | |
| | Chicago, IL 60621 | | Page # : | 14 of 14 |
| Phone: | (773) 874-5661 | | | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | * * * * * Actual Hours Per Week * * * * * | | | | | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Month | | | | | | | | |
| 1 | Unidentified Subcontractor | CD41A | 0.00 | 0.00 | 34.25 | | | | | 34.25 | | 0.00 | 34.25 |
| | | | | Total | 34.25 | 0.00 | 0.00 | 0.00 | 0.00 | 34.25 | | 0.00 | 34.25 |

Total Items Listed in this Period: 1.00

13 CV 06366

Exhibit  B-2

# Interest & Damages Summary

Account Number:     24950                          Calculation Date: March 4, 2015

Employer:          Imperium LLC
Address:           6615 South Yale Avenue
                   Chicago, Illinois 60621

| Reporting Period | Delinquency Amount | Interest | Liquidated Damages | Total Due |
|---|---|---|---|---|
| July 2010 | $14,240.16 | $2,210.84 | $2,848.03 | $19,299.03 |
| August 2010 | $6,165.90 | $933.13 | $1,233.18 | $8,332.21 |
| September 2010 | $1,171.80 | $172.95 | $234.36 | $1,579.11 |
| October 2010 | $546.84 | $78.57 | $109.37 | $734.78 |
| November 2010 | $3,509.82 | $491.29 | $701.96 | $4,703.07 |
| January 2011 | $3,666.06 | $490.41 | $733.21 | $4,889.68 |
| March 2011 | $2,466.36 | $314.80 | $493.27 | $3,274.43 |
| June 2011 | $22,763.52 | $2,652.21 | $4,552.70 | $29,968.43 |
| July 2011 | $20,355.84 | $2,296.20 | $4,071.17 | $26,723.21 |
| August 2011 | ($194.56) | ($21.22) | ($38.91) | ($254.69) |
| September 2011 | $832.96 | $88.31 | $166.59 | $1,087.86 |
| Totals | $75,524.70 | $9,707.49 | $15,104.93 | $100,337.12 |

# 13 CV 06366

# Exhibit  C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND *et al.*, | ) ) ) | |
| | ) | 13 CV 06366 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Norgle |
| WILLIAM A. DAVIS, III; *et al.*, | ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF KEVIN P. MCJESSY

I, Kevin P. McJessy, hereby declare, under penalty of perjury pursuant to the laws of the United States, that the following statements are true:

1.      I am one of the attorneys representing the Chicago Regional Council of Carpenters Pension Fund, the Chicago Regional Council of Carpenters Welfare Fund, the Chicago and Northeast Illinois Regional Council of Carpenter Apprentice and Trainee Program, and the Labor/Management Union Carpentry Cooperation Promotion Fund (collectively "the Trust Funds") in the above-captioned lawsuit ("Lawsuit") against William A. Davis, III, Tina Harbin, James Harbin and Dawin Fuentes (collectively "Defendants").

2.      I am also one of the attorneys who represented the Trust Funds in the lawsuit *Chicago Regional Council of Carpenters Pension Fund et al. v. Imperium, LLC*, 12 CV 03694.

3.      I have been licensed to practice law in the State of Illinois and the United States District Court for the Northern District of Illinois since 1995.  I am an attorney with McJessy, Ching & Thompson, LLC ("MC&T").

4.     As part of my practice, I handle claims under ERISA.  I personally represented the Trust Funds throughout the lawsuit against Imperium and throughout this veil-piercing Lawsuit against Defendants to collect unpaid fringe benefit contributions.

5.     The Trust Funds have incurred $38,557.97 in fees and expenses to compel Imperium LLC and then, through this veil piercing claim, Defendants to comply with their obligations under the terms of the Collective Bargaining Agreement and applicable trust agreements.  A redacted copy of the billing statement from MC&T from the inception of this lawsuit to the present, redacted to protect privileged communications, is attached as Exhibit C-1.  The detailed billing statement describes in detail all work performed by MC&T in this matter.

   a)     The Trust Funds have collectively incurred fees totaling $32,380.00 for 202.50 hours of attorney services.  The substantially reduced hourly rate for attorneys at MC&T for Trust Funds matters is $160.00 per hour.

   b)     The Trust Funds have collectively incurred fees totaling $1,038.00 for 17.30 hours of paralegal time.  The substantially reduced hourly rate for paralegals at MC&T for Trust Fund matters is $60.00 per hour.

   c)     The Trust Funds incurred $5,139.97 in expenses for the filing fee; process server charges; legal research charges; courier charges; photocopy charges; postage charges; court reporter charges and witness fees.

6.     The attorneys' fees, paralegal fees and costs charged to the Trust Funds in this matter are consistent with MC&T's regular charges for services to the Trust Funds on similar matters and are substantially reduced from MC&T for other clients.

7.     I have personal knowledge of the matters stated in this affidavit and could testify competently to them.

FURTHER AFFIANT SAYETH NOT.

_____

Kevin P. McJessy                          Date

13 CV 06366

Exhibit  C-1

Client Ledger
ALL DATES

| Date / Entry # | Received From/Paid To / Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **1000   Chicago Regional Council of Carpenters - )180-IMPE   Imperium, LLC** | | | | | | | | | | Resp Lawyer: KM |
| May 10/2012 66580 | Lawyer: KM 1.40 Hrs X 160.00 Reviewed audit referral file to assess merits of referral. (.9) Prepared complaint. (.5) | | | | 224.00 | 6780 | | | | |
| May 14/2012 66624 | Lawyer: SK 0.70 Hrs X 60.00 Prepared civil cover sheet, appearance and summons (.2). Filed complaint, civil cover sheet and appearance with court (.3). Reviewed court notice re: judge and magistrate assignments, completed summons as appropriate, and prepared correspondence to court clerk forwarding summons for issuance (.2) | | | | 42.00 | 6780 | | | | |
| May 15/2012 66627 | Lawyer: SK 0.20 Hrs X 60.00 Prepared email correspondence to process server forwarding summons, complaint and 5/15/12 order for service. Prepared email ▬▬▬▬▬ to J. Libby and N. Lagalo. Updated open file report to add court filing information. | | | | 12.00 | 6780 | | | | |
| May 15/2012 67391 | Lawyer: KM 0.10 Hrs X 0.00 Reviewed correspondence from S. Keating to J. Libby and N. Lagalo ▬▬▬▬. [NO CHARGE] | | | | 0.00 | 6780 | | | | |
| May 15/2012 67395 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Castillo entering judgment on audit and ordering parties to cooperate on amount due. | | | | 16.00 | 6780 | | | | |
| May 22/2012 66693 | Lawyer: SK 0.20 Hrs X 60.00 Reviewed email from process server re Imperium's registered agent refusing to open door for service of summons and complaint and confer with K. McJessy re: same. Prepared alias summons for Imperium LLC, prepared email correspondence to court clerk for issuance of summons, and prepared email correspondence to process server forwarding alias summons for service with complaint upon an LLC member. | | | | 12.00 | 6780 | | | | |
| May 22/2012 67398 | Lawyer: KM 0.10 Hrs X 0.00 Reviewed correspondence from S. Keating to N. Lagalo ▬▬▬▬ ▬▬▬▬. [NO CHARGE] | | | | 0.00 | 6780 | | | | |
| May 31/2012 66838 | Expense Recovery Photocopy Recovery | 00240 | | 5.04 | | 6780 | | | | |
| Jun 4/2012 66849 | Lawyer: KM 0.20 Hrs X 60.00 Reviewed process server's affidavit of service and filed same along with summons with court. | | | | 12.00 | 6823 | | | | |
| Jun 4/2012 67925 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF notice for return of service of summons. | | | | 16.00 | 6823 | | | | |
| Jun 5/2012 67135 | Billing on Invoice 6744 | | | 0.00 | | 6744 | | | | |
| Jun 13/2012 67164 | Midwest Investigations Process Server recovery - Service of Summons, Complaint and 5/15/12 Court Order | 3813 | | 85.00 | | 6823 | | | | |
| Jun 21/2012 67214 | Capital One Services Filing Fee | 3817 | | 350.00 | | 6823 | | | | |
| Jun 21/2012 68030 | Lawyer: KM 0.40 Hrs X 160.00 Telephone call from P. Jaquez asking for adjusted audit report and intent to seek extension of time to answer complaint. Prepared correspondence to P. Jaquez forwarding same. Reviewed correspondence from P. Jaquez acknowledging receipt and advising no response yet on request for extension of time from court's clerk. (.1) | | | | 64.00 | 6823 | | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Trust Activity Acc | Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | Reviewed ECF court order of Judge Castillo granting defendant until 7/23/12 to answer complaint. (.1) Prepared correspondence to P. Jaquez forwarding order and following up on how quickly his client can respond to the audit. (.1) Reviewed correspondence from P. Jaquez requesting additional documents and forwarding document related to promissory note which Imperium claims is the basis for the cash payments; reviewed promissory note. (.1) | | | | | | | | | |
| Jun 26/2012 68040 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed correspondence from H. Bailey following up on request for information about basis for the audit. | | | | 16.00 | 6823 | | | | |
| Jul  6/2012 67636 | Billing on Invoice 6780 FEES      306.00 DISBS       5.04 | | | 0.00 | | 6780 | | | | |
| Jul  9/2012 67759 | Lawyer: KM  0.20 Hrs X 160.00 Telephone call with P. Jaquez regarding whether promissory note was sufficient to address audit findings. (.1) Prepared correspondence to N. Lagalo ███████████████ . (.1) | | | | 32.00 | 6854 | | | | |
| Jul 10/2012 67755 | Lawyer: KM  0.30 Hrs X 160.00 Telephone call with N. Lagalo regarding ███████████████████████████████████████████████████████████████ (.2) Telephone call with P. Jaquez responding that the Trust Funds will not adjust the audit based on information provided to date. (.1) | | | | 48.00 | 6854 | | | | |
| Jul 10/2012 67765 | Lawyer: KM  0.40 Hrs X 160.00 Prepared correspondence to N. Lagalo ████████████ . (.1) Prepared draft demand letter to P. Jaquez; reviewed correspondence from N. Lagalo, audit report and LDs and interest summary as necessary to prepare demand letter. (.3) | | | | 64.00 | 6854 | | | | |
| Jul 11/2012 68217 | Lawyer: SK  0.10 Hrs X 60.00 Prepared correspondence to N. Lagalo and J. Libby ████████ | | | | 6.00 | 6854 | | | | |
| Jul 11/2012 68378 | Lawyer: KM  1.70 Hrs X 160.00 Prepared draft demand letter to Imperium's counsel; reviewed audit documents as necessary to prepare demand letter. (.4) Telephone call with N. Lagalo regarding the ████████████████████████████████████ . (.2) Reviewed correspondence from N. Lagalo ████████ . (.1) Reviewed LEXIS research materials on Jerry L. Lewis and JLL, LLC names on promissory note provided by Imperium as explanation for | | | | 272.00 | 6854 | | | | |

| Date<br>Entry # | Received From/Paid To<br>Explanation | Chq#<br>Rec# | \|----- General -----\|<br>Rcpts      Disbs | Fees | Bld \|----------- Trust Activity -----------\|<br>Inv# Acc   Rcpts     Disbs     Balance |
|---|---|---|---|---|---|

cash payments and conducted
online research of Jerry L.
Lewis and his companies. (.9)
Prepared correspondence to N.
Lagalo ▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉ (.1)

**Jul 11/2012**
**68674** Lawyer: KM  0.50 Hrs X 160.00 ... 80.00  6854
Prepared correspondence to P.
Jaquez forwarding documents
substantiating the Trust
Funds' claim that Imperium was
paying workers cash and
concealing the payments and
summarizing the facts
supporting the Trust Funds'
claim, including the three
different inconsistent
explanations that Imperium has
given for the cash payments,
with copy to client. (.4)
Reviewed correspondence from
N. Lagalo regarding ▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉. (.1)

**Jul 12/2012**
**68383** Lawyer: KM  0.10 Hrs X 160.00 ... 16.00  6854
Reviewed correspondence from J.
Libby ▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉

**Jul 19/2012**
**67820** Lawyer: KM  0.50 Hrs X 160.00 ... 80.00  6854
Reviewed and responded to
correspondence from P. Jaquez
regarding settlement proposal.
(.1) Prepared correspondence
to J. Libby and N. Lagalo
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
reviewed prior correspondence
and file materials to prepare
correspondence to J. Libby and
N. Lagalo. (.4)

**Jul 20/2012**
**67876** Chicago Regional Council of Carp   01206   311.04
PMT -

**Jul 23/2012**
**68459** Lawyer: KM  0.20 Hrs X 160.00 ... 32.00  6854
Reviewed answer to complaint
filed by Imperium, LLC.

**Jul 24/2012**
**68463** Lawyer: KM  0.20 Hrs X 160.00 ... 32.00  6854
Reviewed answer filed by
Defendant.  Reviewed
correspondence from J. Libby ▉▉▉▉

**Jul 27/2012**
**68127** Billing on Invoice 6823
FEES     108.00
DISBS    435.00                              0.00       6823

**Jul 30/2012**
**68183** Lawyer: KM  0.20 Hrs X 160.00 ... 32.00  6854
Telephone call with P. Jaquez
regarding settlement offer and
Trust Funds' rejection of same.
Prepared correspondence to P.
Jaquez confirming settlement
offer rejected and need to set
schedule for Rule 26(f)
conference.

**Jul 31/2012**
**68236** Expense Recovery
Photocopy Recovery            00243          2.76       6854

**Aug 13/2012**
**68330** Chicago Regional Council of Carpe  01211   543.00
PMT -

**Aug 24/2012**
**68721** Billing on Invoice 6854
FEES     694.00
DISBS      2.76                              0.00       6854

**Sep 4/2012**
**68858** Lawyer: KM  0.20 Hrs X 160.00 ... 32.00  6980
Confer with J. Sopata regarding
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉

**Client Ledger**
**ALL DATES**

| Date Entry # | Received From/Paid To Explanation | Chg# Rec# | General Rcpts | General Disbs | Fees | Bld Inv# | Trust Activity Acc Rcpts | Trust Activity Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Sep 4/2012 69785 | Lawyer: ATT 1.70 Hrs X 160.00 Drafted Rule 26(a) disclosures. | | | | 272.00 | 6980 | | | |
| Sep 6/2012 69787 | Lawyer: ATT 0.30 Hrs X 160.00 Continued drafting Rule 26(a) disclosures. | | | | 48.00 | 6980 | | | |
| Sep 12/2012 69791 | Lawyer: ATT 1.70 Hrs X 160.00 Drafted Rule 30(b)(6) deposition notice (.9) and drafted written discovery (.8). | | | | 272.00 | 6980 | | | |
| Sep 14/2012 68932 | Chicago Regional Council of Carpe PMT - | 01217 | 696.76 | | | | | | |
| Sep 18/2012 69202 | Expense Recovery Postage Recovery | 00249 | | 1.05 | | 6980 | | | |
| Sep 18/2012 69829 | Lawyer: KM 0.30 Hrs X 160.00 Telephone call from P. Jacquez advising of intent to withdraw, whether we have any objection. Reviewed motion by counsel for Imperium to withdraw as counsel. Reviewed correspondence from P. Jacquez to Judge Castillo's proposed order email forwarding proposed order; and, reviewed proposed order. | | | | 48.00 | 6980 | | | |
| Sep 19/2012 69838 | Lawyer: KM 1.40 Hrs X 160.00 Reviewed and revised interrogatories and document requests to Imperium, made final revisions and issued same. | | | | 224.00 | 6980 | | | |
| Sep 30/2012 69178 | Expense Recovery Photocopy Recovery | 00248 | | 6.84 | | 6980 | | | |
| Oct 8/2012 69598 | Billing on Invoice 6948 | | | | 0.00 | 6948 | | | |
| Oct 8/2012 70565 | Lawyer: ATT 2.10 Hrs X 160.00 Drafted motion for default after attorneys withdrew including declarations of K. McJessy and J. Libby. | | | | 336.00 | 7088 | | | |
| Oct 17/2012 70744 | Lawyer: KM 0.30 Hrs X 160.00 Telephone call with Jim Taylor (773) 731-1970 regarding outstanding discovery, his appearance on behalf of Imperium and settlement offer. (.2) Reviewed correspondence from J. Taylor confirming no dispute over amounts due for purposes of reaching settlement. (.1) | | | | 48.00 | 7088 | | | |
| Oct 19/2012 70747 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed motion by K. Saulter to appear as counsel for Imperium. (.2) | | | | 32.00 | 7088 | | | |
| Oct 23/2012 70783 | Lawyer: KM 0.20 Hrs X 160.00 Telephone call with N. Lagalo ███ Reviewed correspondence from N. Lagalo ████████ | | | | 32.00 | 7088 | | | |
| Oct 24/2012 69745 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed correspondence from N. Lagalo █ ████ Revised declaration of J. Libby. Prepared correspondence to J. Libby and N. Lagalo ████████ (.2) Reviewed motion by Imperium for leave to have an attorney appear in its behalf. (.1) | | | | 32.00 | 7088 | | | |
| Oct 24/2012 70765 | Lawyer: KM 0.20 Hrs X 0.00 Reviewed correspondence from N. Lagalo regarding ████ . Revised declaration. Prepared correspondence to N. Lagalo ████ ████ [NO CHARGE] ███ | | | | 0.00 | 7088 | | | |
| Oct 24/2012 70769 | Lawyer: KM 0.60 Hrs X 160.00 Prepared correspondence to K. Saulter forwarding prior correspondence from James Taylor, seeking direction on his clients' intentions in defending the lawsuit, and | | | | 96.00 | 7088 | | | |

| Date<br>Entry # | Received From/Paid To<br>Explanation | Chq#<br>Rec# | \|----- General -----\|<br>Rcpts      Disbs | Fees | Bld<br>Inv# Acc | \|------------ Trust Activity ------------\|<br>Rcpts      Disbs      Balance |
|---|---|---|---|---|---|---|
| | summarizing total damages; reviewed file documents as necessary to prepare correspondence to K. Saulter. (.5)  Reviewed and responded to correspondence from K. Saulter regarding discovery matters and rejection of request for further extension of time. (.1) | | | | | |
| Oct 25/2012<br>69754 | Lawyer: KM  0.10 Hrs X 160.00<br>Telephone call with J. Libby regarding ▓▓▓▓▓▓▓▓▓ | | | 16.00 | 7088 | |
| Oct 26/2012<br>69980 | Expense Recovery<br>Postage Recovery | 00250 | 0.65 | | 7088 | |
| Oct 26/2012<br>70773 | Lawyer: KM  1.00 Hrs X 160.00<br>Prepared Rule 26(a) disclosures; reviewed file materials as necessary to prepare disclosures. | | | 160.00 | 7088 | |
| Oct 29/2012<br>69915 | Billing on Invoice 6980<br>FEES          896.00<br>DISBS          7.89 | | 0.00 | | 6980 | |
| Oct 31/2012<br>70005 | Expense Recovery<br>Photocopy Recovery | 00251 | 1.92 | | 7088 | |
| Nov  7/2012<br>70356 | Lawyer: KM  1.30 Hrs X 160.00<br>Appeared in court for status hearing and hearing on defendant's motion for leave for counsel to appear. | | | 208.00 | 7179 | |
| Nov  7/2012<br>71378 | Lawyer: KM  1.30 Hrs X 160.00<br>Appeared in court before Judge Castillo regarding counsel's motion for leave to appear. (1.2)  Post-hearing conference with counsel for defendant as to whether defendant intends to comply with discovery requests and no assurance of same. (.1) | | | 208.00 | 7179 | |
| Nov  9/2012<br>71537 | Lawyer: KM  0.10 Hrs X 160.00<br>Reviewed ECF court order of Judge Castillo granting leave to appear and setting status hearing for 12/18/12. | | | 16.00 | 7179 | |
| Nov 20/2012<br>70441 | Chicago Regional Council of Carpe<br>PMT - | 01240 | 903.89 | | 7179 | |
| Nov 28/2012<br>70649 | Lawyer: ATT  0.90 Hrs X 160.00<br>Review of record and drafted motion to compel discovery responses. | | | 144.00 | 7179 | |
| Dec  4/2012<br>71883 | Lawyer: KM  0.10 Hrs X 160.00<br>Prepared correspondence to K. Saulter responding to his request for Plaintiff's Rule 30(b)(6) documents. | | | 16.00 | 7276 | |
| Dec  5/2012<br>70790 | Lawyer: SK  0.50 Hrs X 60.00<br>Reviewed Judge Castillo's website for motion practice and scheduling and prepared notice of motion to compel. (.1)  Filed motion to compel and notice of motion with court (.3).  Prepared correspondence to Judge Castillo forwarding courtesy copies of same (.1). | | | 30.00 | 7276 | |
| Dec  5/2012<br>70792 | Lawyer: KM  0.20 Hrs X 160.00<br>Final review and edits to motion to compel. | | | 32.00 | 7276 | |
| Dec  6/2012<br>70907 | Billing on Invoice 7088<br>FEES          752.00<br>DISBS          2.57 | | 0.00 | | 7088 | |
| Dec  7/2012<br>71838 | Lawyer: ATT  1.00 Hrs X 160.00<br>Discussion with K. McJessy ▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | 160.00 | 7276 | |
| Dec 11/2012<br>71841 | Lawyer: ATT  4.50 Hrs X 160.00<br>Compiled Rule 26(a) documents including checking for privileged documents and putting on disk (1.0); continued drafting first set of requests to admit based on certified payroll (3.5). | | | 720.00 | 7276 | |
| Dec 12/2012<br>70976 | Lawyer: KM  1.30 Hrs X 160.00<br>Appeared in court before Judge Castillo for hearing on motion to compel. (1.2)  Prepared | | | 208.00 | 7276 | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | correspondence to K. Saulter regarding intent to deliver 30(b)(6) documents to him in court this morning but because he failed to show documents will be mailed to him. (.1) | | | | | | | | | |
| Dec 12/2012 71397 | Expense Recovery Postage Recovery | 00254 | | 1.30 | | 7276 | | | | |
| Dec 16/2012 71844 | Lawyer: ATT 2.00 Hrs X 160.00 Completed drafting of first set of requests to admit based on certified payroll which totaled approximately 412 individual requests. | | | | 320.00 | 7276 | | | | |
| Dec 18/2012 71392 | Expense Recovery Postage Recovery | 00254 | | 4.90 | | 7276 | | | | |
| Dec 18/2012 71845 | Lawyer: ATT 0.40 Hrs X 160.00 Final review and modification of first set of requests to admit. | | | | 64.00 | 7276 | | | | |
| Dec 21/2012 72136 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed and responded to correspondence from K. Saulter asking for time to respond to admission requests until 2/11/13. Reviewed and responded to correspondence from K. Saulter regarding extension of time to respond to discovery ordered to be produced by 12/24/12. | | | | 32.00 | 7276 | | | | |
| Dec 27/2012 71320 | Chicago Regional Council of Carpe PMT – | 01254 | 754.57 | | | | | | | |
| Dec 28/2012 72162 | Lawyer: KM 0.10 Hrs X 160.00 Prepared correspondence to K. Saulter following up on discovery responses due by 12/24/12 extended to today by agreement. | | | | 16.00 | 7276 | | | | |
| Dec 31/2012 71421 | Expense Recovery Photocopy Recovery | 00255 | | 37.68 | | 7276 | | | | |
| Jan 3/2013 72643 | Lawyer: KM 1.80 Hrs X 160.00 Appeared in court for hearing before Judge Castillo on status of Defendant's compliance with Court's order compelling discovery responses; order entered that compliance is due by 1/17/13 under penalty of bar of defenses. (1.3) Reviewed ECF court order of Judge Castillo regarding hearing on 1/3/13. (.1) Prepared proposed draft order and submitted same to Court per electronic filing. (.4) | | | | 288.00 | 7356 | | | | |
| Jan 4/2013 72675 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed ECF court order of Judge Castillo ordering discovery compliance by 1/17/13 under penalty of barring defenses. (.1) Prepared correspondence to N. Lagalo ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ (.1) | | | | 32.00 | 7356 | | | | |
| Jan 7/2013 71765 | Billing on Invoice 7179 FEES 576.00 | | | 0.00 | | 7179 | | | | |
| Jan 17/2013 71987 | US Messenger & Logistics Courier Recovery | 4018 | | 14.60 | | 7356 | | | | |
| Jan 18/2013 72340 | Billing on Invoice 7276 FEES 1598.00 DISBS 43.88 | | | 0.00 | | 7276 | | | | |
| Jan 18/2013 72752 | Lawyer: KM 0.30 Hrs X 160.00 Reviewed correspondence from K. Saulter forwarding discovery responses; brief initial review of discovery responses. (.3) | | | | 48.00 | 7356 | | | | |
| Jan 24/2013 72405 | Chicago Regional Council of Carpe PMT – | 01268 | 576.00 | | | | | | | |
| Jan 28/2013 72816 | Lawyer: KM 1.20 Hrs X 160.00 Reviewed Imperium's responses to discovery requests (interrogatories and document requests); reviewed documents produced by Imperium. (.4) Started drafting motion to bar defenses based on Imperium's failure to comply with the | | | | 192.00 | 7356 | | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General ---- Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | Court's January 17th order. (.8) Prepared correspondence to N. Lagalo and J. Libby ▓▓▓▓▓▓▓▓ (.1) | | | | | | | | | |
| Jan 29/2013 72828 | Lawyer: KM  2.10 Hrs X 160.00 Further revised motion to bar defenses; reviewed file materials including correspondence as necessary to complete drafting motion. (1.3) Prepared rider for subpoena to JLL, LLC / Jerry L. Lewis, party on promissory note with Imperium. (.4) Reviewed Illinois Secretary of State records regarding entities affiliated with JLL, LLC. (.4) | | | | 336.00 | 7356 | | | | |
| Jan 31/2013 72477 | Expense Recovery Photocopy Recovery | 00257 | | 12.48 | | 7356 | | | | |
| Feb  5/2013 72514 | Chicago Regional Council of Carpe PMT - | 01278 | 1641.88 | | | 7356 | | | | |
| Feb  6/2013 73520 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed correspondence from N. Lagalo ▓▓▓▓▓▓▓▓▓ | | | | 16.00 | 7426 | | | | |
| Feb  6/2013 73527 | Lawyer: KM  3.20 Hrs X 160.00 Prepared motion to bar Imperium from asserting defenses to audit claim based on its failure to comply with discovery requests and conducted online review of case authority that defendant is barred from asserting defenses for failing to comply with discovery; reviewed file documents as necessary to put together factual information for motion. (3.2) | | | | 512.00 | 7426 | | | | |
| Feb  8/2013 73538 | Lawyer: KM  3.10 Hrs X 160.00 Revised motion to bar Imperium from asserting defenses to audit based on its failure to comply with the court's January 13, 2013 order compelling defendant to produce discovery; started preparing summary of payroll documents produced based on persons reported in contribution reports to show that not all payroll documents were produced; records missing for at least two months. (1.8) Reviewed online record information for JLL, LLC, an apparent nonexistent entity and for companies owned by Jerry L. Lewis; prepared subpoena riders for subpoenas to JLL Construction Services, Inc. and to Jerry Lewis. (1.3) | | | | 496.00 | 7426 | | | | |
| Feb  8/2013 73672 | Lawyer: SK  1.00 Hrs X 60.00 Prepared document subpoenas to JLL Construction and Jerry Lewis (.2). Prepared email correspondences to process server and to defense counsel forwarding copies of document subpoenas (.2). Prepared notice of motion for motion to bar defenses and filed same with notice of motion with court (.4). Prepared correspondence to Judge Castillo forwarding courtesy copies of motion and notice (.2). | | | | 60.00 | 7426 | | | | |
| Feb 14/2013 72629 | Lawyer: SK  1.20 Hrs X 60.00 Reviewed Judge Castillo's motion procedures and schedule and prepared notice of motion to bar defenses (.2). Filed motion to bar defenses with exhibits and several conferences with ECF clerks re: same (.4). Filed notice of motion (.2). Prepared | | | | 72.00 | 7426 | | | | |

ALL DATES
Client Ledger

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | Rcpts | Disbs | Fees | Bld Inv# Acc | Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | correspondence to Judge Castillo forwarding courtesy copies of same (.2). | | | | | | | | |
| Feb 14/2013 73579 | Lawyer: KM 0.80 Hrs X 160.00 Final review and revisions to motion to bar Imperium from asserting defenses to audit based on its failure to comply with Court's order granting Trust Funds' motion to compel; and assembled additional exhibits. | | | | 128.00 | 7426 | | | |
| Feb 18/2013 73594 | Lawyer: KM 0.30 Hrs X 160.00 Telephone call with N. Lagalo regarding ████████████ ████████████████████ ████████████████████ ████████████████ ████████████████████ ████████████████. Reviewed correspondence from N. Lagalo. | | | | 48.00 | 7426 | | | |
| Feb 20/2013 73063 | Billing on Invoice 7356 FEES          896.00 DISBS          27.08 | | | 0.00 | | 7356 | | | |
| Feb 21/2013 73618 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Castillo entering and continuing motion to 2/28/13. | | | | 16.00 | 7426 | | | |
| Feb 25/2013 73129 | Lawyer: KM 0.10 Hrs X 160.00 Several attempts to reach counsel for JJL, LLC / Jerry Lewis regarding subpoena. | | | | 16.00 | 7426 | | | |
| Feb 26/2013 73136 | Lawyer: KM 0.10 Hrs X 160.00 Several attempts to reach Charles Pinkston, counsel for JJL, LLC / Jerry Lewis regarding subpoena (312) 578-1957. | | | | 16.00 | 7426 | | | |
| Feb 27/2013 73629 | Lawyer: KM 0.20 Hrs X 160.00 Telephone call with counsel for J. Lewis regarding subpoena, advising KPM that there was no loan, there are no documents and Mr. Lewis has no idea what this is about, although he does know the owner of Imperium. | | | | 32.00 | 7426 | | | |
| Feb 28/2013 73149 | Midwest Investigations Process Server recovery - Service of Document Subpoena on JLL Construction and Jerry Lewis | 4058 | | 85.00 | | 7426 | | | |
| Feb 28/2013 73180 | Lawyer: KM 1.90 Hrs X 160.00 Reviewed motion and exhibits to prepare for hearing; appeared in court before Judge Castillo for motion to bar defenses due to Imperium's failure to fully respond to discovery.  (1.8) Reviewed court order of Judge Castillo setting briefing schedule.  (.1) | | | | 304.00 | 7426 | | | |
| Feb 28/2013 73207 | Expense Recovery Photocopy Recovery | 00258 | | 16.32 | | 7426 | | | |
| Mar 1/2013 73196 | Lawyer: KM 1.60 Hrs X 160.00 Reviewed documents, including audit, promissory note and discovery requests, as necessary to draft Rule 30(b)(6) deposition notice to Imperium LLC.  (1.2)  Reviewed notice of suggestion of bankruptcy from Imperium; prepared correspondence to client ████████████████ ████████████████████ ████████████████████ ██████████████. (.4) | | | | 256.00 | 7489 | | | |
| Mar 4/2013 74045 | Lawyer: KM 1.10 Hrs X 160.00 Telephone call with J. Libby ████████████████████ ████████████████████ ████████████████████ ████████████████ | | | | 176.00 | 7489 | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | General Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Trust Activity Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | (.3) Reviewed correspondence from J. Libby to KFM and B. Scalambrino ███████ ████████ . Reviewed correspondence from B. Scalambrino ████████ ███████████████████ (.1) Reviewed correspondence from C. Muniz ███████ █████████████████ ; reviewed attached bankruptcy documents. (.2) Reviewed correspondence from J. Libby ████████████ (.1) Reviewed correspondence from B. Scalambrino regarding ███████████████ Prepared correspondence to B. Scalambrino ████████ ██████. (.1) Telephone call with B. Scalambrino to ████████████ (.3) | | | | | | | | | |
| Mar 5/2013 74055 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed court order of Judge Castillo dismissing case without prejudice due to bankruptcy filing. | | | | 16.00 | 7489 | | | | |
| Mar 7/2013 73263 | LexisNexis Legal Research | 4065 | | 48.02 | | 7489 | | | | |
| Mar 8/2013 74086 | Lawyer: KM 0.80 Hrs X 160.00 Reviewed notice of meeting of creditors. Prepared correspondence to J. Libby, N. Lagalo, C. Muniz and B. Scalambrino ███████. (.1) Telephone call with C. Muniz regarding ████████████. (.2) Reviewed correspondence from C. Muniz regarding ████████. (.1) Reviewed correspondence from C. Muniz ████████████████ ████████████████ (.1) Started drafting declaration of Jerry Lewis confirming information relayed by his counsel. (.3) | | | | 128.00 | 7489 | | | | |
| Mar 11/2013 73324 | Chicago Regional Council of Carpe PMT - | 01298 | 923.08 | | | | | | | |
| Mar 14/2013 74125 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed correspondence from C. Muniz regarding ███████████████ | | | | 16.00 | 7489 | | | | |
| Mar 20/2013 74150 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed correspondence from C. Muniz regarding ███████████ | | | | 16.00 | 7489 | | | | |
| Mar 21/2013 73393 | US Messenger & Logistics Courier Recovery | 4076 | | 14.60 | | 7489 | | | | |
| Mar 22/2013 74198 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed correspondence from C. Muniz ████████████████ | | | | 16.00 | 7489 | | | | |
| Mar 25/2013 74174 | Lawyer: KM 0.80 Hrs X 160.00 Revised record requests for bankruptcy purposes. Prepared correspondence to C. Muniz | | | | 128.00 | 7489 | | | | |

Client Ledger
ALL DATES

| Date<br>Entry # | Received From/Paid To<br>Explanation | Chq#<br>Rec# | \|----- General -----\|<br>Rcpts    Disbs | Fees | Bld<br>Inv# Acc | \|----------- Trust Activity -----------\|<br>Rcpts   Disbs   Balance |
|---|---|---|---|---|---|---|
| Mar 26/2013<br>74199 | Lawyer: KM  0.50 Hrs X 160.00<br>Telephone call with C. Muniz<br>regarding<br><br>(.2)  Reviewed file materials<br>and prepared correspondence to<br>C. Muniz<br><br>(.3) | | | 80.00 | 7489 | |
| Mar 27/2013<br>73801 | Billing on Invoice 7426<br>FEES     1716.00<br>DISBS     101.32 | | 0.00 | | 7426 | |
| Apr 1/2013<br>74710 | Lawyer: KM  0.10 Hrs X 160.00<br>Reviewed correspondence from C.<br>Muniz regarding<br>reviewed same. | | | 16.00 | 7557 | |
| Apr 11/2013<br>74019 | Chicago Regional Council of Carpe<br>PMT - | 01313 | 1817.32 | | | |
| Apr 18/2013<br>74237 | Billing on Invoice 7489<br>FEES      832.00<br>DISBS      62.62 | | 0.00 | | 7489 | |
| Apr 18/2013<br>74800 | Lawyer: KM  0.30 Hrs X 160.00<br>Reviewed and responded to<br>correspondence from C. Muniz<br>regarding<br><br>Reviewed and<br>responded to correspondence<br>from C. Muniz | | | 48.00 | 7557 | |
| Apr 19/2013<br>74802 | Lawyer: KM  0.20 Hrs X 160.00<br>Reviewed correspondence from J.<br>Libby to C. Muniz<br><br>Prepared<br>correspondence to C. Muniz | | | 32.00 | 7557 | |
| Apr 22/2013<br>74473 | Lawyer: KM  0.40 Hrs X 160.00<br>Reviewed correspondence from J.<br>Libby<br><br>Reviewed<br>correspondence from C. Muniz<br>regarding<br>briefly reviewed<br>bank statements. | | | 64.00 | 7557 | |
| Apr 25/2013<br>75123 | PACEr<br>PACR | 4092 | 0.40 | | 7557 | |
| Apr 26/2013<br>74536 | Chicago Regional Council of Carpe<br>PMT - | 01322 | 894.62 | | | |
| Apr 29/2013<br>74865 | Lawyer: KM  0.10 Hrs X 0.00<br>Reviewed correspondence from C.<br>Muniz regarding<br>correspondence setting call<br>for tomorrow.  [NO CHARGE] | | | 0.00 | 7557 | |
| Apr 30/2013<br>74833 | Lawyer: KM  1.20 Hrs X 160.00<br>Reviewed correspondence from C.<br>Muniz<br>reviewed affidavit.  Telephone<br>call with J. Libby, N. Lagalo,<br>B. Scalambrino and C. Muniz<br>regarding | | | 192.00 | 7557 | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | Rcpts | Disbs | Fees | Inv# | Acc | Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | ██████. Telephone call from J. Libby ████ | | | | | | | | | |
| | Exchange numerous correspondence with C. Muniz regarding ████████. | | | | | | | | | |
| May 6/2013 75428 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed correspondence from B. Scalambrino regarding | | | | 16.00 | 7614 | | | | |
| May 13/2013 74667 | Lawyer: KM 0.10 Hrs X 160.00 Telephone call with B. Scalambrino regarding | | | | 16.00 | 7614 | | | | |
| May 17/2013 74902 | Billing on Invoice 7557 FEES 352.00 DISBS 0.40 | | | 0.00 | | 7557 | | | | |
| May 24/2013 75547 | Lawyer: KM 0.40 Hrs X 160.00 Reviewed correspondence from J. Libby to B. Scalambrino ████. Reviewed and responded to correspondence from B. Scalambrino ████ ████████ reviewed file materials to produce documents. | | | | 64.00 | 7614 | | | | |
| May 28/2013 75558 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed and responded to and exchanged correspondence from B. Scalambrino regarding . | | | | 32.00 | 7614 | | | | |
| Jun 5/2013 75324 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed and responded to correspondence from B. Scalambrino ████ | | | | 16.00 | 7677 | | | | |
| Jun 10/2013 75412 | Chicago Regional Council of Carpe PMT - | 01344 | 352.40 | | | | | | | |
| Jun 17/2013 76126 | Lawyer: KM 5.70 Hrs X 160.00 Reviewed materials related to T. Harbin's deposition. Appeared at offices B. Scalambrino for deposition of T. Harbin. | | | | 912.00 | 7677 | | | | |
| Jun 20/2013 75645 | Billing on Invoice 7614 FEES 128.00 | | | 0.00 | | 7614 | | | | |
| Jun 30/2013 75927 | Expense Recovery Photocopy Recovery | 00267 | | 11.64 | | 7677 | | | | |
| Jul 18/2013 76049 | Chicago Regional Council of Carpe PMT - | 01353 | 128.00 | | | | | | | |
| Jul 19/2013 76140 | Billing on Invoice 7677 FEES 928.00 DISBS 11.64 | | | 0.00 | | 7677 | | | | |
| Jul 29/2013 76353 | Lawyer: KM 0.50 Hrs X 160.00 Reviewed bankruptcy hearing transcript of T. Harbin acknowledging falsity of promissory notes. | | | | 80.00 | 7738 | | | | |
| Aug 2/2013 76416 | Chicago Regional Council of Carpe PMT - | 01359 | 939.64 | | | | | | | |
| Aug 9/2013 77204 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed correspondence from B. Scalambrino ████ ████ | | | | 16.00 | 7798 | | | | |
| Aug 19/2013 76749 | Billing on Invoice 7738 FEES 80.00 | | | 0.00 | | 7738 | | | | |
| Aug 22/2013 77352 | Lawyer: KM 0.80 Hrs X 160.00 Started drafting complaint against individual owners; reviewed portions of T. Harbin complaint to confirm certain facts. | | | | 128.00 | 7798 | | | | |
| Sep 5/2013 77584 | Lawyer: SK 0.90 Hrs X 60.00 Prepared civil cover sheet and attorney appearance and summonses for T. and J. Harbin. D. Fuentes and W. Davis (.3). Filed complaint, cover sheet and appearance with court (.4). Reviewed ECF notice re: judges assignments and updated open file report accordingly (.2). | | | | 54.00 | 7867 | | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | General Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Trust Activity Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 5/2013 77799 | Lawyer: KM  2.80 Hrs X 160.00 Reviewed and responded to correspondence from C. Muniz regarding ███████ (.1)  Reviewed and responded to correspondence from B. Scalambrino ███ (.1) Drafted complaint against owners/members of Imperium LLC based on the fraudulent activities committed by its members.  Reviewed documents, including deposition transcript of T. Harbin in order to draft complaint. (2.5)  Prepared correspondence to B. Scalambrino ██████ (.1) | | | | 448.00 | 7867 | | | | |
| Sep 6/2013 77804 | Lawyer: KM  0.20 Hrs X 160.00 Reviewed ECF court order assigning Judge Norgle and Magistrate Mason to the lawsuit. (.1)  Reviewed correspondence from C. Muniz ████████████████ ██████ (.1) | | | | 32.00 | 7867 | | | | |
| Sep 9/2013 77587 | Lawyer: SK  0.30 Hrs X 60.00 Completed preparing summonses to T. and J. Harbin, D. Fuentes and W. Davis by adding judge and magistrate information and prepared email correspondence to court intake clerk forwarding same for issuance by court. | | | | 18.00 | 7867 | | | | |
| Sep 10/2013 77590 | Lawyer: SK  0.20 Hrs X 60.00 Prepared email correspondence to process server forwarding complaint and summonses to T. and J. Harbin. D. Fuentes and W. Davis for service. | | | | 12.00 | 7867 | | | | |
| Sep 12/2013 77117 | Chicago Regional Council of Carpe PMT - | 01375 | 80.00 | | | | | | | |
| Sep 18/2013 77134 | Lawyer: SK  0.60 Hrs X 60.00 Reviewed process server's affidavits of service of summons and complaint upon T. and J. Harbin, D. Fuentes and W. Davis (.2).  Filed affidavits of service with court (.3).  Prepared correspondence to Judge Norgle forwarding courtesy copies of same (.2). | | | | 36.00 | 7867 | | | | |
| Sep 18/2013 77845 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed affidavits of service returned by process server; arrangements for filing of same. | | | | 16.00 | 7867 | | | | |
| Sep 20/2013 77361 | Billing on Invoice 7798 FEES        144.00 | | | | | 7798 | | | | |
| Sep 30/2013 77687 | Expense Recovery Photocopy Recovery | 00272 | | 15.00 | | 7867 | | | | |
| Oct 2/2013 77615 | Capital One Services Filing Fee - | 4208 | | 400.00 | | 7939 | | | | |
| Oct 2/2013 77618 | Midwest Investigations Process Server recovery - Service of Summons and Complaint upon T. and J. Harbin | 4209 | | 85.00 | | 7939 | | | | |
| Oct 2/2013 77619 | Midwest Investigations Process Server recovery - Service of Summons and Complaint upon W. Davis | 4209 | | 85.00 | | 7939 | | | | |
| Oct 2/2013 77620 | Midwest Investigations Process Server recovery - Service of Summons and Complaint upon D. Fuentes | 4209 | | 85.00 | | 7939 | | | | |
| Oct 2/2013 77655 | Chicago Regional Council of Carpe PMT - | 01388 | 144.00 | | | | | | | |
| Oct 2/2013 78485 | Lawyer: KM  0.20 Hrs X 160.00 Reviewed ECF notice of filing of appearance of J. Taylor for W. Davis.  Reviewed motion for extension of time; diaried event. | | | | 32.00 | 7939 | | | | |
| Oct 3/2013 78492 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed motion for appointment | | | | 16.00 | 7939 | | | | |

Client Ledger
ALL DATES

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | of counsel by T. Harbin and J. Harbin. | | | | | | | | |
| Oct 9/2013 77728 | Lawyer: SK 0.20 Hrs X 60.00 Reviewed Judge Norgle's order received from court's ECF system but dated 10/7 and confer with K. McJessy ▓▓▓▓ ▓▓▓▓prepared correspondence to J. Harbin, T. Harbin and D. Fuentes forwarding 10/7 order. | | | | 12.00 | 7939 | | | |
| Oct 9/2013 78275 | Expense Recovery Postage Recovery | 00274 | | 1.38 | | 7939 | | | |
| Oct 9/2013 78521 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed ECF court order of Judge Norgle ruling on motion by defendants for appointment of counsel. Prepared correspondence to defendants forwarding same. | | | | 32.00 | 7939 | | | |
| Oct 10/2013 78528 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Norgle granting motion to extend time to answer, answer due on 11/8/13. | | | | 16.00 | 7939 | | | |
| Oct 17/2013 77759 | US Messenger & Logistics Courier Recovery | 4219 | | 14.60 | | 7939 | | | |
| Oct 18/2013 77903 | Billing on Invoice 7867 FEES 616.00 DISBS 15.00 | | | 0.00 | | 7867 | | | |
| Oct 22/2013 78594 | Lawyer: KM 0.30 Hrs X 160.00 Reviewed motion to dismiss filed by William Davis. | | | | 48.00 | 7939 | | | |
| Oct 23/2013 77972 | LexisNexis Legal Research | 4223 | | 9.26 | | 7939 | | | |
| Oct 30/2013 78211 | Chicago Regional Council of Carpe PMT - | 01401 | 631.00 | | | 7939 | | | |
| Oct 31/2013 78285 | Expense Recovery Photocopy Recovery | 00275 | | 3.84 | | 7939 | | | |
| Nov 8/2013 78346 | Lawyer: KM 2.80 Hrs X 160.00 Reviewed Defendant Davis' motion to dismiss. Online LEXIS research regarding case authority cited by David and briefly reviewed cases cited in Defendant Davis' motion to dismiss. (1.3) Appeared before Judge Norgle for initial hearing on motion to dismiss, motion denied by Trust Funds given 21 days to file more definite statement of allegations. (1.5) | | | | 448.00 | 8049 | | | |
| Nov 20/2013 78682 | Billing on Invoice 7939 FEES 156.00 DISBS 684.08 | | | 0.00 | | 7939 | | | |
| Dec 2/2013 78948 | Lawyer: SK 1.00 Hrs X 60.00 Filed Trust Funds' amended complaint and prepared correspondence to Judge Norgle's clerk forwarding courtesy copy of same (.4). Prepared notice of motion for motion for extension of time and reviewed Judge Norgle's motion requirements and schedule (.2). Filed motion for extension of time to file amended complaint and notice of motion with court (.3). Prepared correspondence to Judge Norgle forwarding courtesy copies of notice and motion for extension of time (.1). | | | | 60.00 | 8108 | | | |
| Dec 2/2013 78966 | Lawyer: KM 1.40 Hrs X 160.00 Prepared amended complaint. Reviewed case authority on piercing the corporate veil in order to prepare amended complaint. Prepared motion for extension of time to file amended complaint. | | | | 224.00 | 8108 | | | |
| Dec 2/2013 79511 | Expense Recovery Postage Recovery | 00279 | | 1.52 | | 8108 | | | |
| Dec 3/2013 79510 | Expense Recovery Postage Recovery | 00279 | | 2.52 | | 8108 | | | |
| Dec 5/2013 79049 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Norgle granting motion for extension of time to file amended complaint and filed | | | | 16.00 | 8108 | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | General Disbs | Fees | Bld Inv# Acc | Trust Activity Rcpts | Trust Activity Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | amended complaint. | | | | | | | | |
| Dec 5/2013 79089 | Chicago Regional Council of Carpe PMT – | 01418 | 840.08 | | | | | | |
| Dec 6/2013 79506 | Expense Recovery Postage Recovery | 00279 | | 1.98 | | 8108 | | | |
| Dec 6/2013 79660 | Lawyer: KM 0.60 Hrs X 160.00 Prepared correspondence to J. Libby regarding ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Prepared Rule 26(a) disclosures. | | | | 96.00 | 8108 | | | |
| Dec 18/2013 79215 | LexisNexis Legal Research | 4266 | | 45.93 | | 8108 | | | |
| Dec 18/2013 79427 | Billing on Invoice 8049 FEES 448.00 | | | 0.00 | | 8049 | | | |
| Dec 27/2013 79769 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed ECF court notice of appearance filed for Dwain Fuentes and motion for extension of time. Reviewed motion for extension of time. | | | | 32.00 | 8108 | | | |
| Dec 31/2013 79487 | Expense Recovery Photocopy Recovery | 00278 | | 15.84 | | 8108 | | | |
| Jan 2/2014 80231 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Norgle granting motion for extension of time to answer or otherwise plead. | | | | 16.00 | 8159 | | | |
| Jan 16/2014 79621 | US Messenger & Logistics Courier Recovery | 4284 | | 14.60 | | 8159 | | | |
| Jan 20/2014 79804 | Chicago Regional Council of Carpe PMT – | 01430 | 448.00 | | | | | | |
| Jan 20/2014 79985 | Billing on Invoice 8108 FEES 428.00 DISBS 67.79 | | | 0.00 | | 8108 | | | |
| Jan 23/2014 80063 | Lawyer: KM 3.50 Hrs X 160.00 Prepared first set of interrogatories and document requests to William Davis III; reviewed file documents and prior documents produced by Imperium to prepare discovery requests. | | | | 560.00 | 8159 | | | |
| Jan 24/2014 80108 | Expense Recovery Postage Recovery | 00281 | | 16.21 | | 8159 | | | |
| Jan 24/2014 80391 | Lawyer: KM 1.50 Hrs X 160.00 Final review and edits to discovery requests to William Davis. (.8) Revised discovery requests against William Davis to apply to J. Harbin, T. Harbin and D. Fuentes and reviewed same. (.5) Prepared subpoena to Legacy Professionals for audit file of Imperium LLC. (.2) | | | | 240.00 | 8159 | | | |
| Jan 30/2014 80583 | PACEr PACR | 4294 | | 0.40 | | 8159 | | | |
| Jan 31/2014 80093 | Expense Recovery Photocopy Recovery | 00280 | | 39.60 | | 8159 | | | |
| Feb 10/2014 80696 | Lawyer: KM 0.30 Hrs X 160.00 Prepared subpoena to Legacy Professionals for documents related to Imperium audit; reviewed file materials as necessary to prepare subpoena. | | | | 48.00 | 8235 | | | |
| Feb 10/2014 80700 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed motions by T. Harbin and J. Harbin for appointment of counsel forwarded by ECF notice.. | | | | 32.00 | 8235 | | | |
| Feb 14/2014 80217 | Chicago Regional Council of Carpe PMT – | 01441 | 495.79 | | | | | | |
| Feb 20/2014 80470 | Billing on Invoice 8159 FEES 816.00 DISBS 70.81 | | | 0.00 | | 8159 | | | |
| Feb 20/2014 80761 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed file materials for status of answer and date when discovery responses are due. Prepared correspondence to J. Taylor advising of overdue answer and expected timely response to discovery which responses are due 2/24/14. | | | | 32.00 | 8235 | | | |
| Feb 21/2014 80675 | Lawyer: KM 1.70 Hrs X 160.00 Appeared in court before Judge Norgle regarding hearing on status of answer to complaint and discovery, matter continued to 06/13/14; | | | | 272.00 | 8235 | | | |

| Date<br>Entry # | Received From/Paid To<br>Explanation | Chq#<br>Rec# | \|----- General -----\|<br>Rcpts      Disbs | Fees | Bld<br>Inv# | \|----------- Trust Activity -----------\|<br>Acc        Rcpts       Disbs       Balance |
|---|---|---|---|---|---|---|
| | post-hearing conference with<br>defendants / counsel regarding<br>discovery, agreement to extend<br>by a week and possible<br>settlement offer if they care<br>to make one. | | | | | |
| Feb 24/2014<br>80774 | Lawyer: KM  0.10 Hrs X 160.00<br>Reviewed ECF court order of<br>Judge Norgle denying T.<br>Harbin's and J. Harbin's<br>motion for appointment of<br>counsel. | | | 16.00 | 8235 | |
| Feb 26/2014<br>80832 | Lawyer: KM  0.30 Hrs X 160.00<br>Prepared correspondence to<br>defendants confirming<br>agreement to give them a<br>one-week extension on<br>discovery responses per<br>discussion after court on<br>2/21/14.  (.2)  Prepared<br>correspondence to B.<br>Scalambrino, Trust Funds<br>bankruptcy counsel, ▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (.1) | | | 48.00 | 8235 | |
| Feb 26/2014<br>80882 | Expense Recovery<br>Postage Recovery | 00282 | 0.96 | | 8235 | |
| Feb 28/2014<br>80902 | Expense Recovery<br>Photocopy Recovery | 00283 | 0.72 | | 8235 | |
| Mar 6/2014<br>80964 | Chicago Regional Council of Carpe<br>PMT - | 01449 | 886.81 | | | |
| Mar 7/2014<br>81208 | Billing on Invoice 8235<br>FEES    448.00<br>DISBS     1.68 | | | 0.00 | 8235 | |
| Mar 14/2014<br>81702 | Lawyer: KM  0.30 Hrs X 160.00<br>Reviewed ECF filed motion to<br>dismiss for failure to state a<br>claim, filed by Defendants<br>Fuentes and Davis. | | | 48.00 | 8283 | |
| Mar 17/2014<br>81569 | Lawyer: KM  0.20 Hrs X 160.00<br>Reviewed defendant Davis' and<br>Fuentes' motion to dismiss. | | | 32.00 | 8283 | |
| Mar 20/2014<br>81330 | Chicago Regional Council of Carpe<br>PMT - | 01456 | 449.68 | | | |
| Mar 24/2014<br>81368 | Lawyer: SK  0.50 Hrs X 60.00<br>Prepared notice of motion for<br>motion to compel against<br>defendants Davis and Fuentes;<br>filed motion to compel and<br>notice of motion with court;<br>prepared correspondence to<br>Judge Norgle forwarding<br>courtesy copies of same. | | | 30.00 | 8283 | |
| Mar 24/2014<br>81390 | Lawyer: KM  1.30 Hrs X 160.00<br>Reviewed file for status of<br>discovery by Defendants Davis<br>and Fuentes; prepared motion<br>to compel by drafting motion<br>and assembling exhibits. (1.0)<br>Arrangements for depositions of<br>defendants and preparation of<br>deposition notices.  (.3) | | | 208.00 | 8283 | |
| Mar 24/2014<br>81477 | Expense Recovery<br>Postage Recovery | 00284 | 0.96 | | 8283 | |
| Mar 25/2014<br>81453 | Lawyer: KM  0.30 Hrs X 160.00<br>Reviewed and made notations to<br>answers to complaint filed by<br>James Harbin and by Tina<br>Harbin. | | | 48.00 | 8283 | |
| Mar 26/2014<br>81643 | Lawyer: KM  0.20 Hrs X 160.00<br>Telephone call with J. Libby<br>regarding ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | 32.00 | 8283 | |
| Mar 31/2014<br>81496 | Expense Recovery<br>Photocopy Recovery | 00285 | 20.52 | | 8283 | |
| Mar 31/2014<br>81543 | US Messenger & Logistics<br>Courier Recovery | 4350 | 14.60 | | 8283 | |
| Mar 31/2014<br>81544 | US Messenger & Logistics<br>Courier Recovery | 4350 | 14.60 | | 8283 | |
| Apr 4/2014<br>82207 | Lawyer: KM  1.50 Hrs X 160.00<br>Appeared in court on Trust<br>Funds' motion to compel and<br>defendants' motion to dismiss.<br>Reviewed ECF court order of<br>Judge Norgle advising that<br>Trust Funds' motion is taken<br>under advisement and setting<br>briefing schedule on motion to<br>dismiss; diaried dates. | | | 240.00 | 8351 | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Apr 10/2014 81901 | Billing on Invoice 8283 FEES 398.00 DISBS 50.68 | | | 0.00 | | 8283 | | | | |
| Apr 16/2014 82281 | Lawyer: KM 7.60 Hrs X 160.00 LEXIS research for cases cited by defendants in their motion to dismiss and for authority to the contrary. Prepared CRCC response to defendants' motion to dismiss. | | | | 1216.00 | 8351 | | | | |
| Apr 17/2014 81971 | Lawyer: SK 0.40 Hrs X 60.00 Filed response to defendants Davis and Fuentes' motion to dismiss; prepared correspondence to Judge Norgle forwarding courtesy copy of same. | | | | 24.00 | 8351 | | | | |
| Apr 17/2014 82484 | Lawyer: KM 1.80 Hrs X 160.00 Made final edits and revisions to response opposing motion for summary judgment prior to filing same this date. | | | | 288.00 | 8351 | | | | |
| Apr 21/2014 81995 | Chicago Regional Council of Carpe PMT - | 01464 | 448.68 | | | | | | | |
| Apr 22/2014 82302 | Lawyer: KM 0.20 Hrs X 160.00 Prepared correspondence to J. Taylor and Harbins advising that depositions will be postponed because Davis/Fuentes defendants have not yet produced discovery responses. | | | | 32.00 | 8351 | | | | |
| Apr 30/2014 82076 | US Messenger & Logistics Courier Recovery | 4375 | | 15.92 | | 8351 | | | | |
| Apr 30/2014 82089 | Expense Recovery Photocopy Recovery | 00286 | | 12.24 | | 8351 | | | | |
| Apr 30/2014 82376 | PACEr PACR | 4370 | | 0.40 | | 8351 | | | | |
| May 7/2014 83035 | Lawyer: KM 0.50 Hrs X 160.00 Prepared correspondence to J. Taylor pursuant to Rule 37.2 seeking to resolve discovery dispute, no discovery responses which are now overdue even considering extension.; reviewed file as necessary for dates and for prior demands for discovery. | | | | 80.00 | 8443 | | | | |
| May 8/2014 83036 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Feinerman setting next status hearing date of 6/11/14. | | | | 16.00 | 8443 | | | | |
| May 9/2014 82149 | Lawyer: SK 0.10 Hrs X 60.00 Prepared email correspondence to J. Taylor forwarding Word versions of discovery requests to defendants Davis and Fuentes. | | | | 6.00 | 8443 | | | | |
| May 9/2014 82744 | Lawyer: KM 0.50 Hrs X 160.00 Reviewed file for status of follow up on discovery. Telephone call to J. Taylor to follow up on prior Rule 37.2 correspondence, left message. Prepared correspondence to J. Taylor regarding final demand for discovery or filing motion to compel. (.3) Prepared correspondence to J. Libby ▓▓▓▓▓▓▓▓▓▓ (.1) Telephone call from J. Taylor advising his clients will have their discovery responses to MC&T no later than Friday 5/16/14. (.1) | | | | 80.00 | 8443 | | | | |
| May 12/2014 82784 | Lawyer: KM 0.30 Hrs X 160.00 Reviewed ECF court order of Judge Norgle denying defendants' motion to dismiss. | | | | 48.00 | 8443 | | | | |
| May 13/2014 82785 | Lawyer: KM 0.10 Hrs X 160.00 Prepared correspondence to J. Libby ▓▓▓▓▓▓▓ | | | | 16.00 | 8443 | | | | |
| May 19/2014 82520 | Billing on Invoice 8351 FEES 1800.00 DISBS 28.56 | | | 0.00 | | 8351 | | | | |
| May 21/2014 82556 | Lawyer: SK 0.60 Hrs X 60.00 Prepared notice of motion for Trust Funds' renewed and amended motion to compel against defendants Davis and Fuentes; filed renewed and | | | | 36.00 | 8443 | | | | |

Client Ledger
ALL DATES

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | amended motion to compel with court; filed notice of motion with court; prepared correspondence to Judge Norgle forwarding courtesy copies of same. | | | | | | | | | |
| May 21/2014 82827 | Lawyer: JS 1.20 Hrs X 160.00 Drafted new motion for default and declarations; email to N. Lagalo ▓▓▓▓▓ | | | | 192.00 | 8443 | | | | |
| May 21/2014 82842 | Lawyer: KM 0.70 Hrs X 160.00 Prepared renewed motion for entry of order to compel for Davis' and Fuentes' response to outstanding discovery. | | | | 112.00 | 8443 | | | | |
| May 21/2014 82844 | Lawyer: KM 0.50 Hrs X 160.00 Started drafting motion for entry of default judgment; reviewed file and notice that Imperium has counsel, case needs reinstated because it was dismissed. | | | | 80.00 | 8443 | | | | |
| May 22/2014 82570 | LexisNexis Legal Research | 4386 | | 119.22 | | 8443 | | | | |
| May 22/2014 82860 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed and responded to correspondence from J. Taylor advising he will drop off discovery responses tomorrow. | | | | 16.00 | 8443 | | | | |
| May 28/2014 82829 | Lawyer: JS 1.60 Hrs X 160.00 Discussion with K. McJessy and review of docket report; call to attorney Saulter and voicemail message; review of federal rules and initial drafting of motion to reinstate. | | | | 256.00 | 8443 | | | | |
| May 29/2014 82600 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Norgle granting motion to compel, defendants must comply with discovery responses by June 26 2014. | | | | 16.00 | 8443 | | | | |
| May 31/2014 82624 | Expense Recovery Photocopy Recovery | 00288 | | 14.16 | | 8443 | | | | |
| Jun 3/2014 82697 | Lawyer: SK 0.20 Hrs X 60.00 Prepared appearance of J. Sopata; reviewed Judge Castillo's motion practice requirements and prepared notice of motion for reinstatement. | | | | 12.00 | 8492 | | | | |
| Jun 3/2014 83574 | Lawyer: KM 0.40 Hrs X 160.00 Confer with J. Sopata regarding ▓▓▓▓▓▓▓▓▓▓▓ Reviewed and revised motion to reinstate lawsuit. | | | | 64.00 | 8492 | | | | |
| Jun 3/2014 83798 | Lawyer: JS 1.00 Hrs X 160.00 Confer with K. McJessy re: ▓▓▓▓▓▓▓▓▓ research on Bankruptcy Code 362(a)(2) and continued drafting motion to reinstate and draft order. | | | | 160.00 | 8492 | | | | |
| Jun 5/2014 83799 | Lawyer: KM 0.10 Hrs X 160.00 Prepared correspondence to J. Libby regarding ▓▓▓▓▓▓▓ | | | | 16.00 | 8492 | | | | |
| Jun 6/2014 82932 | Chicago Regional Council of Carpe PMT - | 01476 | 1828.56 | | | | | | | |
| Jun 6/2014 83800 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed and responded to correspondence from J. Libby regarding ▓▓▓▓▓▓▓ | | | | 16.00 | 8492 | | | | |
| Jun 9/2014 83167 | Billing on Invoice 8443 FEES    DISBS   133.38 | | | 0.00 | 954.00 | 8443 | | | | |
| Jun 9/2014 83200 | Lawyer: SK 0.20 Hrs X 60.00 Prepared amended notice of depositions for all defendants for July 8 and 9, 2014. | | | | 12.00 | 8492 | | | | |
| Jun 9/2014 83505 | Expense Recovery Postage Recovery | 00291 | | 0.96 | | 8492 | | | | |
| Jun 9/2014 83801 | Lawyer: KM 0.20 Hrs X 160.00 Reviewed correspondence from J. Libby regarding ▓▓▓▓▓▓▓ | | | | 32.00 | 8492 | | | | |

Client Ledger
ALL DATES

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Trust Activity Acc Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Jun 17/2014 83699 | Lawyer: KM  0.40 Hrs X 160.00 Telephone call to Harbins and J. Taylor to confirm depositions.  Telephone call with T. Harbin confirming her deposition and James' deposition and likely length of depositions.  Prepared correspondence to J. Libby ▬▬▬.  Prepared correspondence to T. & J. Harbin confirming their depositions date and time. | | | | 64.00 | 8492 | | | |
| Jun 18/2014 83712 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed correspondence from J. Libby ▬▬▬ | | | | 16.00 | 8492 | | | |
| Jun 19/2014 83257 | LexisNexis Legal Research | 4401 | | 95.33 | | 8492 | | | |
| Jun 19/2014 83268 | US Messenger & Logistics Courier Recovery | 4402 | | 14.60 | | 8492 | | | |
| Jun 20/2014 83313 | Chicago Regional Council of Carpe PMT - | 01486 | 1087.38 | | | | | | |
| Jun 20/2014 83320 | Lawyer: SK  0.60 Hrs X 60.00 Filed appearance of J. Sopata; filed motion for reinstatement and notice of motion with court; prepared correspondence to Judge Lee forwarding courtesy copies. | | | | 36.00 | 8492 | | | |
| Jun 30/2014 83473 | Expense Recovery Photocopy Recovery | 00290 | | 9.24 | | 8492 | | | |
| Jul  1/2014 84200 | Lawyer: SK  0.20 Hrs X 60.00 Confer with K. McJessy ▬▬▬ ▬▬▬.  Call to and prepared email correspondence to J. Taylor, counsel for W. Davis and D. Fuentes, confirmation depositions for 7/9/14. | | | | 12.00 | 8559 | | | |
| Jul  1/2014 84424 | Lawyer: KM  0.20 Hrs X 160.00 Confer with S. Keating ▬▬▬.  Reviewed correspondence from S. Keating to J. Taylor ▬▬▬ | | | | 32.00 | 8559 | | | |
| Jul  3/2014 84213 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed correspondence from J. Taylor advising he is still trying to confirm his client's depositions for 7/9/14. | | | | 16.00 | 8559 | | | |
| Jul  7/2014 83448 | Lawyer: KM  0.20 Hrs X 160.00 Telephone call with J. Sopata regarding ▬▬▬.  Prepared correspondence to J. Sopata ▬▬▬ | | | | 32.00 | 8559 | | | |
| Jul  7/2014 83450 | Lawyer: SK  0.40 Hrs X 60.00 Prepared summary of weekly time reports for May-June 2014 for attachment to Harbins' deposition exhibit. | | | | 24.00 | 8559 | | | |
| Jul  7/2014 84069 | Expense Recovery Postage Recovery | 00292 | | 1.38 | | 8559 | | | |
| Jul  7/2014 84225 | Lawyer: KM  5.80 Hrs X 160.00 Telephone call with N. Lagalo regarding ▬▬▬ (.2)  Reviewed correspondence from N. Lagalo ▬▬▬ reviewed reports. (.2) Prepared amended Rule 26(a) disclosures. (.3)  Reviewed file documents to prepare | | | | 928.00 | 8559 | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Trust Activity Acc Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | exhibits for deposition schedule for 7/8/14 of Tina and James Harbin and prepared deposition outline. (5.1) | | | | | | | | |
| Jul 7/2014 84425 | Lawyer: JS 0.30 Hrs X 160.00 Preparation for 7/8/14 hearing and review of pleading; confer with K. McJessy ▓▓▓▓▓▓▓ | | | | 48.00 | 8559 | | | |
| Jul 8/2014 84426 | Lawyer: KM 4.80 Hrs X 160.00 Conducted deposition of T. Harbin. Conducted deposition of J. Harbin. Telephone call with J. Sopata regarding ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Reviewed ECF court order of Judge Castillo referring matter to Judge Schenkier for settlement conference. Reviewed ECF court order of Judge Castillo continuing motion for reinstatement to 9/18/14. | | | | 768.00 | 8559 | | | |
| Jul 8/2014 84428 | Lawyer: JS 1.50 Hrs X 160.00 Attendance at hearing on motion to bar defenses; confer with K. McJessy ▓▓▓▓▓▓ | | | | 240.00 | 8559 | | | |
| Jul 9/2014 83467 | Lawyer: KM 1.50 Hrs X 160.00 Reviewed discovery responses and documents produced by Davis & Fuentes defendants to prepare for depositions. | | | | 240.00 | 8559 | | | |
| Jul 9/2014 83508 | Lawyer: KM 5.30 Hrs X 160.00 Conducted deposition of W. Davis. Conducted deposition of D. Fuentes. Confer with J. Taylor counsel for deponents after depositions regarding settlement. | | | | 848.00 | 8559 | | | |
| Jul 9/2014 84241 | Lawyer: JS 0.50 Hrs X 160.00 Review of officer's notes for references to audit, cash payments, the Trust Funds, etc. | | | | 80.00 | 8559 | | | |
| Jul 10/2014 84423 | Lawyer: SK 0.10 Hrs X 60.00 Prepared correspondence to K. Saulter inquiring about availability for settlement conference for dates offered by Judge Schenkier. | | | | 6.00 | 8559 | | | |
| Jul 10/2014 84429 | Lawyer: KM 0.20 Hrs X 160.00 Telephone call from Judge Schenkier's chambers to set settlement conference; request S. Keating to check opposing counsel's availability. Prepared correspondence to J. Libby ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | | 32.00 | 8559 | | | |
| Jul 17/2014 83639 | US Messenger & Logistics Courier Recovery | 4427 | | 14.60 | | 8559 | | | |
| Jul 17/2014 83943 | PACEr PACR | 4429 | | 1.80 | | 8559 | | | |
| Jul 17/2014 84297 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Castillo resetting court dates and motion date to 9/23/14. | | | | 16.00 | 8559 | | | |
| Jul 18/2014 83818 | Billing on Invoice 8492 FEES 428.00 DISBS 120.13 | | | 0.00 | | 8492 | | | |
| Jul 23/2014 84462 | Lawyer: KM 0.20 Hrs X 160.00 Confer with Judge Schenkier's staff -- no word from opposing counsel; Judge out of town but will get date for conference call. | | | | 32.00 | 8559 | | | |
| Jul 28/2014 84430 | Lawyer: KM 0.30 Hrs X 160.00 Participated in conference call with Court and opposing counsel for status on setting settlement conference. Reviewed ECF court order of Judge Schenkier regarding telephone conference and likelihood of counsel withdrawing. | | | | 48.00 | 8559 | | | |
| Jul 31/2014 | Expense Recovery | | | | | | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Trust Activity Acc Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | 84078 Photocopy Recovery | 00293 | | 113.48 | | 8559 | | | |
| Jul 31/2014 | 84129 Certified Reporting Co. Court Reporter - Attendance and Transcripts of Depositions - W. Davis and D. Fuentes | 4441 | | 1114.50 | | 8559 | | | |
| Jul 31/2014 | 84131 Certified Reporting Co. Court Reporter - Attendance and Transcripts of Depositions - J. Harbin and T. Harbin | 4441 | | 764.90 | | 8559 | | | |
| Jul 31/2014 | 84371 Lawyer: KM  0.10 Hrs X 160.00 Reviewed motion to withdraw filed by Keenan Saulter. | | | | 16.00 | 8559 | | | |
| Aug 15/2014 | 84476 Billing on Invoice 8559 FEES      3418.00 DISBS     2010.66 | | | 0.00 | | 8559 | | | |
| Aug 19/2014 | 84609 Chicago Regional Council of Carpe PMT - | 01510 | 548.13 | | | | | | |
| Aug 29/2014 | 84736 Chicago Regional Council of Carpe PMT - | 01518 | 5428.66 | | | | | | |
| Sep 11/2014 | 85629 Lawyer: KM  0.50 Hrs X 160.00 Reviewed correspondence from N. Lagalo regarding ███████████. Arranged with S. Keating ███████. Reviewed bankruptcy petition filed by Imperium. Prepared correspondence to N. Lagalo ███████████████. | | | | 80.00 | 8676 | | | |
| Sep 16/2014 | 85015 Billing on Invoice 8613 | | | 0.00 | | 8613 | | | |
| Sep 23/2014 | 85300 Lawyer: KM  1.30 Hrs X 160.00 Appeared in court before Judge Castillo for hearing on Trust Funds' continued motion to reinstate and K. Saulter's motion to withdraw. | | | | 208.00 | 8676 | | | |
| Sep 24/2014 | 85601 Lawyer: KM  0.10 Hrs X 160.00 Reviewed ECF court order of Judge Castillo granting motion to withdraw to Keenan Saulter and entering default against Imperium. | | | | 16.00 | 8676 | | | |
| Sep 25/2014 | 85296 Lawyer: JS  1.70 Hrs X 160.00 Drafted motion for entry of judgment including draft order and declaration. | | | | 272.00 | 8676 | | | |
| Sep 29/2014 | 85233 Lawyer: KM  0.50 Hrs X 160.00 Reviewed and revised motion for entry of judgment.  Telephone call with N. Lagalo regarding ████████████████████████. | | | | 80.00 | 8676 | | | |
| Sep 30/2014 | 85373 Expense Recovery Photocopy Recovery | 00297 | | 3.60 | | 8676 | | | |
| Oct  1/2014 | 86008 Lawyer: KM  0.30 Hrs X 160.00 Telephone call with N. Lagalo ████████████████████████████. (.2)  Reviewed correspondence from N. Lagalo ███████████. (.1) | | | | 48.00 | 8740 | | | |
| Oct  2/2014 | 86018 Lawyer: KM  0.90 Hrs X 160.00 Reviewed correspondence from N. Lagalo ███████████.  Prepared correspondence to S. Keating ███████████. (.1) Reviewed revised declaration of J. Libby and made final revisions to same. (.3) Revised motion to fill in damage amounts for interest and liquidated damages based on correspondence from N. Lagalo. (.3)  Prepared correspondence to J. Libby ███████████████████. (.1) Reviewed correspondence from J. Libby ███████. (.1) | | | | 144.00 | 8740 | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | General Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Trust Activity Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct 7/2014 86036 | Lawyer: KM 3.00 Hrs X 160.00 Reviewed billing records for entire case to extract time billed to matter pending before Judge Castillo against Imperium from time for case bending before Judge Norgle against individual Imperium members. (1.3) Drafted order of judgment for prove up of damages. (.2) Prepared declaration of K. McJessy in support of award of attorneys fees. (.3) Edited and revised petition for prove up of damages and reviewed billing statement and redactions of attorney-client information. Completed information in petition for filing of same. (1.2) | | | | 480.00 | | 8740 | | | |
| Oct 8/2014 85316 | Lawyer: SK 0.60 Hrs X 60.00 Prepared notice of motion for motion to prove up damages and for final judgment; filed motion to prove up damages and judgment with court; filed notice of motion with court; prepared correspondence to Judge Castillo forwarding courtesy copies of same. | | | | 36.00 | | 8740 | | | |
| Oct 8/2014 85917 | Expense Recovery Postage Recovery | 00299 | | 2.66 | | | 8740 | | | |
| Oct 8/2014 86047 | Lawyer: KM 0.60 Hrs X 160.00 Final review and edits to petition to prove up damages prior to filing and reviewed all attached exhibits to ensure that all damages claimed match all of the supporting documentation. | | | | 96.00 | | 8740 | | | |
| Oct 14/2014 85400 | Lawyer: KM 1.30 Hrs X 160.00 Appeared before Judge Castillo for hearing on prove up of damages, petition granted and order entered. Prepared correspondence to N. Lagalo and J. Libby███████ | | | | 208.00 | | 8740 | | | |
| Oct 16/2014 86086 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court notice of entry of final judgment by Judge Castillo. | | | | 16.00 | | 8740 | | | |
| Oct 20/2014 85658 | Billing on Invoice 8676 FEES     656.00 DISBS     3.60 | | | 0.00 | | | 8676 | | | |
| Oct 28/2014 85853 | Lawyer: KM 2.00 Hrs X 160.00 Reviewed Court's Order setting schedule on due dates of proposed findings of fact and conclusions of law and reviewed Local Rules regarding preparation of proposed findings of fact and reviewed local rules on pretrial order preparation and submission. (1.0) Started very preliminary preparation of proposed findings of fact and conclusions of law. (1.0) | | | | 320.00 | | 8740 | | | |
| Oct 30/2014 85874 | PACEr PACR | 4509 | | 4.50 | | | 8740 | | | |
| Oct 31/2014 85890 | Expense Recovery Photocopy Recovery | 00298 | | 24.00 | | | 8740 | | | |
| Oct 31/2014 85972 | Tina Harbin Witness Fee - Trial Subpoena | 4517 | | 46.00 | | | 8740 | | | |
| Oct 31/2014 85974 | James Harbin Witness Fee - Trial Subpoena | 4518 | | 46.00 | | | 8740 | | | |
| Oct 31/2014 85976 | Marc Pugh Witness Fee - Trial Subpoena | 4519 | | 41.00 | | | 8740 | | | |
| Oct 31/2014 85978 | Salvador Lopez Witness Fee - Trial Subpoena | 4520 | | 45.00 | | | 8740 | | | |
| Nov 6/2014 86622 | Lawyer: KM 5.50 Hrs X 160.00 Drafted portion of CRCC Proposed Stipulations of Fact; reviewed documents as necessary to put together statements of fact including portions of depositions. | | | | 880.00 | | 8812 | | | |
| Nov 6/2014 86750 | Lawyer: JS 4.10 Hrs X 160.00 Research and draft conclusions | | | | 656.00 | | 8812 | | | |

| Date<br>Entry # | Received From/Paid To<br>Explanation | Chq#<br>Rec# | General<br>Rcpts | Disbs | Fees | Bld<br>Inv# | Trust Activity<br>Acc | Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|

of law section for plaintiffs'
proposed findings of fact and
conclusions of law pleading
including ERISA basis for
damages, jurisdiction, venue,
and post-judgment fees and
supporting case authority;
also search for case authority
to further support action
against silent-conspirator D.
Fuentes and as to
conspirators, generally.

Nov 7/2014   Lawyer: KM   9.40 Hrs X 160.00
86909   Completed drafting proposed     1504.00   8812
stipulations of fact and
revised the proposed
conclusions of law; edited and
revised same.  Reviewed
documents as necessary to
complete proposed stipulations
of fact and conclusions of law
including depositions of each
of the defendants and case
authority obtained from LEXIS
research; arrangements for
filing of same (completed at
7:45 PM).  (9.2)  Re-reviewed
rule regarding filing of
proposed findings of fact and
conclusions of law per local
rules prior to filing.  (.2)

Nov 7/2014   Lawyer: JS   5.00 Hrs X 160.00
86910   Continued research and drafted     800.00   8812
conclusions of law section
including limited liability
research and matching findings
of fact with conclusions of
law; also assist in reviewing
and editing findings of fact
section.

Nov 10/2014   Lawyer: SK   0.70 Hrs X 60.00
85981   Prepared trial subpoena for W.     42.00   8812
Davis, T. Harbin, J. Harbin,
Marc Pugh and Salvador Lopez
(.3); calculated witness fee
amounts for the 5 trial
witnesses (.2); prepared
subpoena compliance letter for
S. Lopez (.2).

Nov 10/2014   Expense Recovery
86706   Postage Recovery   00301     3.22     8812

Nov 10/2014   Lawyer: KM   0.70 Hrs X 160.00
86723   Worked with S. Keating for     112.00   8812
preparation of trail subpoenas
for Davis, Harbin, Harbin, Pugh
and Lopez.  (.3)  Prepared
correspondence to J. Libby
▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬
(.1)  Reviewed court notice of
transmittal of record on
appeal.  (.1)  Reviewed
correspondence from C. Conway
transmitting transcripts.
(.1)  Prepared correspondence
to J. Taylor asking whether he
will accept service of trial
subpoena on behalf of his
client.  (.1)

Nov 12/2014   Lawyer: KM   0.10 Hrs X 160.00
86743   Reviewed and responded to     16.00   8812
correspondence from J. Taylor
regarding his acceptance of
trial subpoenas on behalf of
his clients.

Nov 13/2014   Lawyer: KM   0.50 Hrs X 160.00
86064   Telephone call from "Bronco"     80.00   8812
(630) 330-5989 on behalf of
Salvador Lopez regarding
Lopez's receipt of the trial
subpoena, need for him to
appear at trial and discussion
of why S. Lopez has been
subpoenaed.  (.3)  Telephone
call from Bronco following up
on prior call, S. Lopez

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | General Disbs | Fees | Bld Inv# Acc | Trust Activity Rcpts | Trust Activity Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | confirms that he did maintain the time records and that he was asked to do so by the Union and asked Bronco to make arrangements with S. Lopez to come to MC&T office to review time records and need for S. Lopez to contact MC&T again as trial date grows closer. (.2) | | | | | | | | |
| Nov 13/2014 86121 | US Messenger & Logistics Courier Recovery | 4523 | | 15.92 | | 8812 | | | |
| Nov 14/2014 86247 | Chicago Regional Council of Carpe PMT - | 01537 | 659.60 | | | 8812 | | | |
| Nov 14/2014 86257 | Lawyer: SK  0.30 Hrs X 60.00 Prepared trial subpoena for M. Ragona, Legacy; prepared certificate of service upon parties of record of same. | | | | 18.00 | 8812 | | | |
| Nov 14/2014 86293 | Billing on Invoice 8740 FEES    1348.00 DISBS    209.16 | | | 0.00 | | 8740 | | | |
| Nov 14/2014 86762 | Lawyer: KM  0.40 Hrs X 160.00 Telephone call with M. Ragona regarding service of subpoena on M. Pugh who is no longer employed by Legacy Professionals and is no longer in the state of Illinois, discussed M. Ragona's involvement in the audit of Imperium as supervisor. (.3) Arrangements with S. Keating ▬▬▬▬▬▬▬▬▬▬▬▬; reviewed trial subpoena and signed same. (.1) | | | | 64.00 | 8812 | | | |
| Nov 17/2014 86436 | Marc Pugh Witness Fee - Trial Subpoena - Void | 4519 | | -41.00 | | 8812 | | | |
| Nov 17/2014 86912 | Lawyer: KM  0.10 Hrs X 160.00 Reviewed service of trial subpoena on S. Lopez; arranged with S. Keating ▬▬▬▬ | | | | 16.00 | 8812 | | | |
| Nov 18/2014 86439 | Lawyer: SK  0.20 Hrs X 60.00 Call from process server regarding issues with service of trial subpoenas upon M. Pugh at Legacy, Tina and James Harbin -- affidavits to follow. | | | | 12.00 | 8812 | | | |
| Nov 19/2014 86444 | Lawyer: SK  0.30 Hrs X 60.00 Reviewed process server's affidavit of service of trial subpoena upon S. Lopez; prepared and filed same with court; prepared correspondence to Judge Norgle forwarding courtesy copy of same. | | | | 18.00 | 8812 | | | |
| Nov 19/2014 86703 | Expense Recovery Postage Recovery | 00301 | | 7.44 | | 8812 | | | |
| Nov 20/2014 86458 | Lawyer: SK  0.50 Hrs X 60.00 Reviewed process server's affidavits of service upon James and Tina Harbin and prepared same for filing; filed affidavit of service of trial subpoena upon J. Harbin with court; filed affidavit of service of trial subpoena upon T. Harbin with court; prepared correspondence to Judge Norgle forwarding courtesy copies of same. | | | | 30.00 | 8812 | | | |
| Nov 21/2014 86490 | Chicago Regional Council of Carpe PMT - | 01540 | 1557.16 | | | 8812 | | | |
| Nov 21/2014 86837 | Lawyer: KM  0.20 Hrs X 160.00 Reviewed motion to continue trial date or for extension of time.  Prepared correspondence to J. Libby ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ | | | | 32.00 | 8812 | | | |
| Nov 24/2014 86915 | Lawyer: KM  0.10 Hrs X 0.00 Reviewed correspondence from J. Libby ▬▬▬▬▬▬  [NO CHARGE] | | | | 0.00 | 8812 | | | |
| Nov 25/2014 86515 | UPS Courier - UPS - recovery - | 4534 | | 21.58 | | 8812 | | | |
| Nov 25/2014 86526 | Lawyer: KM  0.20 Hrs X 160.00 Telephone call with Judge | | | | 32.00 | 8812 | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | Norgle's Courtroom Deputy Eric Fulbright regarding whether motion by James Taylor will be heard on Friday.  Prepared correspondence to J. Taylor advising of problem with noticed date for motion. | | | | | | | | |
| Nov 25/2014 86870 | Lawyer: KM  0.30 Hrs X 160.00 Telephone call to E. Fullbright regarding whether motion to continue trial date set for 12/29, day after Thanksgiving will be heard by the Court and advised that it will be stricken as the Court is not sitting that day.  Prepared correspondence to J. Taylor advising motion will be stricken and he will have to renotice.  (.2)  Reviewed ECF court order of Judge Norgle striking court date of 11/29/14.  (.1) | | | | 48.00 | 8812 | | | |
| Nov 26/2014 86529 | Lawyer: SK  0.60 Hrs X 60.00 Prepared notice of motion for motion for sanctions; filed motion for sanctions and notice of motion with court; prepared correspondence to Judge Norgle forwarding courtesy copies of same. | | | | 36.00 | 8812 | | | |
| Nov 26/2014 86878 | Lawyer: KM  2.60 Hrs X 160.00 Reviewed correspondence from J. Taylor advising renoticing motion.  Reviewed notice of motion for 12/5/14 for continuing trial date.  (.1) Online LEXIS research regarding whether proposed findings of fact can be deemed admitted for defendants' failure to respond as part of pretrial process and whether default can be entered where defendant is not ready for trial.  (1.5)  Prepared motion for sanctions against defendants.  (1.0) | | | | 416.00 | 8812 | | | |
| Nov 30/2014 86655 | US Messenger & Logistics Courier Recovery | 4538 | | 14.60 | | 8812 | | | |
| Nov 30/2014 86659 | US Messenger & Logistics Courier Recovery | 4538 | | 14.60 | | 8812 | | | |
| Nov 30/2014 86661 | US Messenger & Logistics Courier Recovery | 4538 | | 14.60 | | 8812 | | | |
| Nov 30/2014 86666 | Midwest Investigations Process Server recovery - Trial Subpoena on Salvador Lopez | 4539 | | 85.00 | | 8812 | | | |
| Nov 30/2014 86667 | Midwest Investigations Process Server recovery - Trial Subpoena on Legacy - Marc Pugh | 4539 | | 85.00 | | 8812 | | | |
| Nov 30/2014 86668 | Midwest Investigations Process Server recovery - Trial Subpoenas on T. Harbin and J. Harbin | 4539 | | 85.00 | | 8812 | | | |
| Nov 30/2014 86680 | Expense Recovery Photocopy Recovery | 00300 | | 38.04 | | 8812 | | | |
| Nov 30/2014 86874 | Midwest Investigations Process Server recovery - Trial Subpoena on Paul Jaquez (rush with skip trace) | 4544 | | 270.00 | | 8812 | | | |
| Nov 30/2014 87141 | LexisNexis Legal Research - | 4545 | | 54.36 | | 8812 | | | |
| Nov 30/2014 87142 | LexisNexis Legal Research - | 4545 | | 92.46 | | 8812 | | | |
| Nov 30/2014 87143 | LexisNexis Legal Research - | 4545 | | 43.51 | | 8812 | | | |
| Dec  1/2014 86593 | Lawyer: KM  6.30 Hrs X 160.00 Telephone call to M. Ragona to follow up on subpoena and testimony; prepared correspondence to M. Ragona following up on same.  (.1) Arrangements for subpoena to P. Jaquez, reviewed and executed same.  (.1)  Reviewed Rule 26(a) Disclosures to ensure that P. Jaquez and his 6/21/12 email were disclosed as witnesses and documents. (.1)  Telephone call with M. Ragona regarding arrangements | | | | 1008.00 | 8875 | | | |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|

for his testimony.  (.2)
Prepared list of trial
exhibits and reviewed
documents as necessary to
prepare same.  (1.4)   Started
drafting trial examination of
N. Lagalo and J. Libby.  (4.3)

Dec  1/2014  Expense Recovery
    87326    Postage Recovery              00302            0.96             8875

Dec  2/2014  Lawyer: KM  3.70 Hrs X 160.00
    86599    Telephone call to Bronco                            592.00     8875
             regarding time to meet with
             Salvador Lopez to discuss
             testimony.  (.1)  Meeting with
             J. Libby and N. Lagalo
             ██████████████████████
             ███████████  (2.9)
             Reviewed exhibit binder and
             exhibits gathered by S.
             Keating, made changes and
             reorganized same, arrangements
             with S. Keating to correct some
             of the exhibits which are not
             the right versions of the
             documents.  (.7)

Dec  2/2014  Lawyer: SK  1.80 Hrs X 60.00
    86603    Reviewed K. McJessy emails,                        108.00      8875
             deposition exhibits and audit
             referral file and assembled
             trial exhibits 1-33 including
             preparation of exhibit list.

Dec  3/2014  Lawyer: SK  0.20 Hrs X 60.00
    86605    Prepared email correspondence                       12.00      8875
             to J. Berglund forwarding 12/3
             court order and to notify
             McLeods of hearing date change.

Dec  3/2014  Lawyer: KM  5.70 Hrs X 160.00
    86607    Meeting with Salvador Lopez for                    912.00      8875
             the purposes of conducting a
             witness interview prior to
             trial next week regarding his
             knowledge of the Steward
             Timesheets signed by him.
             (.7)  Confer with J. Sopata
             regarding ██████████████████
             ███████████████████████████
             ███████  (.4)  Telephone call
             with N. Lagalo regarding
             ███████████████████████████
             ██████████  (.2)
             Reviewed correspondence from
             N. Lagalo ████████████████s;
             █████████████████████
             reviewed enclosures.  (.2)
             Reviewed and revised Exhibit
             index; reviewed assembled
             exhibits to produce to
             defendants in advance of the
             trial.  (1.7)  Telephone calls
             to J. Taylor to discuss
             exhibits, stipulations and
             trial matters but numbers
             disconnected; attempted to
             verify phone numbers; prepared
             correspondence to J. Taylor
             seeking to discuss trial
             matters.  (.2)  Telephone call
             with N. Lagalo regarding
             ███████████████████████████
             ███████████████████████████
             ███████████████████████████
             ██████████  (.2)
             Prepared correspondence to J.
             Libby regarding ██████████████
             ███████████████████████████
             ██████████████████
             (.3)  Reviewed ████████████
             ████████ produced by N.
             Lagalo, reviewed and arranged
             documents for production and
             to be included as additional
             exhibits, arranged with S.
             Keating to amend Exhibit index
             to add additional records and
             to prepare amended Rule 26(a)

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | disclosures.  (1.3)  Prepared correspondence to J. Libby | | | | | | | | | |
| | ▬▬▬▬▬▬▬▬▬▬ (.1) Final review of exhibit binder and exhibit index prior to arranging to have it scanned in for service upon defendants.  (.4) | | | | | | | | | |
| Dec  3/2014 87323 | Expense Recovery Postage Recovery | 00302 | | 1.38 | | 8875 | | | | |
| Dec  3/2014 87481 | Lawyer: JS  5.20 Hrs X 160.00 Research and trial preparation including research on admissibility of testimony of audit supervisor versus auditor providing authentication of audit report because audit no longer with Legacy so M. Ragona will substitute instead, admissibility of photocopies, Lopez' comments as to "Imperium not reporting" and hearsay, generally (3.6). Drafted third-party citations as to Harris Bank and Guaranty Bank (1.6). | | | | 832.00 | 8875 | | | | |
| Dec  4/2014 87370 | Lawyer: KM  2.30 Hrs X 160.00 Telephone call with P. Jaquez regarding receipt of subpoena, discussed his appearance at trial and his knowledge of the promissory note that he sent to MC&T in response to the audit, his current employer/position and likelihood that matter may be continued.  (.4)  Telephone call with J. Taylor regarding defendants' failure to respond to imperium's proposed findings of fact and conclusions of law and pending motion for extension of time set for hearing tomorrow 12/5/14. (.3)  Prepared letter to J. Taylor forwarding exhibits and exhibit list and seeking stipulation as to authenticity and admissibility of exhibits. (.3)  Completed review of documents compiled as trial exhibits to compare against letter to J. Taylor and gathered certain additional exhibits to include with exhibits.  (1.1)  Telephone call with M. Ragona regarding original audit period and confirm meeting tomorrow and asked questions from him about the foundation for his testimony.  (.2) | | | | 368.00 | 8875 | | | | |
| Dec  4/2014 87482 | Lawyer: JS  0.20 Hrs X 160.00 Discussion with K. McJessy and preparation for 12/5/14 motion hearing. | | | | 32.00 | 8875 | | | | |
| Dec  5/2014 87322 | Expense Recovery Postage Recovery | 00302 | | 7.00 | | 8875 | | | | |
| Dec  5/2014 87387 | Lawyer: KM  1.40 Hrs X 160.00 Telephone call with P. Jaquez regarding postponement of hearing date and arrangements to reschedule his trial appearance.  (.2)  Reviewed documents produced by Legacy Professionals as supplement to subpoena response.  (.4) Confer with M. Ragona regarding postponement of trial date and rescheduling his appearance at trial, conferred about his role in the audit of Imperium and preparation of the audit report, conferred about additional documents produced by Legacy Professionals in response to subpoena based on original audit which were hand | | | | 224.00 | 8875 | | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | General Rcpts | Disbs | Fees | Bld Inv# | Acc | Trust Activity Rcpts | Disbs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | delivered by M. Ragona this afternoon. (.4) Confer with N. Lagalo regarding ▮▮▮▮▮▮▮▮▮▮▮▮ (.4) | | | | | | | | | |
| Dec 5/2014 87483 | Lawyer: JS 1.50 Hrs X 160.00 Attended hearing on defendants' motion to continue trial at which court continued trial over plaintiffs' objection. | | | | 240.00 | 8875 | | | | |
| Dec 8/2014 86865 | Lawyer: SK 0.40 Hrs X 60.00 Confer with Bronco (on behalf of S. Lopez) confirming that 12/9 trial has been postponed until March 2015; reviewed process server's affidavit of trial subpoena upon P. Jaquez; filed same with court; and prepared correspondence to Judge Norgle forwarding file-stamped copy. | | | | 24.00 | 8875 | | | | |
| Dec 8/2014 87393 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed ECF court order of Judge Norgle granting motion to continue trial date, setting due date for response to proposed findings of fact and conclusions of law by defendants. | | | | 16.00 | 8875 | | | | |
| Dec 9/2014 87017 | Billing on Invoice 8812 FEES 4812.00 DISBS 804.33 | | | 0.00 | | 8812 | | | | |
| Dec 18/2014 87166 | UPS Courier - UPS - recovery - | 4550 | | 17.71 | | 8875 | | | | |
| Dec 18/2014 87167 | UPS Courier - UPS - recovery - | 4550 | | 21.33 | | 8875 | | | | |
| Dec 31/2014 87289 | US Messenger & Logistics Courier Recovery | 4564 | | 14.60 | | 8875 | | | | |
| Dec 31/2014 87291 | US Messenger & Logistics Courier Recovery | 4564 | | 14.60 | | 8875 | | | | |
| Dec 31/2014 87301 | LexisNexis Legal Research - December 2014 | 4566 | | 7.86 | | 8875 | | | | |
| Dec 31/2014 87302 | LexisNexis Legal Research - December 2014 | 4566 | | 25.34 | | 8875 | | | | |
| Dec 31/2014 87329 | Expense Recovery Photocopy Recovery | 00303 | | 105.40 | | 8875 | | | | |
| Jan 2/2015 87230 | Chicago Regional Council of Carpe PMT - | 01553 | 5616.33 | | | | | | | |
| Jan 7/2015 87915 | Lawyer: KM 0.10 Hrs X 160.00 Reviewed correspondence from N. Lagalo ▮▮▮▮▮▮▮ | | | | 16.00 | 8941 | | | | |
| Jan 15/2015 87346 | Lawyer: SK 0.10 Hrs X 60.00 Call from Salvador Lopez (872-218-1283): we are not to contact "Bronco" any more on his behalf; relayed 3/11/15 trial date and said he could call us week before or we would call him to confirm appearance. | | | | 6.00 | 8941 | | | | |
| Jan 20/2015 87540 | Billing on Invoice 8875 FEES 4368.00 DISBS 216.18 | | | 0.00 | | 8875 | | | | |
| Jan 22/2015 87597 | UPS Courier - UPS - recovery - | 4578 | | 3.28 | | 8941 | | | | |
| Jan 28/2015 88104 | Lawyer: KM 0.70 Hrs X 160.00 Prepared revised citation to discover assets to BMO Harris Bank to enforce judgment against Imperium. | | | | 112.00 | 8941 | | | | |
| Jan 30/2015 87743 | Lawyer: SK 0.60 Hrs X 60.00 Arrangements with clerk of court to issue CTDA to Guaranty Bank and CTDA to BMO Harris Bank. | | | | 36.00 | 8941 | | | | |
| Jan 30/2015 87745 | Lawyer: SK 0.60 Hrs X 60.00 Prepared notice of motion for CRCC motion for sanctions; filed motion for sanctions and notice of motion with court; prepared correspondence to Judge Norgle forwarding courtesy copies of same. | | | | 36.00 | 8941 | | | | |
| Jan 30/2015 88088 | Lawyer: KM 3.70 Hrs X 160.00 Additional LEXIS research on the issue of appropriate | | | | 592.00 | 8941 | | | | |

| Date Entry # | Received From/Paid To Explanation | Chq# Rec# | \|----- General -----\| Rcpts Disbs | Fees | Bld Inv# Acc | \|----------- Trust Activity -----------\| Rcpts Disbs Balance |
|---|---|---|---|---|---|---|

sanctions for failing twice to comply with Court order. (1.8) Prepared motion for entry of default judgment against Defendants for failing to properly respond to Court order requiring defendants to answer the proposed findings of fact and conclusions of law; reviewed record materials and case authority as necessary to prepare motion. (1.9)

**Jan 30/2015  88105**  Lawyer: KM  0.50 Hrs X 160.00  Prepared revised citation to Guaranty Bank to enforce judgment against Imperium.  — Fees 80.00  8941

**Jan 31/2015  87763**  Expense Recovery  Photocopy Recovery  00304  Rcpts 10.08  8941

**Feb  5/2015  88443**  Lawyer: KM  0.50 Hrs X 160.00  Telephone call with J. Davis regarding defendants failure to comply with Court's order again, failing to file response to proposed findings of fact and conclusions of law, motion for sanctions, hearing set for 2/6/15, his potential difficulty getting from criminal court to federal court, agreement to relay same to the Court, and a recent conflict of interest between him and J. Davis and intent to withdraw from the case.  — Fees 80.00

**Feb  6/2015  88418**  Expense Recovery  Postage Recovery  00307  Disbs 1.61

**Feb  6/2015  88444**  Lawyer: KM  2.30 Hrs X 160.00  Appeared in court before Judge Norgle regarding hearing on motion for entry of default based on defendants' repeated failure to abide by court orders. (1.4)  Prepared draft court order based on ruling in court. (.3)  Telephone call to J. Davis to advise of results of court hearing. (.1)  Reviewed docket entry for results of hearing. (.1)  Prepared correspondence to J. Libby and N. Lagalo regarding ██████████████ (.4)  — Fees 368.00

**Feb 10/2015  87855**  Chicago Regional Council of Carpe  PMT -  01571  Rcpts 4584.18

**Feb 12/2015  87876**  Lawyer: KM  0.20 Hrs X 160.00  Reviewed file for status of entry of order on sanctions, no order as of yet.  Telephone call to Judge Norgle's courtroom deputy regarding status of order, order entered and has been sent down to Clerk of Court's office for posting to docket, should be entered shortly.  — Fees 32.00

**Feb 12/2015  88446**  Lawyer: KM  0.20 Hrs X 160.00  Reviewed ECF court order of Judge Norgle granting motion for entry of default and setting prove up of damages petition due date. (.1)  Prepared correspondence to J. Libby and N. Lagalo ██████ ████████████████ (.1)  — Fees 32.00

**Feb 17/2015  88132**  Billing on Invoice 8941  FEES    878.00  DISBS    13.36  — Fees 0.00  8941

**Feb 23/2015  88452**  Lawyer: KM  4.80 Hrs X 160.00  Started drafting petition for prove up of damages, reviewed file materials related to damages for current audit and prior audit based on fraudulent statements by defendants in prior audit and drafted declaration of J.  — Fees 768.00

| Date | | Chq# | |----- General -----| | | Bld | |---------- Trust Activity ----------| |
|------|------|------|------|------|------|------|------|------|------|------|------|
| Entry # | Explanation | Rec# | Rcpts | Disbs | Fees | Inv# | Acc | Rcpts | Disbs | Balance |
| | Libby and declaration of K. McJessy in support of petition to prove up damages. | | | | | | | | | |
| Feb 28/2015 | Expense Recovery | | | | | | | | | |
| 88424 | Photocopy Recovery | 00308 | | 8.76 | | | | | | |
| Mar 2/2015 | Lawyer: KM 0.50 Hrs X 160.00 | | | | | | | | | |
| 88447 | Telephone call to N. Lagalo | | | | 80.00 | | | | | |
| | (.1) Reviewed correspondence from N. Lagalo | | | | | | | | | |
| | (.1) Revised petition in support of damages to include updated figures. (.3) | | | | | | | | | |
| Mar 2/2015 | Lawyer: KM 0.00 Hrs X 160.00 | | | | | | | | | |
| 88448 | Revised declaration of J. Libby in support of petition to prove up damages based on N. Lagalo's updated figures. (.2) Prepared correspondence to J. Libby | | | | 0.00 | | | | | |
| | (.1) | | | | | | | | | |
| Mar 3/2015 | Lawyer: KM 0.10 Hrs X 160.00 | | | | | | | | | |
| 88449 | Reviewed correspondence from J. Libby | | | | 16.00 | | | | | |
| Mar 13/2015 | Lawyer: KM 0.40 Hrs X 160.00 | | | | | | | | | |
| 88451 | Reviewed response by Harris Bank to citation. Reviewed response by Guaranty Bank to citation. | | | | 64.00 | | | | | |

| | |----- UNBILLED -----| | | |----- BILLED -----| | | |--- BALANCES ---| |
|------|------|------|------|------|------|------|------|------|------|
| | CHE | + RECOV | + FEES | = TOTAL | DISBS | + FEES | + TAX | - RECEIPTS | = A/R | TRUST |
| TOTALS | | | | | | | | | | |
| PERIOD | 0.00 | 10.37 | 1440.00 | 1450.37 | 5129.60 | 31978.00 | 0.00 | 36216.24 | 891.36 | 0.00 |
| END DATE | 0.00 | 10.37 | 1440.00 | 1450.37 | 5129.60 | 31978.00 | 0.00 | 36216.24 | 891.36 | 0.00 |

| | |----- UNBILLED -----| | | |----- BILLED -----| | | |--- BALANCES ---| |
|------|------|------|------|------|------|------|------|------|------|
| | CHE | + RECOV | + FEES | = TOTAL | DISBS | + FEES | + TAX | - RECEIPTS | = A/R | TRUST |
| FIRM TOTAL | | | | | | | | | | |
| PERIOD | 0.00 | 10.37 | 1440.00 | 1450.37 | 5129.60 | 31978.00 | 0.00 | 36216.24 | 891.36 | 0.00 |
| END DATE | 0.00 | 10.37 | 1440.00 | 1450.37 | 5129.60 | 31978.00 | 0.00 | 36216.24 | 891.36 | 0.00 |

REPORT SELECTIONS - Client Ledger

| | |
|------|------|
| Layout Template | Default |
| Advanced Search Filter | None |
| Requested by | ADMIN |
| Finished | Wednesday, March 04, 2015 at 01:35:09 PM |
| Ver | 13.0 SP2 (13.0.20140210) |
| Matters | 0180-IMPE |
| Clients | All |
| Major Clients | All |
| Client Intro Lawyer | All |
| Matter Intro Lawyer | All |
| Responsible Lawyer | All |
| Assigned Lawyer | All |
| Type of Law | All |
| Select From | Active, Inactive, Archived Matters |
| Matters Sort by | Default |
| New Page for Each Lawyer | No |
| New Page for Each Matter | No |
| No Activity Date | Dec/31/2199 |
| Firm Totals Only | No |
| Totals Only | No |
| Entries Shown - Billed Only | No |
| Entries Shown - Disbursements | Yes |
| Entries Shown - Receipts | Yes |
| Entries Shown - Time or Fees | Yes |
| Entries Shown - Trust | Yes |
| Incl. Matters with Retainer Bal | No |
| Incl. Matters with Neg Unbld Disb | No |
| Trust Account | All |
| Working Lawyer | All |
| Include Corrected Entries | No |
| Show Check # on Paid Payables | No |
| Show Client Address | No |
| Consolidate Payments | No |
| Show Trust Summary by Account | No |
| Show Interest | No |
| Interest Up To | Mar/ 4/2015 |
| Show Invoices that Payments Were Applied to | No |
| Display Entries in | Date Order |

# 13 CV 06366

# Exhibit  D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CHICAGO REGIONAL COUNCIL OF CARPENTERS    )
PENSION FUND, et al,                      )
                                          )
                    Plaintiffs,           )
                                          )
    -vs-                                  )    13 CV 06366
                                          )
WILLIAM A. DAVIS, III, et al,             )
                                          )
                    Defendants.           )
_____)


        The deposition of TINA HARBIN called by the

Plaintiffs for examination, pursuant to notice and

pursuant to the Federal Rules of Civil Procedure for

the District Courts of the United States, taken before

Sheryl F. Rose, a Notary Public and Certified Shorthand

Reporter within and for the County of Cook and the State

of Illinois, at 3759 North Ravenswood Avenue, Suite 231,

Chicago, Illinois, on the 8th day of July, 2014,

commencing at the hour of 12:30 o'clock p.m.

APPEARANCES:

1. McJESSY, CHING & THOMPSON, LLC, by
2. MR. KEVIN P. McJESSY
3. 3759 North Ravenswood Avenue
   Suite 231
4. Chicago, Illinois 60613
5.     Appeared on behalf of the Plaintiffs;
6.
7. MR. JAMES E. TAYLOR
   8055 South Stony Island Avenue
8. Chicago, Illinois 60617
9.     Appeared on behalf of William A. Davis, III
       and Dwain A. Fuentes;
10.
11. MS. TINA HARBIN
    6615 South Yale Avenue
12. Chicago, Illinois 60621
13.     Appeared Pro Se.
14.
15. ALSO PRESENT: Mr. John Libby
       Contributions Department
16.    Chicago Regional Council of
       Carpenters Welfare and Pension
17.    Funds
18.
       Mr. James Harbin
19.
20.
21.
22.
23.
24.

1. (Witness sworn)
2. WHEREUPON:
3.              TINA HARBIN
4. the deponent herein, called as a witness, having been
5. first duly sworn, was examined and testified as follows:
6.              EXAMINATION
7.           by Mr. McJessy
8. Q   Can you state your name for the record?
9. A   Tina Harbin.
10. Q   And can you spell your first and last name?
11. A   T-i-n-a  H-a-r-b, as in boy, i-n.
12. Q   Do you have a middle name?
13. A   Latosha, L-a-t-o-s-h-a.
14. Q   All right. And, Miss Harbin, even though we're
15. in an informal setting here in our conference room you
16. understand that you're under oath and that oath has the
17. same force and effect as if you were testifying in a court
18. of law, is that correct?
19. A   That's correct.
20. Q   Okay. A couple of instructions.
21.      I know you've been through a deposition
22. before.
23.      You were through one in the bankruptcy
24. proceeding that was filed by Imperium, correct?

1.              INDEX
2. WITNESS:
3. Tina Harbin

| | |
|---|---|
| 4. Examination by Mr. McJessy | 4 - 101 |
| Examination by Mr. Taylor | 101 - 103 |
| 5. Further Examination by Mr. McJessy | 103 - 105 |
| Further Examination by Mr. Taylor | 105 - 106 |

6.
7.
8. EXHIBITS:

| | |
|---|---|
| 9. Harbin Deposition Exhibit No. 1 | 13 |
| 10. Harbin Deposition Exhibit No. 2 | 31 |
| 11. Harbin Deposition Exhibit No. 3 | 50 |
| 12. Harbin Deposition Exhibit No. 4 | 61 |
| 13. Harbin Deposition Exhibit No. 5 | 65 |
| 14. Harbin Deposition Exhibit No. 6 | 65 |
| 15. Harbin Deposition Exhibit No. 7 | 66 |
| 16. Harbin Deposition Exhibit No. 8 | 66 |
| 17. Harbin Deposition Exhibit No. 9 | 67 |
| 18. Harbin Deposition Exhibit No. 10 | 67 |
| 19. Harbin Deposition Exhibit No. 11 | 44 |
| 20. Harbin Deposition Exhibit No. 12 | 75 |
| 21. Harbin Deposition Exhibit No. 13 | 80 |
| 22. Harbin Deposition Exhibit No. 14 | 85 |

23.
24.

1. A   That's correct.
2. Q   Just to refresh your memory, I'm going to give
3. you some ground rules for the deposition today. Hopefully
4. it will help things go faster, not slower.
5.      I'm going to ask you a series of questions
6. and hopefully you will give me the best answers that you
7. can.
8.      Is that fair?
9. A   That's fair.
10. Q   Okay. I will ask questions and you need to give
11. verbal responses, meaning yeses and nos are okay, but
12. uh-huhs, uh-uhs or nods or shakes of the head won't do.
13.      Is that fair?
14. A   That's fair.
15. Q   It's just that the court reporter can't take down
16. those kind of gestures.
17. A   Okay.
18. Q   I will also say that I am going to be asking
19. questions and you will know what my question is and you
20. will want to answer before I finish asking my question
21. just to keep things moving along, but I will ask that you
22. wait until I finish my question so that the court reporter
23. can take down a clear question and answer and if we're
24. talking over each other she can't do that.

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603

312-922-1666

1    A  Yes.

2    Q  All right. Imperium never disputed that it was

3  a member of the Chicago Regional Council of Carpenters --

4  strike that.

5          Imperium never disputed that it was a union

6  company bound by the Collective Bargaining Agreement with

7  the Chicago Regional Council of Carpenters, correct?

8    A  Correct.

9    Q  Can you in a nutshell -- I'm not looking for a

10  ten-minute dissertation, but can you describe for me how

11  Imperium came into the market of doing construction and

12  became a member with the union?

13    A  Well, Jim and my background is construction. So

14  we've been doing construction for twenty years now.

15          And that's how Imperium came to do -- you

16  know, came to -- you know, came to be doing construction

17  itself because of our background.

18    Q  Okay. Just briefly what's your background?

19    A  I'm a painter by trade.

20    Q  And what's Mr. Harbin?

21    A  The same. He's a painter by trade as well.

22    Q  And you've been doing that for some time?

23    A  Yes.

24    Q  And why did Imperium sign up with the union?

1    A  Oh, what was going on?

2          It was a job. I'm assuming the South Shore

3  High School was -- it was an opportunity to do that job

4  and we decided to become union based on an opportunity.

5    Q  So it got work that it had to be a union employer

6  to take the contract and you decided to do that?

7    A  Yes.

8    Q  Was that decision made collectively among all of

9  the members at that time?

10    A  Yes.

11    Q  Okay. And Mr. Brown would not have been a member

12  at that time?

13    A  No.

14    Q  So it would have been the four members?

15    A  Yes.

16    Q  When he left were the four members equal partners

17  with the company?

18    A  Yes.

19    Q  And was that -- the company is since dissolved,

20  is that correct?

21    A  That's correct.

22    Q  And it was voluntarily dissolved?

23    A  Yes.

24    Q  And up until the time it was dissolved were

1  Mr. Davis, you, Mr. Harbin and Mr. Fuentes, is that right?

2    A  That's correct.

3    Q  (Continuing) -- all equal partners?

4    A  On paper, no. Our Operating Agreement, yes.

5    Q  Can you explain that to me?

6    A  So when we decided to start the construction

7  company we wanted to make sure it was minority certified.

8  And in order to do that I had to be 51 percent owner.

9          And that's when we documented it to just

10  state that I was 51 percent owner so that we could get our

11  certification, but it was an internal agreement that it

12  still would be equal percentages amongst all the partners

13  regardless.

14    Q  Okay. Was the 51 percent ownership that you

15  would have, was that documented in writing?

16    A  Yes. I want to say it was because I had to turn

17  something into the City showing that.

18    Q  Okay. But the Operating Agreement still stated

19  that you were equal partners, is that correct?

20    A  I actually don't know. We had two operating

21  agreements. One was our original one and the one that we

22  revised to get a certification.

23          So I really don't know what's on there right

24  now.

1    Q  Was it your understanding that even after you

2  were somehow designated as the 51 percent owner that,

3  in fact, the four persons still had sort of an equal

4  interest in the business?

5    A  Yes.

6    Q  Did you share the profits of the company equally?

7    A  Yes. Even though we never had really profits,

8  but yes, if there was any disbursement, everything was

9  always equal.

10    Q  And can you give me an idea of what position each

11  person -- what role -- strike that.

12          Can you describe for me what role each

13  person served within the company after 2010 or beginning

14  in 2010 through the time the company was dissolved?

15    A  Well, it was -- you know, we were short staffed.

16  So it was more whatever need was there we just filled it

17  in, but, of course, my background, I had more experience

18  in the office. So that was primarily my role.

19          Jim Harbin with his background in

20  construction, his role was to manage the projects.

21          That role was shared with Bill Davis.

22          And to provide something for Tony to do he

23  would sporadically come out there as well to manage the

24  project, but I think that's pretty much it.

CERTIFIED REPORTING COMPANY         312-922-1666
11 E. Adams Street, Ste. 1606, Chg., IL 60603

1  A  Yes.
2  Q  All right. Was that the only project you did for
3  Pepper or did you do other projects?
4  A  I believe that was the only one.
5  Q  Okay. And who were your principal -- did you
6  have principal customers or was it a job-by-job basis?
7  A  When you say principal customers --
8  Q  Well, did you have customers you worked with
9  regularly or more than once or did you bid every project
10  separate and you didn't have any repeat customers?
11  A  We bid every project separately.
12     Were there repeat customers?
13     Yes. There were a few.
14  Q  Who were the repeat customers?
15  A  We had a repeat with Randolph Construction.
16  That was it.
17     It really wasn't in business that long.
18  Q  And let me ask you. That's sort of a segue,
19  I guess.
20     How did business go between 2010 and --
21  well, strike that.
22     The audit period that's at issue in this
23  lawsuit, more or less, is July of 2010 through
24  September 30th of 2011.

1     How was business during that period of time?
2  A  I can't really speak to the period of time. I
3  have no memory really of that period, but overall I could
4  just tell you it was -- just my overall feeling of how
5  things went, it was always stressful and tight. The cash
6  flow was never there.
7  Q  Okay. And that's going back from the time that
8  you started the business until the time it went out of
9  business?
10  A  From the time we became union to the time it went
11  out of business.
12  Q  When you say cash flow was always tight, meaning
13  it was always difficult to get bills paid on time, that
14  kind of thing?
15  A  It was difficult to have clients pay in a timely
16  fashion where we could pay our bills on time.
17  Q  So you didn't have money coming in timely and you
18  needed to get money out.
19     So that was creating a cash crunch?
20  A  Absolutely.
21  Q  Why was Imperium -- strike that.
22     Imperium was dissolved according to my notes
23  here on June 12th, 2013.
24     Does that sound about right to you?

1  A  I'm not sure of the date. I'm not even certain
2  about the year.
3  Q  Do you know why Imperium was dissolved?
4  A  Yes. We couldn't -- we just could not recover
5  from clients not paying us.
6  Q  And was that sort of a collective decision to
7  dissolve the company among the partners?
8  A  Yes.
9  Q  Okay. How did you refer to the different owners
10  of Imperium?
11     Were they referred to as partners?
12  A  Yes.
13  Q  And except for the one change in ownership when
14  Floyd Brown left and the four remaining partners became
15  equal owners there were no other changes in the ownership
16  of Imperium, is that correct?
17  A  That's correct.
18  Q  It was always the four of you after he left?
19  A  That is correct.
20  Q  All right. Were there different classes of
21  owners or were you pretty much all equal owners?
22  A  All equal owners.
23  Q  To your knowledge did Imperium ever prepare any
24  sort of formal resolutions or documents memorializing the

1  actions that it wanted to take?
2  A  Can you please clarify the question?
3  Q  Yes.
4     Are you familiar with, like, shareholders
5  resolutions or board of directors resolutions that a
6  corporation might pass memorializing some action that the
7  company has taken?
8  A  I have heard of it, but I'm not familiar with it.
9  No.
10  Q  Okay. Did Imperium ever -- well, let me ask the
11  question a slightly different way.
12     How were the decisions made by Imperium to
13  take various actions? How did the -- strike that.
14     How did the partners decide among themselves
15  to take various actions, for example, signing up with the
16  union?
17  A  We would have a meeting and talk about it.
18  Q  Okay. And it was sort of an informal meeting
19  where the four of you would get together and just discuss
20  how to manage the company?
21  A  Yes, but I wouldn't say it was informal. We
22  would meet every week. So we would talk about any issues
23  that's going on.
24  Q  Were there notes or an agenda maintained of those

7 (Pages 22 to 25)

1    meetings?
2    A   Initially when we first got started because we
3    were trying to get our certification so we had to keep
4    that, but it definitely kind of fell by the wayside.
5    Q   All right. How about after 2010?
6    A   No. Our meetings became less and less when we
7    really got kind of caught up with activity that was going
8    on.
9    Q   Now, I'm going to sort of cut to the chase on the
10   corporate records.
11         The account records and other corporate
12   records of Imperium were maintained, as I understand it,
13   at your house, is that right?
14    A   That is correct.
15    Q   And the records were damaged or destroyed in a
16   flood, is that correct?
17    A   That's correct.
18    Q   And when was that?
19    A   Okay. It was -- I want to say it had to have
20   been -- this is '14 -- maybe '12 or '13.
21         Maybe '13. Maybe '13.
22    Q   Somewhere in that time period?
23    A   Yes. It was like at the beginning of the year or
24   something.

1    Q   And what were the -- your company, I assume,
2    maintained time records for the work that was done by the
3   employees on the various jobs?
4    A   Well, the managing partners would keep up with
5   the time.
6    Q   While they were on the jobsites?
7    A   Yes.
8    Q   So that was part of the responsibility of the
9   project manager?
10    A   Yes.
11    Q   How would those records be maintained?
12    A   They would just be out there and write on there
13   who was out there and their hours and give them to me.
14    Q   Did you have some sort of formal sheet that they
15   would fill out or was it like just a scrap of notebook
16   paper or how would it be actually recorded?
17    A   Yes. It was -- I think we had a formal -- and
18   I'm really not sure.
19         I think we had a formal sheet, but I don't
20   think anybody used it. So it was just a sheet of paper
21   and they'd just submit the sheet of paper.
22    Q   So, for example, Mr. Harbin would be out on a
23   jobsite and he would write down who was there and how many
24   hours they worked?

1    A   Correct.
2    Q   And then he would give that to you and what would
3   you do with that?
4    A   Process payroll.
5    Q   And how would you do that?
6    A   I would enter it into the computer and keep up
7   with their time that way so we can figure out how much
8   time has been spent on a job and process payroll through
9   QuickBooks.
10    Q   And when you would enter the hours worked by the
11   workers, where would those be maintained in the computer
12   system?
13         Would it be maintained in QuickBooks? Would
14   it be maintained in a separate program? Would it be an
15   Excel spreadsheet?
16    A   It would be in QuickBooks.
17    Q   So you would actually -- you had a QuickBooks
18   entry for each of the workers and you would enter how much
19   time they worked each day?
20    A   I would enter -- yes. At the end of the week
21   I would enter their time.
22    Q   Okay. And did you keep track of the time on a
23   daily basis or a weekly basis in the computer?
24    A   It was daily, but it was done by the week.

1    Q   Totaled by the week?
2    A   Yes.
3    Q   But it was entered each day?
4    A   No. At the end of the week.
5    Q   Oh, I see.
6         So at the end of the week you would enter
7   all the time, but it would have the time for each day that
8   the workers had worked?
9    A   Yes.
10    Q   All right. And then what would happen to the
11   scraps of paper or the pieces of paper that the hours
12   would have been recorded on?
13         Would you throw those away or would you keep
14   those?
15    A   Well, at the time I had kept everything.
16   Everything was filed away.
17    Q   And what happened to those records?
18    A   Everything got destroyed in the flood.
19    Q   Including those daily time records?
20    A   Correct.
21    Q   And did the computer get destroyed in the flood
22   also?
23    A   Yes, it did.
24    Q   So if you wanted to recreate the hours that the

1  workers had worked, am I correct in assuming that you
2  would have no way to do that?
3     A  That is correct.
4     Q  Okay.  I'm going to ask the question slightly
5  differently.
6         If push came to shove and somebody said can
7  you give me any estimate on what the hours were that your
8  guys worked during the period of July 1st, 2010 through
9  September 30th, 2011, would you have any way to do that or
10  would you have to throw your hands up and say I don't have
11  any records and I just can't do it?
12     A  I would go to my bank statements and go to the
13  union reports and try to formulate some hours that was
14  worked based on those records.
15     Q  So you would go to the bank statements -- and I'm
16  going to sort of cut to the chase, too.  We'll get to this
17  a little bit more later, but some of your workers were
18  paid in cash, is that right?
19     A  That's correct.
20     Q  For the time that they were working during the
21  audit period, is that right?
22     A  That's correct.
23     Q  So you have some hours that you would be able to
24  ascertain from the union reports that you submitted,

1  correct?
2     A  Correct.
3     Q  But that doesn't contain all the hours, correct?
4     A  Correct.
5     Q  So some of the hours that were paid in cash, you
6  would go to the bank statements to see if you could
7  identify what payments were attributable to hours and
8  extrapolate from that, is that right?
9     A  I'm not sure if I would be able to do that from
10  the bank statements, but from guys who actually got paid
11  with a check, I would be able to formulate those hours.
12     Q  So you would be still a little short because you
13  wouldn't be able to account for the other hours, is that
14  right?
15     A  That's correct.
16     Q  Okay.  And you mentioned union reports.
17         I'm going to hand you what I have marked as
18  Exhibit -- these are the union reports.
19         If you flip through what I've marked as
20  Exhibit 2, these appear to be the union reports that were
21  submitted for the period July of 2010 through December of
22  2011.
23         If you could take a look at that exhibit and
24  tell me whether that's accurate?

1     A  Yes.
2     Q  And is that your signature that's on each of
3  those reports?
4     A  On some of them.  Yes.
5     Q  And on some of them it's not?
6     A  That's correct.
7     Q  Can you tell me for those that it's not your
8  signature do you recognize whose signature it is?
9     A  No.
10     Q  Okay.  Do you see where it has the month of each
11  report on it --
12     A  Yes.
13     Q  (Continuing) -- sort of in the upper right
14  corner?
15     A  Yes.
16     Q  Can you go through these and tell me which ones
17  are your signature and which ones aren't?
18     A  Okay.  July 10th.  It doesn't have a year.  I'm
19  assuming maybe 2011.  That is my signature.
20         August --
21     Q  I'll point out that there's a date stamp on the
22  bottom of them that would show when the Trust Funds
23  received it.
24         So assuming that July 10th is accurate and

1  the received date is accurate, that would suggest it's
2  actually July 2010 for the first one.
3     A  Okay.  So July -- do you want me to use the
4  received date or this (indicating)?
5     Q  Why don't you use the -- yes.  Use the received
6  date.
7     A  Okay.  August 26th, 2010, that is my signature.
8         August 8th, 2010 is my signature.
9         November 1st, 2010 is my signature.
10         November 17th, 2010 is my signature.
11         December 20th, 2010 is my signature.
12         February 8th, 2011 is my signature.
13         February 9th, 2011 is my signature.
14         Is that -- January 1st, 2011 is my
15  signature.
16         April --
17     Q  I think that's actually March 1st, 2011 because
18  it looks to be a statement for February of 2011.
19     A  Okay.  So March 1st, 2011 is my signature.
20         April 22nd, 2011 is not my signature.
21         May 2nd, 2011 is my signature.
22         July 1st, 2011 is my signature.
23         August 16th, 2011 is my signature.
24         November 3rd, 2011 is my signature.

CERTIFIED REPORTING COMPANY       312-922-1666
11 E. Adams Street, Ste. 1606, Chg., IL 60603

1          November 3rd, 2011 is my signature.
2          January 4th, 2012 is my signature.
3          And there's no signature there.
4          December 27th, 2011 is my signature.
5     Q    All right. And then can you explain for me the
6     process by which these contribution reports would be
7     filled out?
8     A    The process is I would look at my payroll
9     reports, whatever was on there, to submit it -- you know,
10    copy it onto the report here and submit it and based on
11    if funds were available.
12    Q    Okay. And the payroll reports, those were
13    generated -- are those the same reports that reflected the
14    checks that had been written to the workers?
15    A    That is correct.
16    Q    Did you use a -- when I say you, I mean Imperium.
17         Did you use a payroll service for your
18    payroll?
19    A    QuickBooks.
20    Q    Okay. QuickBooks.
21         So would QuickBooks generate the checks that
22    were paid to the workers?
23    A    Do you mean like an actual physical check?
24    Q    Correct.

1     A    No. I did the checks.
2     Q    You would actually do the checks. Okay.
3          And getting back to where I was a few
4     minutes ago before I got off on the reports, the time
5     records and the computer records no longer exist that were
6     maintained back during this period of time, is that
7     correct, between July 1st, 2010 and September 30th, 2011?
8     A    That's correct.
9     Q    Okay. And looking at these reports, it looks
10    like at least for a couple of months no hours were
11    reported.
12         I'm looking at December of 2010 and January
13    of 2011, February of 2011, March of 2011, April of 2011.
14    I take it, there wasn't much business during
15    that period of time?
16    A    I don't remember.
17    Q    Now, when workers were paid in cash, were their
18    hours not entered into the QuickBooks system?
19    A    Yes.
20    Q    It's correct that they were not entered?
21    A    That's correct.
22    Q    Okay. I think I understand.
23         So there could have been work during one of
24    these given months or more of these given months where

1     there's no hours reported, but if the workers had been
2     paid in cash you wouldn't have a record of that, is that
3     correct?
4     A    Well, let me say it this way.
5          We never had a full crew on cash. So if
6     there's no hours reported, nine times out of ten there was
7     no work going on.
8     Q    I see. Okay.
9          So normally there would be at least some
10    people reported or partial hours reported?
11    A    We generally don't do partial hours. It would be
12    whoever is on payroll is getting payroll. They're getting
13    their check.
14    Q    I'm going to take a big step back now.
15         We'll sort of come back to this later, but
16    who prepared Imperium's taxes?
17    A    Our accountant, Greg Kenner.
18    Q    And who would provide him with the records that
19    he needed to prepare the taxes?
20    A    I did.
21    Q    Where are Mr. Kenner's offices?
22    A    He's off of Jackson. I don't remember the
23    address, but he is here in Chicago.
24    Q    Is he with a firm or just his own?

1     A    He was with a firm. John E. Wilson.
2     Q    And did they prepare the taxes the entire time
3     that Imperium was in operation?
4          Well, strike that.
5          Did he prepare the taxes for 2010 and after?
6     A    I believe so.
7     Q    And you were responsible for managing Imperium's
8     payroll, is that correct?
9     A    That's correct.
10    Q    And each of the project managers were responsible
11    for keeping track of the on-site job hours, is that
12    correct?
13    A    That's correct.
14    Q    So -- and it's Tony Fuentes, is that right?
15    A    That's correct.
16    Q    Mr. Fuentes would be responsible for keeping
17    track of hours when he was managing a jobsite?
18    A    I'm not sure on that.
19    Q    Why is that?
20    A    Because I'm not sure -- I know he was out there.
21    I just don't know exactly what his role was and what he
22    did, why he was out there.
23         That's the best way to put it.
24    Q    Mr. Davis, would he be responsible for keeping

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603
312-922-1666

1  track of hours when he was out on a jobsite?
2      A   Yes.
3      Q   And Mr. Harbin was responsible for keeping track
4  of hours when he was on a jobsite?
5      A   Yes.
6      Q   All right.  And Imperium only used Harris Bank
7  for its banking services?
8      A   Yes.  No.
9          At the end I also used Guaranty, I think was
10  the name of the bank.
11      Q   And when you say at the end, what period of time
12  are you referring to?
13      A   It was, I want to say, maybe 2011.  Maybe the end
14  of the year.
15      Q   Okay.  And this is 3.
16          I'm just going to mark them so we're done.
17          I'm going to hand you Exhibits 3 through 10
18  and they are bank statements from Harris Bank dated months
19  from 2010 and 2011.
20          Do you see those?
21      A   Yes.
22      Q   Do those look like bank statements for Imperium
23  LLC?
24      A   Yes.

1      Q   And there's an address on there, 6615 South Yale.
2          Is that where the records for Imperium were
3  kept?
4      A   Yes.
5      Q   Was that your residence?
6      A   Yes.
7      Q   Did Imperium ever have like a separate office or
8  were the offices run out of your house?
9      A   It was ran out of my house.
10      Q   Is that where the records were when they were
11  damaged or destroyed?
12      A   Yes.
13      Q   Now, was Imperium's payroll run out of this
14  account?
15      A   Yes.
16      Q   Did Imperium have another checking account with
17  Harris besides this one or was this the only account?
18      A   This was the only checking account.
19      Q   Okay.  Did it have another account of some other
20  sort?
21      A   We had a line of credit.
22      Q   Okay.  A line of credit as well.
23          Would payroll be run out of the line of
24  credit?

1      A   No.
2      Q   What was the line of credit used for?
3      A   It was used just to fund the operation.
4      Q   So would checks drawn on the line of credit be
5  deposited into this account?
6      A   It would normally be a transfer.  I would just
7  transfer money from the line of credit into this.
8      Q   So it was an electronic transfer that you would
9  do online, for example?
10      A   Yes.
11      Q   Okay.  Do you remember how much the line of
12  credit was?
13      A   A hundred thousand.
14      Q   So checks weren't written out of the line of
15  credit to, like, workers?
16      A   Not to workers, no.
17      Q   And you didn't take cash out of that account?
18      A   Yes.  I mean, I would say so.  I think most of it
19  was done with transfers, but I'm sure from time to time we
20  did take cash out as well.
21      Q   All right.  Other than Guaranty Bank and Harris
22  Bank did Imperium LLC bank anywhere else?
23      A   No.
24      Q   And to the best of your recollection the account

1  at Guaranty was opened some time at the end of 2011?
2      A   Yes.  I want to say maybe October.  It probably
3  was like four or five months that it was open.
4      Q   And then it was closed in 2012?
5      A   I believe so.
6      Q   And the Harris Bank account is closed, I take it?
7      A   I haven't officially closed it, but, you know, we
8  no longer get statements or any correspondence on there.
9      Q   And the line of credit with Harris Bank, whatever
10  became of that?
11          Was there a balance due on that?
12      A   Yes.  The entire amount.
13      Q   The entire hundred thousand?
14      A   Yes.
15      Q   Is that still outstanding?
16      A   Yes.
17      Q   Has Harris Bank made any effort to collect on
18  that?
19      A   They just sent the correspondence like two weeks
20  ago.
21      Q   Demanding payment on the line of credit?
22      A   Yes.
23      Q   And is that line of credit personally guaranteed?
24      A   It's guaranteed by our home.

1  Q  What loan was that?
2  A  This loan was to Brown & Momen, M-o-m-e-n.
3  Q  And you paid them in cash?
4  A  Yes, I did.
5  Q  Like literally walked in with an envelope with
6  $7600 in bills?
7  A  More than that.
8  Q  And who was your contact at Brown & Momen that
9  you would pay them in cash?
10  A  Ernest Brown.
11  Q  Was that a loan that was memorialized in writing?
12  A  Yes.
13  Q  How was it memorialized in writing?
14  A  All the partners had to sign it. We personally
15  guaranteed that we would pay it.
16     I think it was 40,000. I can't remember.
17     It was to do the South Shore High School
18  project.
19  Q  Explain to me how that arrangement worked.
20     They were hiring you to -- were you hired by
21  Brown & Momen to do that project?
22  A  Brown & Momen is Sollitt, George Sollitt.
23     George Sollitt is a joint venture on the
24  project.

1  Q  So they hired you and then they loaned you money?
2  A  He did.
3  Q  He did personally?
4  A  Yes.
5  Q  His company or Brown & Momen loaned you the
6  money?
7  A  I don't know the particulars. I believe it was
8  him personally or his company.
9  Q  And who personally do you think might have loaned
10  you the money?
11  A  Ernest Brown.
12  Q  And it was $40,000?
13  A  I believe so if I remember correctly.
14  Q  And was that money deposited into your operating
15  account?
16  A  Yes.
17  Q  And then why was he making a loan to you if he
18  was hiring you?
19  A  Well, we never ever had operating capital. It
20  was always grossly under funded. So that was to help with
21  the operating capital.
22  Q  Did you have your line of credit with Harris Bank
23  at this time?
24  A  Yes. I want to say we did.

1  Q  Was the line of credit exhausted?
2  A  2010 we started this project. I don't know the
3  timeline.
4     Oh, no.
5     Yes. It was exhausted. The market changed
6  and we lost on our properties because we opened the
7  company to do real estate initially and we used our line
8  of credit to do that.
9     And that's what exhausted our line of
10  credit.
11  Q  Oh, I see. I think I get it.
12     So you opened the company to acquire
13  properties, fix them up and resell them and you had the
14  line of credit that you were using for that purpose?
15  A  Yes.
16  Q  So by 2010 when you started to go into sort of a
17  different line of work your line of credit was exhausted
18  because you had used it for those kind of endeavors?
19  A  That's correct.
20  Q  I see. Okay. So he was loaning you another
21  $40,000 so that you would be able to essentially fund the
22  work for this project?
23  A  Yes. It really wasn't to fund the work. We used
24  it for start-up costs because we had just became union and

1  we had to do bonds and all sorts of things. Insurance.
2  Q  Now, you would have just -- this is July 2010.
3     So you would have just joined up with the
4  union.
5     You would just be starting out sort of on
6  this venture, correct?
7  A  Yes.
8     Did we start the project in July?
9     I'm not sure when we started the project.
10     If we started in July, then this payment is
11  not accurate.
12  Q  Then the payment wouldn't be for that loan?
13  A  No.
14  Q  Okay. Well, looking back at -- well, I guess
15  I'm looking at the MARBA agreement and it says you're
16  bound to the current Collective Bargaining Agreement
17  effective June 1st, 2010 to May 31st, 2014.
18     So it wouldn't have been within a month that
19  you would have been paying it back, --
20  A  No.
21  Q  (Continuing) -- I'm assuming?
22     And that was the last payment for that
23  statement.
24     All right. If we can turn to Exhibit 4, if

1 you look at the first page there's August 9th for $3,258.
2 It says debit memo.
3 Do you see that?
4 A I do.
5 Q And that matches the first payment in the second
6 column on Exhibit 11 which is Mr. Lagalo's letter.
7 Do you see that?
8 A Yes, I do.
9 Q Okay. What's a debit memo?
10 A That is a good question.
11 It could be, you know, we were trying to get
12 a cashier's check, but I'm not sure.
13 Q You don't recall?
14 A No.
15 Q When you took cash out of the company's accounts
16 -- strike that.
17 When cash was taken out of the company's
18 accounts, who would do that?
19 A Myself or Bill Davis.
20 Q Why would Mr. Davis do it?
21 A He was the only other signer on the account.
22 Q Okay. I should have asked that.
23 The signers on the checking account were you
24 and Mr. Davis?

1 A That is correct.
2 Q Nobody else?
3 A Nobody else.
4 Q So on occasions when cash might be taken out of
5 the account he would do that, too?
6 A Yes.
7 Q Do you have any understanding that when you go to
8 the bank and fill out a withdrawal slip and present that
9 to the teller to withdraw money from an account that shows
10 up on a bank statement as a debit memo?
11 A No.
12 Q Okay. Would you have any records as you sit here
13 today at your disposal anywhere that you're aware of that
14 would explain what the $3,258 debit memo was used for?
15 A I don't believe so.
16 Q Okay. And if you turn to page 2 of that exhibit,
17 there's a highlighted entry for check 3103 for $8,000.
18 And if you flip back to the checks you'll
19 see that it's highlighted or circled in red there.
20 And would you agree that's a check payable
21 to cash?
22 A Yes.
23 Q And, again, do you have any idea what that would
24 have been used for?

1 A I'm not able to read the memo section. No.
2 Q Do you recall did you give the original bank
3 statements to your bankruptcy counsel?
4 A I believe I did.
5 Q To your knowledge does he still have them?
6 A I don't know. I have not talked to him since
7 last year.
8 Q All right. Did you ever get them back from him?
9 A I don't recall, but I think everything I gave him
10 was just the originals.
11 Q You did give him originals though?
12 You didn't give him a PDF file of the
13 statements?
14 A No. It was not a PDF.
15 I believe I gave him the originals.
16 Q Okay. I'm going to ask that you -- since he's
17 still, I guess, technically the counsel for Imperium or
18 may be, can you ask him to see if he has those original
19 statements?
20 A Yes.
21 Q And to get them back from him?
22 A Okay.
23 Q That may be helpful.
24 A Okay.

1 MR. TAYLOR: Can we go off the record for a
2 second?
3 MR. McJESSY: Sure.
4 (Whereupon a discussion was held
5 off the record)
6 MR. McJESSY: Let's go back on the record.
7 BY MR. McJESSY:
8 Q If we can turn to the next statement which is
9 Exhibit 5, September of 2010, if you turn to page 2,
10 there's two debit memos there.
11 Do you see that?
12 One is September 24th for $134.92. The
13 other is September 7th for $2,004.
14 Do you see that?
15 A Yes, I do.
16 Q Okay. Do you have any way to know what those
17 debit memos were used for?
18 A I do not.
19 Q And to the best of your knowledge you don't have
20 any records at your disposal that would explain what those
21 payments were used for?
22 A No.
23 Q Okay. And if you turn to Exhibit 6, if you'll
24 look at the first page of that, there's an October 8th

1   they?
2     A   They were from time to time. I'm not sure if it
3   was this project or not, but I do recognize it just doing
4   payroll.
5     Q   Do you know Hector Mata, M-a-t-a?
6     A   No.
7     Q   Do you know Martin Mata?
8     A   No.
9     Q   Do you recognize those as names of people that
10  worked for your company?
11     A   No.
12     Q   Do you still have any records that show the
13  persons who worked for your company?
14     A   That would have been in QuickBooks. So no.
15     Q   Okay.
16     A   Except for the reports that would show people who
17  worked for the company.
18     Q   The reports?
19     A   Union reports.
20     Q   Anything else that you would have?
21     A   No. I don't believe so.
22     Q   All right. Do you recognize -- you said you
23  recognize the name Carlos Contreras?
24     A   Yes.

1     Q   Do you recognize the name Raymond Aguilera?
2     A   No.
3     Q   That doesn't sound familiar?
4     A   No.
5     Q   Is Cameron Harbin related to you?
6     A   He's my stepson.
7     Q   Did he work for you?
8     A   Yes.
9     Q   Miguel Sanchez, is that a name that's familiar?
10     A   Yes. I remember Miguel.
11     Q   Did he work for you?
12     A   Yes.
13     Q   And you think Salvador Lopez did as well?
14     A   I believe so. I remember that name.
15     Q   How about Genaro Hernandez?
16     A   I don't remember his name.
17     Q   If you'd turn to the next page of that, I know
18  the handwriting isn't terribly legible, but do you
19  recognize any other names that are written there?
20     A   From what I can see it's the same people that
21  I recognized before.
22     Q   Okay. Do you recognize somebody with the last
23  name of Pinto?
24     A   I don't remember that name at all.

1     Q   Panto maybe, P-a-n-t-o?
2     A   That doesn't sound familiar.
3     Q   Let me show you what I have marked as Exhibit 13
4  and ask you if you recognize that document?
5     A   Yes, I do.
6     Q   And what is -- that's an Unsecured Promissory
7  Note is what it says at the top, is that correct?
8     A   That's correct.
9     Q   And that's a document you prepared?
10     A   Not by myself, but yes.
11     MR. TAYLOR: Can I make a standing objection?
12     I don't normally make it a practice to
13  interrupt other people's depositions, but I just want to
14  make an objection to any questions that relate to an
15  Unsecured Promissory Note in any way based upon relevancy.
16     I think that will do it.
17     And that way I don't have to object every
18  time you ask a question.
19     MR. McJESSY: All right. Fair enough.
20  BY MR. McJESSY:
21     Q   How was this document prepared?
22     A   On a computer.
23     Q   And if I understand correctly, you downloaded
24  some variation of this from the Internet, is that correct?

1     A   I believe so. Yes.
2     Q   Okay. And it is not an accurate -- strike that.
3     This document doesn't reflect an actual
4  transaction, is that correct?
5     A   That is correct.
6     Q   Okay. If I understand correctly, you prepared
7  this document to provide it to the Trust Funds or the
8  auditor to explain the purpose of the cash withdrawals
9  from the company, is that right?
10     A   That is correct.
11     Q   Okay. And my understanding is also that the
12  signatures on this document are all -- strike that.
13     That you signed each of the names that are
14  on this document, is that correct?
15     A   No. It's not correct.
16     Q   Who signed in each location that there's --
17  strike that.
18     There's three signatures on this document.
19     Who signed in each location and what is the
20  name that's written there?
21     A   Well, By is my signature, Tina Harbin.
22     Q   And you signed that?
23     A   Yes.
24     Q   Okay.

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603

1    A  I'm actually unsure who the other signatures are.
2  They don't look familiar.
3    Q  Okay.  So there's a signature on there that looks
4  like it's underneath your signature where it says lender
5  and it looks to be Jerry L. Lewis.
6       You didn't sign that?
7    A  No.
8    Q  And you don't know who did?
9    A  No.
10    Q  And then it says executed in the presence of and
11  there's a witness signature.
12       Do you know who signed that?
13    A  I don't.
14    Q  Do you know what the name is that's written
15  there?
16    A  It's trying to say James Harbin, III.
17    Q  Is Mr. Harbin your husband?  Is he the third?
18    A  Yes, he is.
19    Q  Do you recognize his signature based on having
20  seen it in the past many times?
21    A  Yes.
22    Q  All right.  And is that his signature?
23    A  No.
24    Q  All right.  And as I understand it, there never

1  was a loan from Jerry L. Lewis as evidenced by this
2  promissory note, is that correct?
3    A  That is correct.
4    Q  Okay.  The promissory note is dated December 1st,
5  2010, but since it was prepared to be presented to the
6  auditor of the Trust Funds do you know when the actual
7  date was that it was prepared?
8    A  I don't.
9    Q  Okay.  Do you think it would have been after the
10  date of the letter that's marked as Exhibit 11 which was
11  March 12th, 2012?
12    A  I'm going to say no because we used this for the
13  first audit.
14    Q  This was used for the first audit as well?
15    A  Yes.
16    Q  Okay.  So you think it was before that date then?
17    A  Yes.
18    Q  All right.  And were all of the partners aware
19  that this promissory note had been created?
20    A  Yes.
21    Q  And were all of the partners aware that it had
22  been given to the Trust Funds or their auditors --
23    A  Yes.
24    Q  (Continuing) -- to explain the cash payments that

1  were shown in the accounts?
2    A  Yes.
3    Q  Okay.  How was everybody aware of it?
4    A  We were all there when this promissory note was
5  being created.
6    Q  Okay.  Everybody was -- where was everybody?
7    A  At my residence and office.
8    Q  And all four people were there?
9    A  Yes.
10    Q  Okay.  And did all -- let me take a step way
11  back.
12       When you got the audit report from the
13  Trust Funds, the one that's attached to the letter dated
14  or the letter marked as Exhibit 11, was that audit report
15  given to all of the partners or were they made aware of
16  it?
17    A  Yes.
18    Q  Okay.  So all of the partners were aware that the
19  Trust Funds were demanding payment of audit discrepancies?
20    A  Yes.
21    Q  What was the response?
22    A  Nauseousness.
23    Q  That's honest.
24    A  It wasn't a good response.  You know, it's like

1  having one penny and having stuff being thrown at you.
2  You know, it's like what are we going to do about this.
3    Q  You didn't have the money to cover it, is that
4  right?
5    A  That's correct.
6    Q  It sounds, I guess, when you said nauseousness,
7  it was a horrible feeling, I take it?
8    A  It really was.
9    Q  All right.  And can I ask how did the idea come
10  up to use the promissory note to sort of explain the cash
11  payments?
12    A  Brainstorming.
13    Q  Sort of a collective part of the discussion, is
14  that it?
15    A  Yes.
16    Q  The Trust Funds wanted to know where the cash had
17  gone and that was an explanation?
18    A  Yes.
19    Q  All right.  I'm going to show you what I have
20  marked as Exhibit 14.
21       And this is an email to me from Paul Jaquez,
22  J-a-q-u-e-z.
23       Was he the attorney for Imperium for some
24  period of time?

1 A Yes. He worked for that company.

2  I'm sorry. I forget what they call it.

3 Q Smith Amundsen or something to that effect?

4  It's a law firm, correct?

5 A Yes. He wasn't our attorney, but you know how

6 they have someone that will help the attorney, I don't

7 know the name of that person.

8 Q Paralegal?

9 A Paralegal.

10 Q He was a paralegal for that law firm?

11 A I believe so.

12 Q Have you provided -- strike that.

13  Have you provided -- had you provided a copy

14 of the promissory note to that law firm?

15 A I believe I did.

16 Q Okay. And do you know who Heather Bailey is?

17 A She was the attorney for Imperium.

18 Q She was representing the company at that time?

19 A Yes.

20 Q And there's a -- the second to the last paragraph

21 of this letter that begins finally I have attached, do you

22 see that?

23 A Yes, I do.

24 Q It says basically I've attached a copy of a

1 promissory note that explains why Imperium was withdrawing

2 cash amounts as reflected in the audit.

3  Do you see that?

4 A Yes, I do.

5 Q Okay. And it says Imperium provided the union

6 with a copy of the original promissory note with the same

7 Waiver of Interest provision for a prior audit.

8  Do you see that?

9 A I do.

10 Q Okay. In sum, the statements that Mr. Jaquez is

11 putting in his letter aren't true, correct?

12  The payments weren't made pursuant to -- the

13 cash withdrawals weren't made pursuant to this promissory

14 note?

15 A That is correct.

16 Q When workers were paid in cash how did the

17 process work?

18  In other words, would somebody go to the

19 bank and get the money and take it to the jobsite and pay

20 them or did you keep the money at home and they would come

21 by the house?

22  What was the process?

23 A Someone would go to the bank, withdraw the cash

24 and take it to whatever project manager was out there.

1 Q And then they would just pay the workers in cash,

2 is that right?

3 A I believe so. Yes.

4 Q And was that typically done when work was worked

5 like on the weekend or could it have been done during the

6 week or was there no rhyme or reason?

7 A I'm going to say no rhyme or reason.

8 Q Sort of just randomly done?

9 A Yes.

10 Q And then the hours that were paid in cash just

11 weren't reported on the Fringe Benefit Contribution

12 Reports, is that right?

13 A That is correct.

14 Q Do you know Jerry Lewis?

15 A Yes, I do.

16 Q How do you know Jerry Lewis?

17 A He was a former client.

18 Q Okay. And to your knowledge is JLL, LLC a real

19 company?

20 A Yes, it is.

21 Q So you just put that information in there to make

22 the promissory note seem more plausible, is that it?

23 A I was trying.

24 Q All right. Mr. Lewis, I take it, doesn't know

1 anything about the promissory note?

2 A No.

3 Q And, I take it, the hope was that the promissory

4 note would cause the Trust Funds to adjust the audit and

5 you wouldn't owe contributions?

6 A That would have took away the nauseous feeling.

7 Yes.

8 Q Do you have -- I'm trying to think of how not to

9 do this in ten questions, but I'll just ask this.

10  If you had to estimate in some fashion based

11 on some actual records how many hours workers were paid in

12 cash, do you have any way to do that?

13 A I really don't. No.

14 Q Did Imperium hire subcontractors?

15 A I think maybe once or twice.

16 Q Okay. Not as part of its regular business?

17 A No.

18 Q Was Imperium signatory with any unions besides

19 the carpenters?

20 A Yes.

21 Q What else was it signatory to?

22 A Painters union, tapers union, laborers union.

23  MR. TAYLOR: What was the last one?

24  THE WITNESS: Laborers.

1  list.
2        Employees. Vendors. Unions.
3     Q    And then this is the last question.
4        Is it fair to say that some of the -- what
5  I'll call unpleasantries that we have talked about here
6  today were a result of trying to keep the guys paid?
7     A    Yes. It was all about that.
8        This was not a decision that was made to try
9  to put money into our pockets.
10       This was a decision solely to get the guys
11  paid.
12       And I know a lot of it is unorthodox, but we
13  were struggling in trying to find creative ways to not
14  ever send somebody home without their money.
15       MR. TAYLOR: That's all I have.
16       MR. McJESSY: You have the right to review the
17  transcript when the court reporter prepares it and to note
18  any errors that you believe occurred in the transcription
19  of your testimony.
20       So you can read what she typed up and if you
21  think it does not accurately reflect what you've stated,
22  you can write it on what they call an errata sheet that
23  contains the page and the error that you believe occurred.
24       You can't change your testimony.  In other

1  words, if you said five and she wrote down five, you can't
2  change your testimony now to four, but if you believe that
3  you said red and she wrote down green, you can note that
4  you believe she mistranscribed what you testified to.
5        Or, you can waive your testimony or waive
6  the right to review the transcript.
7        I don't care which you do, but the court
8  reporter needs to know.
9        Normally your own attorney would explain
10  this to you if you had an attorney present, but since you
11  don't, you need somebody to explain it to you and she
12  needs an answer.
13       So she needs to know whether you reserve
14  signature which means you reserve your right to read the
15  transcript when it's prepared before she sends it out or
16  whether you waive signature and don't want to read the
17  transcript before she sends it out.
18       Either way is fine, but she needs to know
19  from you what you'd like to do.
20       THE WITNESS: I would definitely like to read it.
21       MR. McJESSY: Then she'll reserve signature.
22       All right.  Very good.  We're done.
23       THE WITNESS: Thank you.
24         (Witness excused)

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
4  CHICAGO REGIONAL COUNCIL OF CARPENTERS  )
  PENSION FUND, et al,            )
5                       )
         Plaintiffs,    )
6                       )
   -vs-                 )  13 CV 06366
7                       )
  WILLIAM A. DAVIS, III, et al,   )
8                       )
         Defendants.    )
9  _____)
10
11
12       I, Tina Harbin, being first duly sworn,
  on oath, say that I am the deponent in the aforesaid
13  deposition; that I have read the foregoing transcript
  of my deposition, consisting of pages 1 through 107
14  inclusive, taken at the aforesaid time and place and
  that the foregoing is a true and correct transcript of
15  my testimony so given.
16
17
18
19       _____
          Tina Harbin, Deponent
20
  SUBSCRIBED AND SWORN TO
21  before me this _____ day
  of _____, 2014.
22
23  _____
24    Notary Public
25

1  STATE OF ILLINOIS  )
               ) SS.
2  COUNTY OF C O O K  )
3
4
5
6
7        I, SHERYL F. ROSE, CSR, a Notary Public, do hereby
8  certify that I am a court reporter doing business in the
9  City of Chicago, County of Cook, State of Illinois; that
10  I reported in machine shorthand the testimony given at the
11  deposition of Tina Harbin on the 8th day of July, 2014,
12  and that the foregoing is a true and correct transcript of
13  my shorthand notes so taken as aforesaid to the best of my
14  knowledge, skill and ability.
15
16
17
18
19       Sheryl F. Rose
          SHERYL F. ROSE,
20        Certified Shorthand Reporter
          Notary Public, Cook County, IL
21        License No. 084-001478
22
23  My notary commission
24  expires July 18, 2015.

28 (Pages 106 to 109)

# 13 CV 06366

# Exhibit  E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CHICAGO REGIONAL COUNCIL OF CARPENTERS      )
PENSION FUND, et al,                        )
                                            )
                    Plaintiffs,             )
                                            )
     -vs-                                   )      13 CV 06366
                                            )
WILLIAM A. DAVIS, III, et al,               )
                                            )
                    Defendants.             )
_____   )


          The deposition of JAMES HARBIN called by the

Plaintiffs for examination, pursuant to notice and

pursuant to the Federal Rules of Civil Procedure for

the District Courts of the United States, taken before

Sheryl F. Rose, a Notary Public and Certified Shorthand

Reporter within and for the County of Cook and the State

of Illinois, at 3759 North Ravenswood Avenue, Suite 231,

Chicago, Illinois, on the 8th day of July, 2014,

commencing at the hour of 3:15 o'clock p.m.

APPEARANCES:

1
2    McJESSY, CHING & THOMPSON, LLC, by
     MR. KEVIN P. McJESSY
3    3759 North Ravenswood Avenue
     Suite 231
4    Chicago, Illinois 60613
5        Appeared on behalf of the Plaintiffs;
6    MR. JAMES E. TAYLOR
     8055 South Stony Island Avenue
7    Chicago, Illinois 60617
8        Appeared on behalf of William A. Davis, III
         and Dwain A. Fuentes;
9
10   MR. JAMES HARBIN
     6615 South Yale Avenue
11   Chicago, Illinois 60621
12       Appeared Pro Se.
13   ALSO PRESENT: Mr. John Libby
                    Contributions Department
14                  Chicago Regional Council of
                    Carpenters Welfare and Pension
15                  Funds
16               Ms. Tina Harbin
17   *  *  *  *  *  *  *  *  *  *
18              I N D E X
19   WITNESS:
20   James Harbin
21       Examination by Mr. McJessy          3 - 39
22
23   EXHIBITS:
24   Harbin Deposition Exhibit No. 15         26

1    (Witness sworn)
2    WHEREUPON:
3            J A M E S     H A R B I N
4    the deponent herein, called as a witness, having been
5    first duly sworn, was examined and testified as follows:
6            E X A M I N A T I O N
7              by Mr. McJessy
8        Q   Mr. Harbin, can you state your name for the
9    record?
10       A   James Harbin, III.
11       Q   And do you have a middle name?
12       A   No.
13       Q   Okay. And you realize you're under oath?
14       A   Yes.
15       Q   You just sat through your wife's deposition?
16       A   Yes.
17       Q   Sat here for the whole thing?
18       A   Yes.
19       Q   Quite entertaining?
20       A   Very entertaining.
21       Q   All right.
22       A   Excruciatingly entertaining.
23       Q   And, remember, you're under oath.
24       A   Yes.

1        Q   Did she say anything in the course of her
2    testimony that you believe is wrong?
3        A   No.
4        Q   Okay. You believe that her testimony is
5    essentially an accurate reflection of your memory of the
6    series of events that she testified to?
7        A   Absolutely.
8        Q   All right. I wish I could say that that ended
9    our deposition, but it doesn't.
10           You know the rules of the deposition, but
11   because it's going to be a separate transcript and it's a
12   separate record I'm going to go ahead and make the same
13   sort of rules of the road that I outlined previously.
14           You're under oath. We're in an informal
15   setting, but it still has the same force and effect as
16   if we're in a court of law.
17           Is that fair?
18       A   Yes.
19       Q   All of your answers need to be verbal answers.
20   Yeses and nos are good. Uh-huhs, uh-uhs, nods or shakes
21   of the head aren't so good.
22           Fair?
23       A   Yes.
24       Q   I'll try not to talk over your answers if you try

1    not to talk over my questions.
2            Is that fair?
3        A   That's very fair.
4        Q   If you don't understand something, ask me and
5    I'll explain it.
6            If I ask a question and you answer it,
7    I'm going to assume you understood it.
8            Is that fair?
9        A   It's fair.
10       Q   If you need to take a break, let me know.
11       A   Okay.
12       Q   I would prefer not to take a break while there's
13   a question pending, but if you answer the question, then
14   we can take the break.
15           Your deposition will probably go a much
16   shorter period of time than your wife's did.
17           What was your role in Imperium?
18       A   Procuring contracts. Managing projects. Finding
19   workers. Being the liaison between our company and the
20   general contractor.
21       Q   Tell me about procuring contracts.
22           How would you go about doing that?
23           That's sales, right?
24       A   Pretty much. It works a little bit different in

1    Mr. Fuentes, you and Miss Harbin, correct?
2    A   That's correct.
3    Q   Did the partners of Imperium have titles?
4    A   Managing partners.
5    Q   Just managing partners?
6    A   Period.
7    Q   Nothing referred to as secretary, treasurer,
8    president, that kind of thing?
9    A   No.
10    Q   How was management of the company run?
11    A   In terms of -- I'm not sure I understand the
12    question.
13    Q   How did the four of you manage the company?
14      Was there one person who had more say than
15    the others or was it a collective decision-making process?
16    A   Collective.
17    Q   Everybody pretty much discussed what was to be
18    done and then you would agree on something and that's the
19    direction you would go?
20    A   Absolutely.
21    Q   Okay. Miss Harbin testified about sort of weekly
22    meetings that the company had in the beginning which sort
23    of faded off, but described sort of collective meetings of
24    the four partners to agree on things.

1      Is that your recollection?
2    A   Yes.
3    Q   That's accurate and consistent with what you
4    recall?
5    A   Yes.
6    Q   The corporate books and records were maintained
7    at your home?
8    A   Yes.
9    Q   Okay. And account records, things like that?
10    A   Yes.
11    Q   When you originally applied for the line of
12    credit with Harris Bank do you recall having to have any
13    financial information of the company or for the company?
14    A   I don't recall.
15    Q   But you applied for the line of credit right
16    around the same time that you created the company, is that
17    right?
18    A   Yes.
19    Q   Is there a reason that you and Mrs. Harbin had to
20    pledge your home as security for the line of credit, but
21    the other owners of the company did not?
22    A   I'm sure there was a -- what seemed like a good
23    reason at the time.
24      In hindsight it seems like just a

1    tremendously terrible decision, but that's about all I can
2    add to that.
3    Q   There was no particular thing that you can recall
4    or no reason that it was done?
5      They didn't have less involvement in the
6    company or anything like that?
7    A   No.
8    Q   Did you have any role in the preparation of
9    documents to give to the accountant to prepare the taxes?
10    A   Yes.
11    Q   What was your role?
12    A   In terms of -- in terms of the promissory note,
13    I did sign that promissory note. Yes.
14    Q   Well, that cuts way ahead of things, but sure.
15    A   Other than that note --
16    Q   There's a stack of documents in front of you to
17    your right.
18      The promissory note is Exhibit 13. I don't
19    know if they're in order.
20      Where did you sign?
21    A   Where it says executed in the presence of
22    witness.
23    Q   That's your signature there?
24    A   Yes.

1    Q   And the signature of Jerry L. Lewis, do you know
2    whose signature that is?
3    A   I do not.
4    Q   Okay. I mean, do you know who signed the name
5    Jerry L. Lewis?
6    A   I do not.
7    Q   And the promissory note, you heard your wife's
8    testimony, she said that was sort of a collective decision
9    by the members to come up with a way to address the
10    findings in the audit report.
11      Do you recall that?
12    A   Yes.
13    Q   Okay. Would you agree with that?
14    A   Yes.
15    Q   Okay. Can you describe for me that process?
16    A   This is something we need to do to get rid of
17    that nauseous feeling. We needed to do something.
18    Q   Okay. Your wife testified that when she received
19    the communication from the Trust Funds with the audit
20    report attached, and I'll just show you mine, I don't have
21    any secret notes on there, Exhibit 11, this letter to save
22    you the time of digging it out, do you recall seeing that
23    letter and the fringe benefit report that came with it?
24    A   Yes.

1  Q   Was that circulated to all of the members?
2  A   Yes.
3  Q   All of the members were aware that the Trust
4  Funds were demanding payment of unpaid fringe benefit
5  contributions?
6  A   Yes.
7  Q   And, so, the decision to use the promissory note
8  to respond to that audit was a collective decision by all
9  of the members?
10  A   Yes.
11  Q   Exhibit 11 references a number of cash -- checks
12  paid to cash and bank withdrawals that are shown on the
13  bank statements as debit memos.
14     Do you see those there that are listed on
15  Exhibit 11?
16  A   I do.
17  Q   And I walked through those with your wife while
18  you were here and they're in the bank statements.
19     Do you dispute that those checks were paid
20  to cash and that those debit memos exist?
21  A   I wouldn't have any knowledge of that at all.  I
22  wasn't responsible for that.
23  Q   Okay.  So you're not familiar with those checks
24  or those debit memos?

1  A   No.
2  Q   And you're not familiar with the bank statements?
3  A   Not at all.
4  Q   Did you ever -- in part, whatever your role was
5  with the company as you described it to me, would you have
6  ever had occasion to review the bank statements?
7  A   Never.
8  Q   That just wasn't what you did?
9  A   No.
10  Q   Would you have gone to the bank and withdrawn
11  cash from the bank accounts?
12  A   No.
13  Q   Could you have gone to the bank and withdrawn
14  cash from the bank accounts?
15  A   No.
16  Q   You were not an authorized signer on the
17  accounts?
18  A   That's true.
19  Q   Did you ever sign checks?
20  A   No.
21  Q   Okay.  Assuming that those -- well, strike that.
22     Would you deliver cash payments to workers
23  for hours worked?
24  A   Yes.

1  Q   Where would you get the cash?
2  A   From the office.
3  Q   Okay.  You kept cash in the office?
4  A   No.  I just would pick it up from the office.
5  Q   You would pick it up from the office?
6  A   Yes.
7  Q   Would Mr. Davis ever bring the cash -- would he
8  get cash?
9  A   Yes.
10  Q   Would he go to the bank and get cash?
11  A   Yes.
12  Q   And would he bring it to the jobsite to pay the
13  workers?
14  A   Yes.
15  Q   And you guys worked, as you described it, in
16  tandem.
17     So you were sometimes physically on the
18  jobsite together so you could see this, is that correct?
19  A   Yes.
20  Q   And was that done in part because the company was
21  stretched financially in trying to figure out a way to pay
22  workers and avoid fringe benefit contributions?
23  A   I wouldn't categorize it that way.
24     We did it because we normally were stretched

1  for cash because clients didn't pay us on time.
2  Q   Not an unusual fact in the construction industry,
3  I think, but -- so you didn't have the cash to pay the
4  fringe benefit contributions?
5  A   That's correct.
6  Q   And you wanted to make sure the workers got their
7  pay for the hours they worked?
8  A   That's correct.
9  Q   So you would pay the workers in cash and then
10  just not report the fringes because you didn't have the
11  money to do it?
12  A   Well, again, I wasn't responsible for reporting,
13  but as a company we understood we needed to pay the guys.
14  Q   The hours they were working?
15  A   Exactly.
16  Q   Did you know that the upshot of that was that
17  their hours would not get reported for the fringe benefit
18  contributions?
19  A   Yes.
20  Q   Okay.  Was that understood by all of the members?
21  A   Yes.
22  Q   Sir, I'm going to hand you a list.
23     I'm not going to mark it as an exhibit, but
24  I'll show a copy to Mr. Taylor.

1  Q   So it needed the loan from Brown & Momen to sort
2  of make that transition into its new phase of operation?
3  A   That's correct.
4  Q   Other than the four partners and the workers who
5  were actually working on the jobsite did Imperium have any
6  other employees?
7  A   No.
8  Q   It didn't have any office staff or anything like
9  that?
10 A   No.
11 Q   Were all of the partners aware that the workers
12 were receiving cash payments?
13      MR. TAYLOR:  Object. Calls for speculation.
14      You can answer.
15 BY THE WITNESS:
16 A   Can you repeat the question?
17 BY MR. McJESSY:
18 Q   Yes.
19      To the best of your knowledge were all of
20 the members of Imperium aware that the workers
21 were receiving cash payments?
22      MR. TAYLOR:  Same objection.
23 BY THE WITNESS:
24 A   Yes.

1  BY MR. McJESSY:
2  Q   Okay.
3  A   When you say workers, you mean partners or the
4  actual employees?
5  Q   I mean the actual employees.
6  A   Oh, no. No.
7  Q   I mean, were all of the -- were all of the
8  members -- were all of the partners of Imperium aware that
9  the carpenters, for example, and painters or whoever else,
10 you said you had laborers, were receiving cash payments?
11 A   Yes.
12 Q   For example, Miss Harbin was aware that the
13 workers were receiving cash payments?
14 A   Yes.
15 Q   You were aware the workers were receiving --
16 A   Yes.
17 Q   Mr. Davis was aware that the workers were
18 receiving --
19      MR. TAYLOR:  Objection. Calls for speculation.
20      I've got to squeeze it in before his answer.
21      MR. McJESSY:  I'm going to ask, you're going to
22 wait, he's going to object and then you can answer.
23      MR. TAYLOR:  And my objection is not suggesting
24 that you should not answer the question. It's just for

1  the record.
2  BY MR. McJESSY:
3  Q   Was Mr. Davis aware that the workers were
4  receiving cash payments?
5      MR. TAYLOR:  Object. Calls for speculation.
6  BY THE WITNESS:
7  A   Yes.
8  BY MR. McJESSY:
9  Q   Okay. Why do you think he was aware?
10 A   I watched him do it.
11 Q   Was Mr. Fuentes aware that the workers were
12 receiving cash payments?
13      MR. TAYLOR:  Objection. Calls for speculation.
14 BY THE WITNESS:
15 A   Yes.
16 BY MR. McJESSY:
17 Q   And why do you believe he was aware?
18 A   Because it was discussed.
19 Q   Okay. It was discussed among the partners?
20 A   Yes.
21 Q   And it was discussed among the partners at
22 meetings where you were present and he was present?
23 A   Yes.
24 Q   Do you recall how the audit report and

1  communications from the Trust Funds were distributed to
2  the members or how it was shown to the members?
3  A   No. I just remember the document being available
4  and us discussing it.
5  Q   At one of the meetings that you had?
6  A   Yes.
7  Q   And the expectation among the members was that
8  the promissory note would satisfy the Trust Funds and
9  cause them to adjust the audit?
10      MR. TAYLOR:  Let me jump in on that one.
11      Objection. Calls for speculation.
12 BY THE WITNESS:
13 A   The assumption was that it would attempt to do
14 that.
15 BY MR. McJESSY:
16 Q   And was that discussed among the members?
17 A   Yes.
18 Q   With you personally present?
19 A   Yes.
20 Q   Miss Harbin testified that there was a period
21 where the members received a salary or a payment for a
22 period of time from, I think, June to November of 2010.
23      Do you recall that testimony?
24 A   Yes.

CERTIFIED REPORTING COMPANY                                312-922-1666
11 E. Adams Street, Ste. 1606, Chg., IL 60603

1     Q   Does that sound right to you? Do you recall
2 that?
3     A   Yes.
4     Q   Okay. And do you recall that those payments were
5 made by check?
6     A   Yes.
7     Q   And did the amounts that she recited, that she
8 received about a thousand dollars a week, that you and
9 Bill Davis received about $700 a week and that Tony
10 Fuentes received about $600 a week, does that sound
11 right to you?
12     A   Yes.
13     Q   And what was the nature of that agreement to do
14 that?
15     A   In terms of what?
16     Q   Was it just we decided we're all entitled to a
17 salary so here's the amounts or how did it come to be that
18 that was the agreement?
19     A   Yes. Starting the project the assumption was we
20 were going to get paid for managing the project.
21     Q   This is July of 2010.
22       So this is you're starting on a new venture,
23 is that right?
24     A   Exactly.

1     Q   And this is a new project with -- I understand.
2       You've got a new business with a new
3 company?
4     A   Yes.
5     Q   And this was the South Shore project?
6     A   That's correct.
7     Q   The payments she mentioned stopped their
8 regularity within a few months, by like November.
9       Is there a reason for that?
10     A   Cash flow or lack thereof.
11     MR. McJESSY: I want to take five minutes to talk
12 to Mr. Libby.
13       (Whereupon a short recess was had.)
14 BY MR. McJESSY:
15     Q   Mr. Harbin, did you ever go with Mr. Davis to the
16 bank to withdraw cash?
17     A   On occasion.
18     Q   Okay. How many occasions?
19     A   A few times.
20     Q   All right. Do you know what the amounts were?
21     A   No.
22     MR. McJESSY: All right. I don't have any other
23 questions.
24     MR. TAYLOR: I do not have any questions.

1     MR. McJESSY: All right. You heard me explain to
2 your wife about the right to reserve signature.
3     I'll make it quick.
4     You have a right to reserve signature so
5 that you can review the transcript before the court
6 reporter prepares the transcript.
7     You can't change your testimony, but you can
8 note corrections or errors that you believe that the court
9 reporter made in the transcription of taking down your
10 testimony and converting it to a deposition transcript.
11     Do you wish to waive that right or reserve
12 that right?
13     THE WITNESS: Reserve the right to review.
14     MR. McJESSY: Very good. So you'll reserve
15 signature.
16     And we are done.
17
18
19
20     (Witness excused)
21     AND FURTHER THE DEPONENT SAITH NOT
22     ---
23
24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO REGIONAL COUNCIL OF CARPENTERS )
PENSION FUND, et al, )
                  )
    Plaintiffs,    )
                  )
-vs-          ) 13 CV 06366
                  )
WILLIAM A. DAVIS, III, et al, )
                  )
    Defendants.   )

    I, James Harbin, being first duly sworn,
on oath, say that I am the deponent in the aforesaid
deposition; that I have read the foregoing transcript
of my deposition, consisting of pages 1 through 40
inclusive, taken at the aforesaid time and place and
that the foregoing is a true and correct transcript of
my testimony so given.


    _____
    James Harbin, Deponent

SUBSCRIBED AND SWORN TO
before me this _____ day
of _____, 2014.


    _____
    Notary Public



Page 42

```
1    STATE OF ILLINOIS  )
                        ) SS.
2    COUNTY OF C O O K  )
3
4
5
6
7        I, SHERYL F. ROSE, CSR, a Notary Public, do hereby
8    certify that I am a court reporter doing business in the
9    City of Chicago, County of Cook, State of Illinois; that
10   I reported in machine shorthand the testimony given at the
11   deposition of James Harbin on the 8th day of July, 2014,
12   and that the foregoing is a true and correct transcript of
13   my shorthand notes so taken as aforesaid to the best of my
14   knowledge, skill and ability.
15
16
17
18
19
         SHERYL F. ROSE,
20       Certified Shorthand Reporter
         Notary Public, Cook County, IL
21       License No. 084-001478
22
23   My notary commission
24   expires July 18, 2015.
```

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603

312-922-1666

# 13 CV 06366

# Exhibit  F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CHICAGO REGIONAL COUNCIL   )
OF CARPENTERS PENSION      )
FUND, et al.,              )
                           )
            Plaintiffs,    )
                           )
        vs.                )   No. 13 CV 06366
                           )
WILLIAM A. DAVIS, III,     )
et al.,                    )
                           )
            Defendants.    )



            The deposition of WILLIAM A. DAVIS,

    III, called by the Plaintiffs for examination,

    taken pursuant to the Federal Rules of Civil

    Procedure of the United States District Courts

    pertaining to the taking of depositions, taken

    before DIANE M. NULICK, a Notary Public within

    and for the County of Cook, State of Illinois,

    and a Certified Shorthand Reporter of said

    State, at Suite 231, 3759 North Ravenswood,

    Chicago, Illinois, on the 9th day of July, A.D.

    2014, at 12:33 p.m.

1  PRESENT:
2  McJESSY, CHING & THOMPSON, LLC,
    (3759 North Ravenswood, Suite 231,
3   Chicago, Illinois 60613,
    (773) 880-1260), by:
4  MR. KEVIN McJESSY,
    mcjessy@MCandT.com,
5
       appeared on behalf of the plaintiffs;
6
7  LAW OFFICE OF JAMES E. TAYLOR, PC,
    (8055 South Stony Island Avenue,
    Chicago, Illinois 60617,
8   (773) 731-1970), by:
   MR. JAMES E. TAYLOR,
9   jtaylor@jetlaw.net,
10     appeared on behalf of the defendants.
11
   Also Present:
12
   Mr. John Libby, Chicago Regional Council of
13  Carpenters Pension Fund.
14
15
16
17
18
19
20
21
22
23
24

1
2          I N D E X
3
4  WITNESS: WILLIAM A. DAVIS, III
5
   EXAMINATION BY:              PAGE
6  Mr. McJessy              8
   Mr. Taylor             166
7
8
   DAVIS DEPOSITION EXHIBITS:
9
   No. 16                 13
10 No. 17                 17
   No. 18                 34
11 No. 19                 40
   Nos. 20 and 21         47
12 No. 22                140
13
14
15
16
17
18
19
20
21
22
23
24

1       (The witness was duly sworn.)
2
3       MR. McJESSY: You can go ahead and
4  swear in the witness.
5
6       (The witness was duly sworn.)
7
8       MR. McJESSY: All right.
9       Sir, can you state your name
10 for the record, please?
11      THE WITNESS: William A. Davis, III.
12      MR. McJESSY: All right.
13      And can you spell -- what's
14 the middle initial stand for?
15      THE WITNESS: Adam, A-d-a-m.
16      MR. McJESSY: All right.
17      And -- all right. And
18 without telling me anything you and your
19 attorney have talked about, you've had a --
20 you're represented by counsel here today?
21      THE WITNESS: Yes.
22      MR. McJESSY: All right.
23      And I imagine that he's had a
24 chance to describe for you what's going to

1  happen today, but I'm going to go ahead and set
2  forth a few ground rules that he's probably
3  already told you just so they're on the record.
4       You understand that you're
5  under oath here today?
6       THE WITNESS: Yes.
7       MR. McJESSY: Okay.
8       And you understand that even
9  though we're in a somewhat informal setting
10 here in our conference room that that oath has
11 the same force and effect as if you were in a
12 court of law; is that correct?
13      THE WITNESS: Yes.
14      MR. McJESSY: Okay.
15      Also, I'm going to ask you
16 questions, and hopefully you will give me the
17 best most truthful answer that you can. If I
18 ask a question and you don't understand it, ask
19 me to rephrase the question, and I will do my
20 best to do so.
21      Is that fair?
22      THE WITNESS: Sure.
23      MR. McJESSY: Okay.
24      If you -- if I ask a question

2 (Pages 2 to 5)

1  and you answer the question, I'm going to
2  assume that you understood my question; is that
3  fair?
4          THE WITNESS:  Yes.
5          MR. McJESSY:  Okay.
6          Also, all of your answers
7  need to be verbal responses, yeses and nos are
8  good.  Ah-huhs, uh-huhs, nods or shakes of the
9  head aren't so good because the court reporter
10 can't take down those kind of gestures; is that
11 fair?
12         THE WITNESS:  Yes.
13         MR. McJESSY:  Hand gestures won't
14 work either, but that was a pleasant hand
15 gesture for the record.
16         THE WITNESS:  Yeah, yeah.
17         MR. McJESSY:  It was the peace sign.
18         THE WITNESS:  Peace sign.  That's
19 right.
20         MR. McJESSY:  And, now, you've
21 thrown me off, a very effective action on your
22 part.  You've got me all verklempt at the
23 moment.
24         The other thing is, when I'm

1  asking a question, I will need you to wait
2  until I'm done asking the question before you
3  start answering, even if you know what I'm
4  going to ask, and that's so that the court
5  reporter can take down an accurate reflection
6  of what each of us is saying.  If we're both
7  talking at the same time, she's unable to do
8  that.
9          Is that fair?
10         THE WITNESS:  Yes.
11         MR. McJESSY:  And last but not
12 least, are you under any medication or under
13 the influence of any substances that would
14 impair your ability to give truthful answers
15 today?
16         THE WITNESS:  No.
17         MR. McJESSY:  Okay.
18
19
20
21
22
23
24

1          WILLIAM A. DAVIS, III,
2  called as a witness herein, having been first
3  duly sworn, was examined and testified as
4  follows:
5
6
7          EXAMINATION
8  BY MR. McJESSY:
9
10 Q.  Let's see.
11         Sir, what's your address?
12 A.  4415 South Ohkenwald, Ohkenwald.
13 Q.  Okay.
14         And is that Chicago?
15 A.  Yes, 60653.
16 Q.  Do you have any present intention to
17 move?
18 A.  No.
19 Q.  Okay.
20         And although you're
21 represented by counsel presently --
22 A.  Sorry.
23 Q.  That's all right.
24

1          (After a brief interruption,
2          the deposition was resumed
3          as follows:)
4
5  BY MR. McJESSY:
6  Q.  Okay.
7          You are presently represented
8  by counsel in this case.  And I would not
9  contact you directly under any circumstances
10 because you are represented by counsel, but can
11 you give me a phone number where you can be
12 reached?
13 A.  Ironically enough, 773 --
14 Q.  All right.
15 A.  -- 491-9100.
16 Q.  And is that a cellphone or a landline?
17 A.  Cell.
18 Q.  Okay.
19         And who's the carrier for
20 that?
21 A.  Verizon.
22 Q.  All right.
23         You were affiliated with
24 Imperium, LLC, correct?

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603

312-922-1666

1    A.  Yes.
2    Q.  Okay.
3        And briefly, you -- strike
4 that.
5        You were part of the start-up
6 of that company; is that correct?
7    A.  Yes.
8    Q.  Why was the company formed? How did
9 it come to be formed?
10   A.  It was an idea from Jim and Tina.
11   Q.  Okay.
12       It was their idea originally?
13   A.  Yes.  They had a company prior, and so
14 they had some experience in the field.
15   Q.  All right.
16       What was the company they had
17 prior?
18       MR. TAYLOR:  It will come to me.
19       THE WITNESS:  Yeah, I'm trying to
20 remember, too.  I don't know.
21       BY MR. McJESSY:
22   Q.  All right.
23       If it comes to you, let me
24 know.

1        MR. TAYLOR:  It's going to pop into
2 my head, one of our heads.  It's blocked out.
3 BY MR. McJESSY:
4    Q.  All right.
5        Did you -- how did you know
6 them?
7    A.  I actually went to college with Jim.
8    Q.  Oh, okay.
9        So you've known him for, at
10 least, some time?
11   A.  Since 1984.
12   Q.  All right.  Quite some time.
13       And do you remember what the
14 prior business was?
15   A.  Jim's prior business?
16   Q.  Yes.
17   A.  The same.  Carpentry.  Construction.
18   Q.  All right.
19       And what was Imperium
20 originally intended to do?  What were you --
21 what was the company formed to do?
22   A.  Lucent was the name of the company,
23 L-u-c-e-n-t.
24   Q.  All right.

1    A.  And it was formed to do
2 subcontracting, carpentry work.
3    Q.  All right.
4        And you said --
5        MR. TAYLOR:  Excuse me.  I think it
6 was called Lucent -- wasn't it called Lucent
7 Decorating?
8        THE WITNESS:  Yes, Lucent
9 Decorating.  Yes.  Very good.  Thanks.
10 BY MR. McJESSY:
11   Q.  Now, you said the company name was
12 Lucent Decorating, and then you said it was
13 formed to do.  I just want to be clear.  Was it
14 Lucent Decorating that was formed to do the
15 carpentry, or was it Imperium, LLC, that was
16 formed to do the carpentry?
17   A.  Both individually.
18   Q.  Both companies were?
19   A.  Yes.
20   Q.  Okay.
21       And was Imperium also going
22 to acquire properties?
23   A.  We talked about it.
24   Q.  Okay.

1        Can you give me -- off the
2 record.
3
4        (There was a discussion off
5        the record.)
6
7        MR. McJESSY:  All right.
8        We can go back on the record.
9
10       (WHEREUPON, the document was
11       marked Williams Deposition
12       Exhibit 16 for identification,
13       as of 7/9/14.)
14
15 BY MR. McJESSY:
16   Q.  Sir, I've handed you what's been
17 marked as Exhibit 16.  And it says, operating
18 agreement for Imperium, LLC, up at the top.
19       Do you see that?
20   A.  Yes.
21   Q.  And it looks like in very faint
22 writing, it says -- I'm going to take a venture
23 and say March, 2008.
24       Does that look right to you?

1  only reason I want to show you that, point out
2  those differences, is to ask whether you have
3  any recollection as to why there would be sort
4  of two slightly different pages for each of
5  these agreements.
6      A.  No, I do not.
7      Q.  Okay.
8          This doesn't refresh your
9  memory as to whether the agreement was, maybe,
10 altered or changed in any way?
11     A.  I don't recall ever making any changes
12 to the operating agreement.
13     Q.  All right.
14         Was this agreement, to your
15 knowledge, produced by you in response to the
16 discovery requests?  Did you gather this
17 document, or did this come from your counsel,
18 as far as you know?
19     A.  I may have produced this.  I know I
20 had a copy of it.  I don't recall specifically,
21 but I know I had a copy of the operating
22 agreement.
23     Q.  All right.
24         Well, that's -- that's fine,

1  then.
2          MR. TAYLOR:  I know the answer.  Do
3  you want me to answer?
4          MR. McJESSY:  Yeah, sure.
5          MR. TAYLOR:  I actually got the
6  operating agreements from Mr. Fuentes.
7          MR. McJESSY:  All right.
8          MR. TAYLOR:  That's not to say that
9  I may -- you know, may have them in my file.  I
10 drafted, at least, the original of that.  So --
11         MR. McJESSY:  All right.
12         MR. TAYLOR:  -- I probably have
13 something in my files, also.
14 BY MR. McJESSY:
15     Q.  All right.
16         And I notice, if you look at
17 the signature page, there isn't a signature for
18 Tina Harbin on this.
19         Do you know why that would
20 be?
21     A.  I would imagine it would have been on
22 a different page, but, no, I don't.
23     Q.  Okay.
24         Do you know whether your

1  version of this agreement has the signature
2  page for Tina Harbin?
3      A.  I hope it does, but I don't know.
4      Q.  All right.
5          And if you look at -- well,
6  strike that.
7          When you -- when Imperium was
8  first formed, what was the arrangement between
9  the parties as far as ownership interest goes?
10     A.  Tina had majority interest because it
11 was a minority company and a female company,
12 and the remainders of us had equal shares.
13     Q.  Okay.
14         And if you turn to page two
15 of Exhibit 16, it lists -- it looks like the
16 original members and their percentage interest.
17         Do you see that?
18     A.  Yes.
19     Q.  Okay.
20         Is that consistent with what
21 your recollection was when the company was
22 formed?
23     A.  Yes.
24     Q.  All right.

1          And there's a Mr. Brown
2  listed there.  Do you see that?
3      A.  Yes.
4      Q.  And did he, at one point, leave the
5  company?
6      A.  Yes.
7      Q.  And do you remember when that was?
8      A.  I don't remember the exact date, no.
9      Q.  All right.
10         Was it -- do you know whether
11 it was before 2010?
12     A.  2010?  We're in '14 now.  I don't
13 recall.
14
15         (There was a discussion off
16          the record.)
17
18         THE WITNESS:  Yes.  Yes.  Yes.  So
19 it was prior to 2010.
20 BY MR. McJESSY:
21     Q.  Okay.
22         And why is it that you think
23 that?
24     A.  Jim reminded me that one of the jobs

6 (Pages 18 to 21)

1  we performed -- I know that he was not with the
2  company when we did it.
3      Q.  Okay.
4      A.  Which was the South Shore High School.
5      Q.  All right.
6          And after he left, what was
7  the ownership interest of each of the parties?
8      A.  We, actually, did not sit down and
9  formulate a new number.
10     Q.  All right.
11     A.  A new percentage.
12     Q.  Was it -- as far as the day-to-day
13 operation and management of the company, was
14 it -- was it -- and I'm looking for after Mr.
15 Brown left.
16     A.  Okay.
17     Q.  So whatever date that was when you
18 continued operating the company after that
19 date.
20     A.  Ah-huh.
21     Q.  Was the operation of the company sort
22 of a collective effort among the four remaining
23 partners?
24     A.  Yes.

1      Q.  Okay.
2          And was the -- well, let me
3  take a step back.  The four members, as of the
4  departure of Mr. Brown, when the four of you
5  were left, what was the role that each of you
6  had?  Can you tell me, for each member, what it
7  was that each of you did?
8      A.  Tina was administration.
9      Q.  Okay.
10     A.  Jim was administration/planning.  I
11 was field project management.  And Tony
12 actually was pretty light in skills across the
13 board.  But we tried to assign him some field
14 duties, such as inventory control.
15     Q.  Okay.
16         Now, as of 2010 and forward,
17 can you describe for me generally what Imperium
18 was doing?
19     A.  We were doing subcontracting work for
20 large general contractors.
21     Q.  Okay.
22         And what kind of
23 subcontracting work?  What would you do?
24     A.  For instance, metal stud framing,

1  drywall, insulation, drop ceilings.
2      Q.  All right.
3      A.  Acoustical ceiling tiles.
4      Q.  All right.
5          Generally, the same kind of
6  work on various different projects?
7      A.  Yes.
8      Q.  And when you say Tina was
9  administration, what does that mean?
10     A.  She handled payroll.  She handled
11 interaction with the union.  She took care of
12 audits, basically everything associated with
13 the office.
14     Q.  Okay.
15         And "you," meaning Imperium,
16 was signatory with more than one union,
17 correct?
18     A.  Correct.
19     Q.  Do you know what unions Imperium was
20 signatory to?
21     A.  It was three, the carpenters union,
22 tapers union, and painting union -- painters
23 union.
24     Q.  Okay.

1          And when did it become
2  signatory with each of those unions, as best
3  you can recall?
4      A.  I have no idea.
5      Q.  Okay.
6          Why did it -- it wasn't
7  signatory with those unions when it was formed,
8  correct?
9      A.  Again, there was that transition from
10 Lucent to Imperium, so I don't know if they
11 kind of just rolled into it, if that was
12 possible, of if we had to redo it.  That wasn't
13 my role, so I don't know the details.
14     Q.  All right.
15         MR. TAYLOR:  You don't have to guess
16 at it, so tell us what you know of your
17 personal knowledge.
18         THE WITNESS:  I don't know.
19 BY MR. McJESSY:
20     Q.  You just don't recall?
21     A.  I never knew.  That wasn't my role.
22     Q.  Okay.
23     A.  Thank you.
24     Q.  All right.

7 (Pages 22 to 25)

1  have been homes or apartments -- you know,
2  small projects. This was a substantial
3  project.
4      Q.  Okay.
5          Were you familiar with the
6  finances for Imperium, LLC?
7      A.  To a degree, yes.
8      Q.  And generally how well it was doing,
9  whether -- well, strike that.
10         Were you familiar generally
11 with the cash flow of Imperium?
12     A.  To some extent, yes.
13     Q.  Okay.
14         And what was your
15 familiarity?
16     A.  During our meetings, Tina would update
17 us on the status of how we were doing cash
18 wise.
19     Q.  Okay.
20         And in 2010, do you remember
21 generally how well Imperium was doing?
22     A.  I don't recall, but it was okay.
23     Q.  It was okay.
24         Was it generally able to pay

1  its bills when they came due?
2      A.  It was tight. It was very tight.
3      Q.  Okay.
4          And why was that, do you
5  know?
6      A.  I don't have the details, no.
7      Q.  Okay.
8          But your recollection is that
9  the finances were tight at that time?
10     A.  Yes, always.
11     Q.  From 2005 onward?
12     A.  Yes. It's always been pretty tight to
13 pay the materials, pay the employees, and stay
14 afloat.
15     Q.  All right.
16         There wasn't any period where
17 the company was rolling in cash, I take it?
18     A.  Not that I know of.
19     Q.  All right.
20         Imperium was voluntarily
21 dissolved in June of 2013; is that correct?
22     A.  I don't recall.
23     Q.  Okay.
24         Was there a decision made by

1  the partners to dissolve Imperium?
2      A.  No.
3      Q.  You don't recall being a party to a
4  decision like that?
5      A.  I was not a party to a decision like
6  that.
7      Q.  Okay.
8          Are you aware that it was
9  dissolved?
10     A.  Yes.
11     Q.  Okay.
12         Do you know who made the
13 decision to do that?
14     A.  I don't know. I'd assume it was Jim
15 or Tina.
16     Q.  Okay.
17         Why would you assume that?
18     A.  Because Tony and I didn't have the
19 wherewithal to dissolve the company.
20     Q.  Okay.
21         Why not?
22     A.  We didn't make that -- that choice.
23 We didn't take that action.
24     Q.  Okay.

1          Could you have, do you know?
2      A.  I think we could have extracted
3  ourselves from the company. I don't think we
4  could have dissolved it based on the Articles
5  of Incorporation and the percentages. Tina had
6  a majority of the company, so my feeling was
7  that we could not have dissolved it ourselves.
8      Q.  Okay.
9          At any point, did the
10 members -- aside from the period -- well,
11 strike that.
12         Aside from the salaries that
13 we discussed that the members received from the
14 company, did the members take distributions out
15 of the company?
16     A.  There were distributions, I assume. I
17 would call it salaries.
18     Q.  Okay.
19         During what period of time do
20 you recall the members received salaries, then,
21 from the company?
22     A.  Primarily during the construction of
23 South Shore. Cash flow was such that it did
24 allow some distributions, so 2010, I guess.

1     A. Ah-huh.
2     Q. It says Spaulding, and then it says
3 senior, junior, CC, Cam, C-a-m, and I can't --
4 what's the other name there? Jenco? Jenero?
5     A. Jenero.
6     Q. J-e-n-e-r-o?
7     A. Correct.
8     Q. And it's underneath Spaulding.
9         Do you know what that's a
10 reference to?
11     A. No.
12     Q. And do you know who that's referring
13 to?
14     A. No. I would have to guess.
15     Q. Okay.
16         Did you ever do any projects
17 for Bovis Lend Lease?
18     A. No.
19     Q. How about for the CTA?
20     A. No.
21     Q. If you look at the second to the last
22 page, it looks like there's a list of -- oh,
23 can you tell me what that's a list of?
24     A. Which side?

1     Q. On the right-hand side.
2     A. Second to last?
3     Q. Second to the last page.
4     A. Right side?
5         That appears to be some job
6 hunting leads that I was pursuing.
7     Q. Okay.
8         By looking at that list, did
9 you get any of those projects?
10     A. This was for me, not for Imperium.
11     Q. Oh, you personally?
12     A. Yes.
13     Q. Okay.
14         And if you turn to the next
15 page --
16     A. Ah-huh.
17     Q. -- there's a reference to
18 W. E. O'Neil?
19     A. Right.
20     Q. The top column.
21         Is that a job that you had?
22     A. Not that I recall, no. That was a
23 pre-bid meeting.
24     Q. Do you remember having any projects

1 for W. E. O'Neil?
2     A. The University of Chicago bridge.
3 That was W. E. O'Neil.
4     Q. That was W. E. O'Neil. I see.
5         And do you remember having
6 any job for W. E. O'Neil after February 15,
7 2012?
8     A. No, I don't.
9     Q. Sir, are you aware of the workers for
10 Imperium being paid in cash?
11     A. I heard about that, yes.
12     Q. Okay.
13         Did you ever pay any of the
14 workers in cash?
15     A. Yes.
16     Q. Okay.
17         And when approximately did
18 you do that?
19     A. I don't recall.
20     Q. You don't recall.
21         Where did the cash come from
22 to pay the workers?
23     A. Tina provided it.
24     Q. Okay.

1     It came from her?
2     A. Yes.
3     Q. Did you ever withdraw any money from
4 Imperium's bank accounts to pay the workers in
5 cash?
6     A. Yes.
7     Q. Okay.
8         And on how many occasions did
9 you do that?
10     A. I think, twice.
11     Q. Do you remember what the amounts were
12 that you withdrew?
13     A. No.
14     Q. Do you remember approximately what the
15 amounts were?
16     A. No, I don't.
17     Q. Do you remember, were the amounts over
18 a thousand dollars?
19     A. Yes.
20     Q. Do you remember whether they were over
21 $10,000?
22     A. I don't believe so.
23     Q. Okay.
24     Oh, let me hand you what was

35 (Pages 134 to 137)

1 you're here giving testimony on today, were you
2 aware that the trust funds were demanding
3 payment of fringe benefit contributions?
4 A. I knew there were some financial
5 issues. I didn't understand the details of it.
6 Q. Were you aware that at one point the
7 trust funds -- well, strike that.
8 Were you aware that the
9 auditors on behalf of the Chicago Regional
10 Council of Carpenters Fringe Benefit Funds had
11 audited the fringe benefit contributions of
12 Imperium?
13 A. I knew we had audits periodically. I
14 didn't know specifically what they were
15 pertaining to.
16 Q. Okay.
17 Did you know that they were
18 pertaining to the carpenters fringe benefit
19 funds?
20 A. No.
21 Q. Okay.
22 Did you know that they had
23 any relation to the carpenters union?
24 A. Yes.

1 Q. All right.
2 What did you know?
3 A. Just that there were issues with
4 the carpenters union.
5 Q. Okay.
6 Did you know that the
7 carpenters were claiming that there were moneys
8 owed by Imperium?
9 A. No.
10 Q. Ms. Harbin never told you that?
11 A. Strike that. Yes, I knew that there
12 were some financial issues. Again, I didn't
13 know the detail of it.
14 Q. Okay.
15 And as best you can recall,
16 when did you become aware of that?
17 A. Near the end of our business.
18 Q. Okay.
19 And what would you
20 characterize -- what period of time would you
21 characterize as near the end of your business?
22 A. I don't recall the time frames.
23 Q. Do you recall the year?
24 A. No.

1 Q. So it could be 2013?
2 A. No.
3 Q. 2012?
4 A. Maybe.
5 Q. Is it fair to say it would be sometime
6 between two thousand -- during 2011 and 2012?
7 A. Yes.
8 Q. Okay. All right.
9 Going back to -- did you ever
10 see any of the bank account statements for
11 Imperium?
12 A. Yes.
13 Q. Okay.
14 MR. TAYLOR: Do you want these back?
15 MR. McJESSY: No. I want to go back
16 to this letter, Exhibit 11.
17 THE WITNESS: Ah-huh.
18 MR. McJESSY: Off the record.
19
20 (There was a discussion off
21 the record.)
22
23 MR. McJESSY: Let's go back on the
24 record.

1 BY MR. McJESSY:
2 Q. Sir, there's an exhibit that's marked
3 as Exhibit 11. I'm actually going to talk to
4 your counsel for a moment. It lists a series
5 of checks, check numbers that the trust funds
6 and their auditors assert were checks written
7 to cash in one column. And then in the other
8 column, it lists bank cash withdrawals. It
9 lists the dates and the amounts of the
10 withdrawals in cash. I think that we have an
11 agreement, that we can stipulate that those --
12 and I'm talking to your counsel now --
13 stipulate that those checks were, in fact,
14 written to cash and that those cash
15 withdrawals, in fact, occurred; is that fair,
16 Counsel?
17 MR. TAYLOR: I think it's fair.
18 We'll stipulate that the bank records
19 accurately reflect the checks attached and cash
20 withdrawals.
21 MR. McJESSY: Okay.
22 And those are the bank
23 account statements that were introduced as
24 exhibits yesterday that we went through; is

37 (Pages 142 to 145)

1  that fair?
2      MR. TAYLOR: That's fair.
3      MR. McJESSY: And just so the
4  record's clear, it's Exhibits 3 through 10.
5  All right?
6  BY MR. McJESSY:
7      Q. That actually helps shorten things up
8  a lot, that stipulation on the record. I'm
9  just going to hand you, then -- well, let me
10  ask you a couple of questions. You said you
11  could recall on -- I'm going to ask you again
12  because I just don't remember what you said. I
13  think you said, on two or three occasions, you
14  can recall withdrawing cash from the company's
15  accounts to pay the workers; is that correct?
16      A. Yes.
17      Q. Okay.
18      And two or three? Is that
19  the number you used?
20      A. Yes. Yes.
21      Q. Okay.
22      And you also said you've seen
23  the company bank statements. I'm going to show
24  you just one exhibit, Exhibit 4, and that's a

1  company bank statement, and it shows on
2  August -- there's a highlighted date on there.
3  Can you tell me what it is?
4      A. August 9.
5      Q. On August 9, it shows a debit memo of
6  $3,280. Do you see that?
7      A. $3,258.
8      Q. Thank you.
9      Do you have any recollection
10  or knowledge of whether that's reflecting a
11  cash withdrawal?
12      A. The debit memo? It appears to be as a
13  cash withdrawal, yes.
14      Q. Okay.
15      That's what you would
16  understand that entry to be?
17      A. Yes.
18      Q. Okay.
19      Now, with the understanding
20  that the -- I'm not going to ask you to look at
21  this column, which is the checks to cash. But
22  looking at the bank cash withdrawals -- and
23  there's a list of dates and a list of amounts
24  associated with those.

1      A. Yes.
2      Q. Which the reason we stipulated that
3  that's accurate is because that's what the bank
4  accounts show. But I don't want to walk
5  through each of the bank accounts with you
6  because that would take a while, and I think
7  that the records are fairly obvious.
8      A. Ah-huh.
9      Q. But looking at those dates and those
10  amounts, do you recall having made any of those
11  cash withdrawals?
12      A. No, I can't.
13      Q. Okay.
14      Looking at those amounts and
15  those dates, none of that information helps you
16  recall the amounts that you might have taken
17  out of the bank accounts?
18      A. No.
19      Q. All right.
20      And the amounts that are
21  listed there are everything from $134.92 up
22  to -- it looks like the largest amount is --
23      A. $6,700.
24      Q. -- $6,700?

1      A. Ah-huh.
2      Q. Your testimony was that it could have
3  been over a thousand dollars you withdrew.
4  Could it have been as much as $6,700?
5      A. I don't think so, no.
6      Q. You think that's a little high?
7      A. Yeah.
8      Q. Okay.
9      A. That would have raised a flag in my
10  mind.
11      Q. Okay.
12      A. I probably would have remembered that.
13      Q. Would $5,000 -- could that have been a
14  number?
15      A. I don't recall.
16      Q. You don't recall. All right.
17      You don't recall one way or
18  another --
19      A. No, it was a cash withdrawal.
20      Q. -- whether that amount could have been
21  an amount you withdrew?
22      A. No, I do not recall. I do not recall.
23      Q. Okay.
24      If you withdrew cash from the

38 (Pages 146 to 149)

1  account -- well, strike that.
2          Do you recall, when you
3  withdrew cash from the account, whether you
4  filled out a withdrawal slip?
5      A.  How did I do that?  I don't recall.
6      Q.  Okay.
7          If I understand your
8  testimony earlier, you didn't have checks,
9  correct?
10      A.  Correct.
11      Q.  So you couldn't have written a check
12  to cash; is that true?
13      A.  I had a checkbook for a week, and then
14  I gave it back.
15      Q.  Okay.
16          Do you recall writing any
17  checks on that account?
18      A.  I may have, and it may have been for
19  one of the withdrawals.
20      Q.  Okay.
21          You just don't recall?
22      A.  I don't recall specifically.
23      Q.  Okay.
24          And do you know where you

1          Just too long ago?
2      A.  Yes.
3      Q.  Are there -- do you have any documents
4  or anything at all that would help refresh your
5  recollection?
6      A.  If -- no.
7      Q.  Okay.
8          Do you have any documents or
9  other materials that would help refresh your
10  recollection as to who was paid in cash?
11      A.  No, I don't.
12      Q.  Okay.
13          Do you recall who was paid in
14  cash?
15      A.  No.
16      Q.  Okay.
17          Would -- is there or are
18  there any documents or information or anything
19  at all that would help refresh your
20  recollection as to how many hours the workers
21  worked who were paid in cash?
22      A.  No.
23      Q.  Okay.
24          And you don't recall the

1  would have made the withdrawals, what branch?
2      A.  There was a branch at 47th and --
3  and -- wait.  There was one in Hyde Park at
4  Cornell.  I think it was 47th and Cornell, 52nd
5  and Cornell.
6      Q.  All right.
7          And you think that would have
8  been where you would have done that?
9      A.  Yeah.
10      Q.  On each occasion?
11      A.  There were two branches in that area,
12  one there and the other on 47th and Drexel.
13      Q.  All right.
14          So somewhere around there?
15      A.  Ah-huh.
16      Q.  Is that a yes?
17      A.  Yes.
18      Q.  Sorry.  She can't take that down.
19      A.  Sorry.
20      Q.  All right.
21          Do you recall what project
22  you would have paid the workers cash on?
23      A.  No.
24      Q.  Okay.

1  hours that they worked?
2      A.  I do not.
3      Q.  Okay.
4          Was Mr. Harbin present when
5  you paid the workers in cash?
6      A.  I don't recall.
7      Q.  Okay.
8          And can you recall on how
9  many occasions that would have happened?
10      A.  That I paid them in cash?  Two to
11  three times.
12      Q.  Okay.
13          The same as the number of
14  withdrawals?
15      A.  Yes.
16      Q.  Okay.  All right.
17          The decision to pay workers
18  in cash, was that a collective decision among
19  all of the partners?
20      A.  It was more of a Tina directive.
21  Typically, it was that we got a check late and
22  couldn't cut a check.  So we had to deposit it,
23  get the cash, pay the employees.  And that was
24  part of one of the notes that I made about

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603

1  getting a -- no, that was something else.
2      Q.  There was no note about that?
3      A.  Yeah.  When I said "check status,"
4  that was something else.
5      Q.  Okay.
6          There was no note about that,
7  then?
8      A.  There was no note.
9      Q.  Okay.
10         If I understand your
11  testimony correctly, you were aware that there
12  was an -- I think the word you used was "issue"
13  with the carpenters regarding fringe benefit
14  contributions; is that correct?
15     A.  An issue with finances.
16     Q.  Finances.  Okay.  Fair enough.
17         And what do you mean by that?
18     A.  During our meetings, Tina had
19  mentioned that there was an issue with the
20  carpenters union.  Again, I never really
21  understood the union side of the business, and
22  so that was my extent of it.
23     Q.  Do you understand the difference
24  between the carpenters union and the carpenters

1  fringe -- strike that.
2          Do you understand the
3  difference between the carpenters union and the
4  carpenters fringe benefit funds?
5      A.  No.
6      Q.  Okay.
7          Was it your understanding
8  that the carpenters union was demanding payment
9  of money?
10     A.  Yes.
11     Q.  Do you know how much money they were
12  demanding?
13     A.  No.
14     Q.  Could you even estimate?
15     A.  No.
16     Q.  It could be a dollar.  It could be
17  $10,000 or a hundred thousand dollars?
18     A.  It could be either of those.
19     Q.  All right.
20         Did you have any
21  understanding of how that issue was resolved?
22     A.  No.
23     Q.  Did you have any understanding of how
24  that issue was going to be addressed with the

1  carpenters union?
2      A.  No.
3      Q.  What can you recall of your
4  discussions with Tina Harbin about that issue?
5      A.  Just that there was a financial issue,
6  so it was part of the debt that the company
7  had.
8      Q.  Anything else?
9      A.  No.
10     Q.  Okay.
11         You can't remember her saying
12  anything else to you about it or you saying
13  anything else to her about it?
14     A.  No, nothing in particular.
15     Q.  All right.
16         Did you discuss it with
17  anybody else?
18     A.  Outside of the company or -- no.
19     Q.  Did you discuss it with anybody else
20  within the company?
21     A.  She mentioned it during our meeting,
22  so we were all aware that there was an issue.
23  But the extent of it and the depth of it, no,
24  no one knew.

1      Q.  All right.
2          And when you say discussed it
3  during our meetings, is that the meeting of the
4  partners?
5      A.  Yes.
6      Q.  And that would have been you, Mr.
7  Fuentes, Mr. Harbin, and her?
8      A.  That's right.
9      Q.  Okay.
10         Anybody else?
11     A.  No.
12     Q.  Okay.
13         Do you remember on how many
14  occasions that was raised?
15     A.  No, I don't.
16     Q.  Was it more than one occasion?
17     A.  Yes.
18     Q.  Do you remember when was the last time
19  you received any money from Imperium?
20     A.  No, I don't.
21     Q.  I'm going to take a couple minute
22  break.  We may be done.
23
24

CERTIFIED REPORTING COMPANY                    312-922-1666
11 E. Adams Street, Ste. 1606, Chg., IL 60603

1  STATE OF ILLINOIS   )
2                     ) SS:
3  COUNTY OF C O O K  )
4
5        I, DIANE M. NULICK, a Notary Public
6  within and for the County of Cook, State of
7  Illinois, and a Certified Shorthand Reporter of
8  said state, do hereby certify:
9        That previous to the commencement of the
10  examination of the witness, the witness was
11  duly sworn to testify the whole truth
12  concerning the matters herein;
13        That the foregoing deposition transcript
14  was reported stenographically by me, was
15  thereafter reduced to typewriting under my
16  personal direction and constitutes a true
17  record of the testimony given and the
18  proceedings had;
19        That the said deposition was taken
20  before me at the time and place specified;
21        That the said deposition was adjourned
22  as stated herein;
23        That I am not a relative or employee or
24  attorney or counsel, nor a relative or employee

1  of such attorney or counsel for any of the
2  parties hereto, nor interested directly or
3  indirectly in the outcome of this action.
4        IN WITNESS WHEREOF, I do hereunto set
5  my hand and affix my seal of office at Chicago,
6  Illinois, this _____ day of
7  _____, 2014.
8
9
10
11
12
13  Notary Public, Cook County, Illinois.
14
15  C.S.R. Certificate No. 084-002029.
16
17
18
19
20
21
22
23
24

CERTIFIED REPORTING COMPANY
11 E. Adams Street, Ste. 1606, Chg., IL 60603
312-922-1666

# 13 CV 06366

# Exhibit  G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | 13 CV 06366 |
| v. | ) ) | Judge Norgle |
| WILLIAM A. DAVIS, III; *et al.*, | ) ) ) | |
| Defendants. | ) | |

## **FINAL JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 54,55 and 58, a final judgment is hereby entered in favor of the Chicago Regional Council of Carpenters Pension Fund *et al.* ("Trust Funds") and against defendants William Davis, III, Tina Harbin, James Harbin and Dawin Fuentes, jointly and severally, in the amount of $130,389.09 as follows:

A.  $65,524.70 in unpaid contributions;

B.  $1,494.00 for auditor's fees incurred by the Trust Funds to complete the audit;

C.  $9,707.49 in interest;

D.  $15,104.93 in liquidated damages; and

E.  $38,557.97 in reasonable attorneys' fees and costs the Trust Funds incurred in this action.

The Trust Funds shall also recover reasonable attorney' fees and costs incurred by the Trust

Funds in enforcing this order and any such further relief as this Court deems appropriate.

_____          _____
        Date                                        Judge Charles Norgle